### UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| ZHENLI YE GON, | ) | |
| c/o Central Virginia Regional Jail, | ) | |
| 13021 James Madison Highway, | ) | |
| Orange, Virginia 22960-2807, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Civil Action No. 7:11-cv-00575 |
| v. | ) | |
| | ) | |
| ERIC HOLDER, JR., Attorney General of | ) | |
| the United States, HILLARY RODHAM | ) | HEARING REQUESTED |
| CLINTON, United States Secretary of | ) | |
| State, GERALD S. HOLT, U.S. Marshal | ) | |
| for the Western District of Virginia, | ) | |
| EDWIN S. SLOANE, U.S. Marshal for | ) | |
| the District of Columbia, and | ) | |
| FLOYD AYLOR, Warden of the | ) | |
| Central Virginia Regional Jail, | ) | |
| | ) | |
| Respondents. | ) | |
| ——————————————— | ) | |

### CORRECTED AMENDED PETITION FOR HABEAS CORPUS
### BY A PERSON IN FEDERAL CUSTODY
### UNDER 28 U.S.C. §§ 2241 & 2243

COMES NOW Petitioner ZHENLI YE GON, by and through undersigned counsel, and

pursuant to this Court's Orders filed December 22, 2011 and May 9 & 16, 2012, respectfully

files this Corrected Amended Petition for Habeas Corpus, pursuant to 28 U.S.C. § 2241 and

2243, seeking such declaratory and injunctive relief as warranted to remedy the current,

prospective and unlawful detention of his person now called for by a Certificate of

Extraditability and Order of Commitment, issued on February 7, 2011, and to enjoin the

Respondents from further violating his constitutionally guaranteed rights by extraditing him to

Mexico.  In support, Petitioner states as follows:

## PREVIOUS RELATED HABEAS FILINGS

On February 10, 2011, Mr. Ye Gon filed his original Petition for Habeas Corpus in this Court, under 28 U.S.C. §§ 2241 & 2243, against Respondents Eric Holder, Jr., Hillary Rodham Clinton, Gerald S. Holt and Floyd Aylor. The case was docketed in this Court as Case No. 7:11-cv-00060 (W.D. Va.). As a part of that Petition, Mr. Ye Gon challenged a Certificate of Extraditability that had been entered the day before, on February 9, 2011, by U.S. Magistrate Judge M. Facciola of the U.S. District Court for the District of Columbia, in Case No. 1:08-mc-596 (D.D.C.). Mr. Ye Gon, through undersigned counsel, also later sought leave to supplement his habeas record, and to amend his original Petition.

After this original Petition was filed and served in Case No. 7:11-cv-00060 (W.D. Va.), Petitioner's counsel received a letter from Respondent Holt, in which Holt advised that he in fact was not the U.S. Marshal exercising custody over Mr. Ye Gon – that the U.S. Marshal actually exercising such authority was Edwin S. Sloane, the U.S. Marshal for the District of Columbia. When the Respondents later sought to dismiss all other federal Respondents in Case No. 7:11-cv-00060 (W.D. Va.), Mr. Ye Gon filed a separate Petition for Habeas Corpus in the U.S. District Court for the District of Columbia – Case No. 1:11-cv-860 (D.D.C.) – this time naming Respondent Sloane, as well as other Respondents. This Court then decided to also transfer its Case No. 7:11-cv-00060 (W.D. Va.) to the District of Columbia, where it was docketed as 1:11-cv-969 (D.D.C.) and consolidated with the case Mr. Ye Gon had filed in the District of Columbia against U.S. Marshal Sloane, Case No. 1:11-cv-860 (D.D.C.).

The U.S. District Court for the District of Columbia, however, transferred this case back to this District, in an order dated November 22, 2001. *See* Case No. 1:11-cv-969 (D.D.C.). It also separately dismissed Mr. Ye Gon's other Petition for Habeas Corpus, which had originally been filed in the District of Columbia (Case No. 1:11-cv-860), for lack of jurisdiction. Mr. Ye

Gon has appealed the dismissal of Case No. 1:11-cv-860 (D.D.C.), and that case is now pending on appeal before the D.C. Circuit.  *See Ye Gon v. Sloane et al.*, Appeal No. 11-5342 (D.C. Cir.).

The instant case was then re-transferred back to this Court, where it was re-docketed under a different case number, Case No. 7:11-cv-575 (W.D. Va.).  On December 22, 2011, this Court granted Mr. Ye Gon leave to file an Amended Petition for Habeas Corpus within 45 days.

## SUMMARY AND BACKGROUND OF THE PETITION

1.      Petitioner is a citizen of Mexico of Chinese origin who entered the United States legally, but who is currently detained within the U.S., and held at the Central Virginia Regional Jail in Orange, Virginia, in the Western District of Virginia, based on a request of the Mexican government, through the U.S. Department of Justice, for Petitioner's extradition to Mexico.

2.      Respondents are each individuals who currently exercise, or who in the future may exercise, custody and control over Petitioner, pursuant to a Certificate of Extraditability and Commitment Order issued on February 9, 2011 by U.S. Magistrate Judge John M. Facciola of the U.S. District Court for the District of Columbia.  Exhibit A.  Petitioner's federal custody is being administered by U.S. Marshal Edwin S. Sloane, through a contract with the Central Virginia Regional Jail, where Petitioner remains physically detained.

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 2241 *et seq.* and 28 U.S.C. § 1331.  Collateral review of a magistrate or district judge's order of extradition is available through habeas corpus review.  <u>Collins v. Miller</u>, 252 U.S. 364, 369-70 (1920).  *See also* <u>Medilius-Rodriguez v. Strickland</u>, 2007 U.S. App. LEXIS 24137 (4th Cir. 2007) ("A writ of habeas corpus is the only available means of challenging a magistrate judge's certification order.") (citing <u>Ordinola v. Hackman</u>, 478 F.3d 588, 598 (4th Cir. 2007)).

4.      Mr. Ye Gon has exhausted his administrative remedies to the extent required by law, and his only remedy is by way of judicial action.  As noted, the U.S. Government's request for a Certificate of Extraditability, at the behest of Mexico, was granted by a U.S. Magistrate in the District of Columbia, who further ordered that a certified copy of his Certificate of Extraditability and Order of Commitment be forwarded by the clerk of court to the U.S. Secretary of State, and that Mr. Ye Gon also remain in the custody of the U.S.  Exhibit A.

5.      No prior application for a writ of habeas corpus has been filed by Petitioner. While a separate habeas corpus petition was later filed in the District of Columbia, the instant case represents the continuation of Petitioner's original Petition for a Writ of Habeas Corpus, filed on February 10, 2011, and previously docketed in this Court as Case No. 7:11-cv-00060.

6.      Before granting a Certificate of Extraditability, the presiding federal judge was required to make the following findings:

- The judicial officer is authorized to conduct the extradition proceeding,

- the court has jurisdiction over the fugitive,

- the applicable treaty is in full force and effect,

- the crimes for which surrender is requested are covered by the applicable treaty, and

- there is sufficient evidence to support a finding of probable cause as to each charge for which extradition is sought.

On February 9, 2011, U.S. Magistrate Judge John M. Facciola of the District of Columbia did make such findings.  Exhibit B (hereinafter "Findings & Conclusions").

7.      Petitioner submits herein that that the Magistrate Judge's Findings and Conclusions were legally erroneous, and that in reality:

- the judicial officer was not legally authorized to conduct the extradition proceeding, since constitutional issues had been raised therein,

- the court did not have proper jurisdiction over Petitioner, since he had been arrested in the State of Maryland, rather than in the District of Columbia, and in fact had never voluntarily appeared in the District of Columbia,

- while a U.S.-Mexican extradition treaty was in full force and effect, *see* Exhibit C, its provisions did not legally support Petitioner's extradition in this case, for reasons set forth more fully *infra*,

- the crimes for which surrender was requested were not covered by the applicable U.S.-Mexican extradition treaty, for the reasons set forth more fully *infra*, and

- there was not sufficient evidence to support a finding of probable cause as to each charge for which extradition is sought.

8.      In addition, Petitioner was also previously prosecuted in the U.S. on related charges, but these U.S. criminal charges were dismissed with prejudice.  Mr. Ye Gon therefore also specifically notes that his continued detention and proposed extradition to Mexico are illegal, under the doctrine of *non bis in idem,* a legal principle of extradition jurisprudence arising from international double jeopardy principles, which is also discussed more fully *infra*.

9.      Accordingly, Petitioner now seeks relief under 28 U.S.C. § 2241 & 2243.

**THE JUDICIARY'S PROPER ROLE IN REVIEWING EXTRADITIONS**

10.      More than 150 years ago, the United States Supreme Court discussed the history and proper roles of the various branches of government in extradition proceedings.  In <u>In re Kaine</u>, 55 U.S. 103 (1853), the Supreme Court  noted how President John Adams, in 1799, had sought to extradite a man named Nathan Robbins to the British, with a judge merely acting by

order of the President in aid of the Executive Branch.  These actions proved highly controversial, and actually led to a resolution in Congress impeaching the President's conduct in Robbins' case, until John Marshall (later Chief Justice) stepped in to speak in Adams' defense.  *Id.* at 112.

11.     The Supreme Court noted in <u>*Kaine*</u> how this incident demonstrated that "a great majority of the people in this country were opposed to the doctrine that the President could arrest, imprison, and surrender, a fugitive, and thereby execute the treaty himself; and they were still more opposed to an assumption that he could order the courts of justice to execute his mandate, as this would destroy the independence of the judiciary, in cases of extradition … and from that day to this, the judicial power has acted in cases of extradition, and in all others, independent of executive control."  *Id.* at 112.  *See also id.* at 113 ("an extradition without an unbiased hearing before an independent judiciary [is] "highly dangerous to liberty, and ought never to be allowed in this country.").

12.     It is now settled law, in fact, that the Executive Branch is without inherent power to seize a fugitive and surrender him to a foreign power, except such as is conferred by treaty or Act of Congress.  As Justice Holmes noted in <u>*Valentine v. United States ex rel. Neidecker*</u>, 299 U.S. 5 (1936), although extradition is "a national power, it is not confided to the Executive in the absence of treaty or legislative provision."  *Id.* at 8.  *See also id.* at 9 ("the Constitution creates no executive prerogative to dispose of the liberty of the individual.  Proceedings against him must be authorized by law.").  *See also* <u>*Mironescu v. Costner*</u>, 480 F.3d 664, 670 (4th Cir. 2007) ("although the Executive has unlimited discretion to *refuse* to extradite a fugitive, it lacks the discretion to extradite a fugitive when extradition would violate his constitutional rights.").

13.     In enacting its extradition statutes, 18 U.S.C. § 3184, *et seq.,* that establish extradition proceedings, Congress was reacting to past abuses by the Executive Branch of its

claimed "nearly absolute discretion in extradition matters."  *In the Matter of Mackin*, 668 F.2d

122, 134-35 (2d Cir. 1981).  Section 3184 thus "interposed the judiciary between the executive

and the individual," evidencing Congress' intent to "limit executive power," as well as its

recognition that the "judiciary should have the authority to review executive action so that

fundamental liberty would not be improperly impinged."  *Austin v. Healy*, 5 F.3d 598, 603-04

(2d Cir. 1993), *cert. denied*, 510 U.S. 1165 (1994).  Accordingly, extradition courts are expected

to serve as impartial arbiters, and "to perform a 'neutral and detached' function and not as a

rubber stamp" for demanding nations' requests for extradition.  *United States v. Fernandez-*

*Morris*, 99 F. Supp. 2d 1358 (S.D. Fla. 1999) (citing *Aguilar v. Texas*, 378 U.S. 108, 111

(1964)).

14.    Although an extradition case is a civil action, courts must also be mindful of the

implications of their decisions on a Petitioner's liberty and property interests, since the potential

long-term consequences may affect Petitioner and his family members for the rest of their lives.

*United States v. Fernandez-Morris*, 99 F. Supp. 2d 1358, 1366 (S.D. Fla. 1999) ("we cannot

blind ourselves to the foreseeable and probable results of our jurisdiction").

15.    The judiciary's duties in the context of extradition include, but importantly extend

beyond a mere determination of probable cause.  This habeas case in fact represents the first time

that any Article III judge has ever examined the statutory and constitutional issues raised by this

Petitioner.  Petitioner therefore submits that a variety of legal issues must properly be addressed

by this Court *de novo* before any extradition can be allowed, including the validity of the

jurisdiction exercised by the U.S. Magistrate over this Petitioner, and whether the applicable

U.S.-Mexico extradition treaty's provisions legally support extradition, based on the types of

evidence presented, the offenses on which extradition is sought, and the unique international

double jeopardy doctrine of *non bis in idem,* as set forth in that treaty.

16.     While "the scope of habeas review of international extradition proceedings has

been traditionally described in narrow terms" of "whether the magistrate had jurisdiction,

whether the offense charged is within the treaty and ... whether there is any evidence [to

substantiate probable cause]," the Fourth Circuit has recognized that the "cases describing the

review in those terms [have not] involved a claim that extradition would be unconstitutional."

*Mironescu v. Costner*, 480 F.3d 664, 670 (4th Cir. 2007).  "The habeas writ indisputably extends

to prisoners being held 'in violation of the Constitution or laws or treaties of the United States."

*Id.* at 671 (citing 28 U.S.C. § 2241(c)(3)).

17.     Particularly with respect to *non bis in idem*, the novelty of this case is apparent.

Prior to filing Mexico's extradition request, the U.S. Government had separately tried to

prosecute Mr. Ye Gon on facts arising from these same facts, for over two years – yet that U.S.

criminal case was later dismissed, and even dismissed *with prejudice*, by U.S. District Judge

Emmet Sullivan, on August 28, 2009.  Exhibit D.  As the U.S. Magistrate acknowledged, "[i]t

appears that there are only two reported cases in American legal history" in which an

independent U.S. prosecution has preceded a foreign government's extradition request.  Exhibit

F-101.  And this appears to be *the first* case ever in American legal history in which the related

U.S. prosecution was expressly dismissed *with prejudice.*

**OVERVIEW OF MEXICO'S CHARGES AND ITS SUBMISSIONS**

18.     The U.S. Magistrate Judge, in his Findings of Fact supporting his Certificate of

Extraditability, appears to have adopted uncritically all of the Government's proposed facts,

describing a litany of events that he claimed supported his findings of probable cause.  Exhibit B.[1]  A closer review of the evidence presented, however, explains why this was legal error.

19.    To support its extradition request, the Mexican government had submitted, through a certification from U.S. Department of State attorney David O. Buchholz, two documents and their appendices, which were translated into English: (A) Diplomatic Note 04507, formally requesting the extradition, and (B) an Affidavit from former Mexican federal prosecutor Jorge Juaqin Diaz Lopez, which attaches (i)  a Mexican Arrest Warrant, (ii) the applicable Mexican criminal statutes, (iii) the applicable Mexican statutes of limitations, (iv) "evidentiary exhibits numbered D-1 through D-49" and (v) identification information.[2]

20.    The "Mexican Arrest Warrant" presented was a 641-page document in English, although the actual charges on which the warrant is issued consisted only of its last few pages.  *Accord* Exhibit F-059, note 10 (Government agrees that Ye Gon's charges are in the Mexican Arrest Warrant at pp.636-639).  This Mexican judicial "Decision" has 19 numbered paragraphs, but not all of those paragraphs involve criminal charges against Mr. Ye Gon.  Paragraphs One through Five charged Mr. Ye Gon and others with certain specified drug-related offenses.  Paragraph Seven charged Mr. Ye Gon and others with "the crime of bearing firearms which use is reserved for the Army, Navy and Air Force."  Paragraph Eight listed a different firearm, and then charged only Mr. Ye Gon with "bearing a firearm which use is exclusively reserved for the

---

[1] U.S. Magistrate Judge Facciola had long ago also found probable cause against Mr. Ye Gon, on June 15, 2007, when he approved the issuance of an arrest warrant based on a Criminal Complaint in the U.S. Government's criminal case against Mr. Ye Gon.  Exhibit F-014.  As noted, that U.S. criminal case was later dismissed with prejudice.

[2] These oversized documents were filed by the Government in Petitioner's extradition case in paper format only.  Respondents have indicated plans to refile these records in this case, and Petitioner does not object to that request.  The record in this case is undeniably massive.  Petitioner has attached materials referenced in this Amended Petition as exhibits, although given the related volume, this has often been done by making excerpted submissions.  Petitioner has no objection to a more complete submissions of all such materials, as contemplated by this Court in its December 22, 2011 Order (Court notes that it is "amenable to finding a workable solution with the parties.").

Army, Navy and Air Force."  Paragraph Eleven charged only Mr. Ye Gon with "aiming the

commission of drug offenses (for the purposes of commission of drug crimes and money

laundering)," in violation of Mexico's Federal Law Against Organized Crime.  Finally,

Paragraph Fourteen charged Mr. Ye Gon and others with money laundering, "in the modality

that … they maintained funds in Mexican territory with the knowledge that the funds had an

illegal source."  Most of the charges also specifically alleged a violation of Article 13, Chapter

III, of Mexico's Criminal Code, which declares criminally responsible those who agree to or plan

a crime.[3]  Exhibit E.

      21.     The U.S. Government's Complaint, which is not a charging document,

nevertheless contained a summary of the charges in Mexico's Arrest Warrant on which

extradition was.  According to this Complaint, Mexico's charges fall into four categories:

    a.  **Drug-related offenses** in the forms of:

        i.  **Importation into Mexico of psychotropic substances**, namely, N-acetyl-pseudoephedrine acetate and ephedrine acetate, derivatives of pseudoephedrine, in violation of Article 13, section III, and Articles 193 and 194, section II of the Mexican Federal Criminal Code, and Article 245, groups II and III and IV of the General Health Law;

       ii.  **Transportation of psychotropic substances**, namely, N-acetyl-pseudoephedrine, a derivative of pseudoephedrine, in violation of Article 13, section III, and Articles 193 and 194, section I of the Mexican Federal Criminal Code, and Article 245, groups II and III and IV of the General Health Law;

      iii.  **Manufacture of psychotropic substances**, namely, pseudoephedrine, ephedrine, pseudoephedrine hydrochloride, and methamphetamine hydrochloride, in violation of Article 3, section III, and Articles 193 and 194, section I of the Mexican Federal Criminal Code, and Article 245, groups II and III and IV of the General Health Law;

---

[3] Paragraphs Nine and Ten also charged Mr. Ye Gon and others with possessing certain ammunition exclusively reserved for the Mexican military, but no extradition is being sought on those charges.

    iv. **Possession of psychotropic substances for the purpose of producing narcotics**, in violation of Article 13, section III, and Articles 193, 194 section I, and Article 195 of the Mexican Federal Criminal Code, and Article 245, groups II and III and IV of the General Health Law; and

    v. **Diversion of essential chemical products**, namely sulfuric acid, to produce narcotics, in violation of Article 13, section III, and Articles 193 and 196-Ter of the Mexican Federal Criminal Code in relation to Article 4 of the Federal Law to Control Chemical Precursors, Essential Chemical Products and Machinery to Formulate Capsules, Tablets and/or Chemical Compounds.

b. **Money Laundering**, by himself or through an intermediary, by having custody of funds within Mexico, knowing that the funds have their source in an illegal activity, with the intention to impede knowledge of their source, location, destination or ownership, in violation of Article 13, section III and Article 400 bis of the Federal Criminal Code.

c. **Organized crime** (for the purpose of repeatedly committing drug crimes and operations with illegal funds) in violation of Article 2, section I, and Article 4, section I, sub-paragraph (a) of the Federal Law against Organized Crime; and

d. **Violations of the Federal Law on Firearms and Explosives** in the form of:

    i. **Possession of firearms reserved for the exclusive use of the Army, Navy and Air Force**, namely:

        --a pistol of caliber 9mm (9x19mm), brand: Heckler & Koch GMBH, model P17M13, serial number 73063;

        -- a pistol of caliber 9mm LUGER (9x19mm), brand: Intratec, model TEC-DC9, serial number DO12785;

        --a pistol of caliber .45 automatic, brand: Heckler & Koch GMBH, model: UPS Tactical, serial number 25-140657; and

        --an AK-47 rifle of caliber 7.62X39mm, brand: Norinco, model: MAK90, serial number 37011250, in violation of Article 13, section III of the Federal Criminal Code and Articles 8, 11, sub-paragraphs (b) and (c), and Article 83 ter,

sections II and III of the Federal Law of Firearms and Explosives; and

ii. **Possession of a firearm reserved for the exclusive use of the Army, Navy and Air Force**, namely, a pistol of caliber 9mm Parabellum (9x19 mm), brand: Pietro Beretta, model 92FS, with serial number obliterated, in violation of Article 13, section III of the Federal Criminal Code, and Articles 8, 11, subparagraph (b) and Article 83-Ter, sections II and III, of the Federal Law of Firearms and Explosives.

22.     As noted, a lengthy Affidavit was submitted by the Mexican government in support of its extradition request, and the material contained in the first 635 pages of the application for the Mexican Arrest Warrant came from a single person, Mr. Jorge Joaqin Diaz Lopez.  After submitting these filings in support of the Mexican Arrest Warrant and Mexico's extradition request, however, Mr. Diaz Lopez resigned from his position as a Mexican federal prosecutor, as verified in a letter of January 31, 2009.  *See* Exhibit F-066.

23.     The U.S. Government has acknowledged that a corruption investigation in Mexico implicated Mr. Diaz Lopez's former boss, Noe Ramirez Mandujano, who had served as the head of Mexico's national organized crime unit, in the Mexican Attorney General's "Subprocuradora de Investigación Especializada en Delincuencia Organizada" (SIEDO), its Office of Special Investigations for Organized Crimes.  *See* Exhibit F-097 (Government:  "It is correct that the former head of what's called SIEDO in Mexico, after a long investigation was arrested and charged with being in collusion with drug cartels…. [H]e was the higher-up boss of the unit that was in charge of prosecuting Ye Gon.").

24.     Between July and October 2008 alone, there were actually 35 officials from the Mexican Attorney General's Office dismissed under an anti-corruption initiative known as Óperacion Limpieza ("Operation Clean-Up"), and it vowed that the process of "purging and

12

investigating" would continue.  Exhibit F-099.  Initially, during his first news conference, Mexican Attorney General Mora stressed that Mandujano had not been implicated, but only weeks later, Mandujano himself was arrested.  *Id.*  Since November 2008, Mr. Mandujano has been detained for allegedly committing the criminal offense of Organized Crime.  Exhibit F-108, at ¶ 6.  The criminal allegations against him assert that he received $500,000 in exchange for providing sensitive and secretive enforcement information to drug cartels in Mexico.  Exhibit F-090.  Mandujano has stated publicly that he traveled to the United States with Mr. Diaz Lopez as a part of the investigation of Mr. Ye Gon.  *Id.* at note 6.

25.    The Government tried to claim that this corruption investigation did not implicate Mr. Diaz Lopez himself, and that the timing of Mr. Diaz Lopez's "voluntary irrevocable resignation" was simply coincidental.  Exhibit F-109, at ¶ 8.  The Government submitted an affidavit from a public prosecutor in Mexico's extradition division, Haydee Chavez Sanchez, stating that at least "during his time as a public servant," Mr. Diaz Lopez was not the subject of any criminal or administrative proceeding, *id.* at ¶ 9, and that unspecified "personnel" in SIEDO advised her on September 14, 2009 that Mr. Diaz Lopez was not then "under investigation nor has he been detained nor prosecuted for any crime." *Id.* at ¶ 7.

26.    On January 18, 2009, however, when the Mexican government announced Attorney General Mora's "renewal" of SIEDO, it specifically noted that the departure of Mr. Diaz Lopez and another man were the first changes being made.  The Mexican government's press release also specifically referred to an article published in *La Jornada* that same day.  The title of that article said that Mr. Diaz Lopez had been dismissed ("Destituyen") as a part of "Operacion Limpieza," ("Operation Clean Sweep"), the term used for the "clean up" of the subproduraduria.  Exhibits F-126 to -128, F-136, F-137 n.2 & F-138 to -143.  Diaz Lopez's

January 31, 2009 letter, listing unspecified "personal reasons" for his resignation, is dated almost two weeks later.  F-066.

27.     No substitute Affiant was presented for any of Mr. Diaz Lopez's submissions, and no other Mexican official ever affirmed any of his statements, despite questions raised by Petitioner's counsel in the extradition court.[4]

28.     Mr. Diaz Lopez's Affidavit was supplemented by a variety of Mexican government exhibits, proffered as Exhibits D-1 through D-49.  Most of those exhibits, however – including all of the Government's proffered witness statements, and several accounting and forensics reports – contained a footnote which states:   *"What follows are the reliable excerpts of the complete text of the witness' statement, and they are parts relevant to the request for extradition of ZHENLI YE GON.  In the text of the statement extracts, where words were omitted, ellipses were inserted and sentences and paragraphs were formulated with grammatical changes to facilitate the reading thereof."  See, e.g.,* Exhibit F-037, at note 1; Exhibit F-043, at note 1.

29.     This recurring footnote in the Mexican government's proffered witness statements and accounting and forensic reports did not say who decided what would be excerpted.  It did not say who is representing that the footnote is reliable.  It did not say who made the determination that these were the relevant portions.  It did not say who made the "grammatical changes to facilitate the reading thereof," or what those grammatical changes were.  And it did not say who made these admitted changes to the text, who compared the excerpted document to the original, or who prepared the summaries.

---

[4] Indeed, Mexico's federal law enforcement establishment suffers from widespread corruption**.**  Exhibit F-247 is a press article from August 31, 2010, in which it was reported that the Mexican government later fired nearly *one tenth* of all officers in its *entire federal police force*, due to failed lie detector tests, suspicions of corruption, and other stated reasons.  *See also* Exhibit F-130 (discussions of admitted corruption in Mexico's police forces).

30.     The Government, at the eleventh hour of Petitioner's extradition hearing, and at a point where Petitioner could not feasibly respond, submitted what the Government said were translated versions of the complete versions of its witness statements, although its accounting and forensics reports were never supplemented, and continued to consist of mere excerpts accompanied by this troubling footnote.  And even as to the more complete witness statements themselves, they were not statements written by the witnesses, but apparently signed statements crafted by this same prosecutor, Mr. Diaz Lopez, at the end of his conducted interrogations.

31.     This format is significant, for it has also been conceded, both in this case and in Petitioner's earlier U.S. criminal case, that several witnesses who were alleged to have implicated Mr. Ye Gon in criminal conduct later recanted.  For example, when confronted in a Mexican court with a written statement he had supposedly signed, and which implicated Mr. Ye Gon, witness Juan Escandon Paz refused to ratify it and said he had been forced to sign it.

32.     The United States admitted learning of this recantation "at some point in 2007 or 2008."  Exhibit F-077.  It was not revealed, however, until a "Notice of Brady and Giglio Materials" was produced by the Government, and filed by Petitioner's counsel, on June 1, 2009, shortly before the U.S. criminal case was dismissed.  There, the Government stated:

> Escandon Paz confessed at the time of his arrest in Mexico that he acquired large quantities of ephedrine from the defendant and sold them on behalf of the defendant.  He statement has been previously provided.  *He has recanted that statement.*

Exhibit F-072 (emphasis added).  Nor was this an isolated admission, for U.S. prosecutors later reiterated that Escandon Paz had "recanted his previous statement that he had obtained quantities of ephedrine from defendant Ye Gon and had sold them on behalf of defendant."  Exhibit F-086.

33.     The U.S. Government also admitted that Michelle Wong had also recanted, Exhibit F-072, and had denied making an alleged statement to agents that Mr. Ye Gon had

15

supposedly spoken to people he described as drug dealers, calling the agents who claimed she made this statement "liars."  Exhibit F-077.  And an unnamed informant witness also claimed that his/her alleged earlier statements about buying illegal substances from Mr. Ye Gon were wrong, and advised agents at "various meetings in December 2008" that the witness "had in fact never met the defendant and never dealt with him personally."  Exhibit F-071.  None of these recantations were disclosed to Petitioner's counsel, however, until June 2009.

34.     Following these recantations, the U.S. prosecutors' own motion to dismiss the U.S. criminal case admitted in writing the following: "with one key witness in the criminal case having stated that previous statements made about the defendant were untrue and another key witness in the criminal case having expressed an unwillingness to testify, the United States has evidentiary concerns in light of these changed circumstances."  Exhibit F-082.

35.     In Petitioner's extradition case, however, the Government continued to try to maintain that there were no evidentiary concerns.  It attempted to downplay the significance of these recantations by trying to claim that they were irrelevant to extradition because "[t]he evidence submitted by Mexico to support its extradition request does not contain statements by Escandon Paz, Michelle Wong, or [this informant] witness."  Exhibit F-092.  But the Government also acknowledged that "Escandon Paz and Michelle Wong are mentioned in a few of the statements of other witnesses."  *Id.*  And a review of the Mexican Arrest Warrant itself reveals that Escandon Paz is actually referred to as "the main accomplice of Mr. Zhenli Ye Gon." Exhibit F-011.

36.     The Magistrate Judge, in issuing his Findings and Conclusions in Petitioner's extradition case, never addressed these issues.  Instead, the U.S. Magistrate appeared to rely on the excerpted statements of former employees of Unimed.  But a look at those former employees

16

reveals little more than a cast of disgruntled employees: Sonia Galicia Villar, for example, admits "I got fired."  Exhibit F-047.  Israel Jesus Gonzalez Hernandez similarly admits he was fired, after being accused of lying to Mr. Ye Gon and not revealing that he was married to Ms. Villar; he even filed a complaint and told company managers that they would "remember" him; he then requested his job back but was refused, after which a severance settlement was reached. Exhibit F-052 to -053.  Jose Luis Perez Castro's excerpt similarly shows that "they asked for my resignation, because ZHENLI [Ye Gon] did not know that Jesus and Sonia were husband and wife…. [S]ince my friend Jesus recommended me, just because my friend had lied to him, Erick – the lawyer – asked me for my resignation."  Exhibit F-055.  And Estela Ramirez Flores similarly felt she "was fired without any justification," before being briefly rehired and then given an opportunity to resign.  Exhibit F-049 to -050.

37.     These witnesses (in addition to supposed "main accomplice" Paz, who has recanted) were the basis for the Mexican government's criminal allegations and pursuit of extradition against Mr. Ye Gon.  The lead U.S. prosecutor even told the U.S. criminal court, before dismissing that case, that "I am not proffering to the Court that I have interviewed a witness, you know, who is a drug trafficker who said I got ephedrine or pseudoephedrine from him, so that to me would be a smoking gun kind of witness, somebody to say I'm a drug trafficker, I make methamphetamine, I got my pseudoephedrine from that man, so I don't want the Court to think that's what I'm saying because I'm not saying that.  What I am saying is that there's other kinds of testimony."  Exhibit F-023.  And as noted above, this "other" testimony appears to come primarily from disgruntled former employees, and supposed witnesses who have since recanted.  Despite an exhaustive review performed on Mr. Ye Gon's many wire

transfers, telephone pen register records, records from his seized computers, subpoenas issued for his emails, etc., no viable link to any cartels or known drug dealers was ever presented.

38.     Nor were Mexico's proffered witnesses merely disgruntled former employees; at least two of them appear to possibly be *paid* witnesses who received unusual immigration benefits.  When U.S. prosecutors disclosed the persons they might call as witnesses in the U.S. criminal case against Mr. Ye Gon, they apparently referred to Sonia Galicia Villar and Israel Jesus Gonzalez Hernandez, when describing plans to "call two witnesses who were formerly employed by the defendant," who "live as husband and wife."  Exhibit F-070.  U.S. prosecutors also revealed therein that these two persons had been "moved … from Mexico to the United States and have been provided financial assistance by the United States while living in the US. That assistance has included cash payments and assistance with their rent.  They presently reside in the United States."  Exhibit F-070 to -071.  Although these cash payments made to these two witnesses was never quantified, U.S. prosecutors separately disclosed that another confidential source against Mr. Ye Gon had been "paid approximately $125,000" before it was learned that he had "lied to the DEA" about his own drug dealing.  Exhibit F-071.

39.     As a past U.S. State Department Human Rights Report (2009) also noted, in describing the Mexican criminal justice system, "Despite enactment of judicial reform legislation in June 2008, judges, particularly in areas that had not yet implemented the reforms, reportedly continued to allow statements coerced through torture to be used as evidence against the accused."  Exhibit F-131.  And of course, most if not all of the Mexican government's alleged witness statements in Mr. Ye Gon's case appear to have been obtained during 2007 and early 2008 – before these reforms in Mexico were even enacted or implemented.

40.     No physical evidence from Mexico – either money or drugs – was ever submitted in the U.S. criminal case, or in Mexico's extradition proceeding against this Petitioner, who is now almost 50 years old, and who was a successful businessman never convicted or even accused of any wrongdoing prior to facing these charges.  As noted below, Mr. Ye Gon was a prominent and large-scale importer of pharmaceutical and other products in Mexico before his arrest, with a record of at least 291 large-scale import operations covering a period of many years.  Only 4 of those 291 import operations are challenged as improper here.

41.     The Mexican government nevertheless claimed that samples were taken of these four specified imported shipments, which it claims tested positive for pseudoephedrine and ephedrine precursor substances.  But none of these referenced samples has ever been produced to Mr. Ye Gon or any of his counsel.  In Mr. Ye Gon's U.S. criminal case, the Mexican government's samples were requested of Mexico for two years by U.S. prosecutors, since Mr. Ye Gon's defense counsel had wanted to conduct independent tests, as permitted under U.S. law. The samples were never provided.  On June 9, 2009, U.S. prosecutors eventually filed a written documentation of their discovery efforts from Mexico, confirming that they had requested these samples from the Mexican government, but that Mexican officials had refused to provide them. The U.S. prosecutors then also revealed the following:  "the [U.S.] government was told that the samples from the first two intermediate shipments sampled *had been used up in the laboratory analysis*."  Exhibit F-281.  So at least for these first two imported shipments that supposedly contained illegal substances, not only have the samples not been retested, but also the Mexican government has admitted that no samples even remain, making independent testing impossible.

42.     In response to requests from Petitioner's counsel, U.S. prosecutors also attempted to get Mexico's samples supposedly taken at Petitioner's pharmaceutical plant in Toluca, so that

those samples might also be independently tested in the U.S.  But once again, Mexican officials refused to provide any of their samples to U.S. prosecutors.  The U.S. District Judge who eventually dismissed Petitioner's U.S. criminal case commented on how the U.S. courts' efforts to get Mexico to make such disclosures had been repeatedly stymied, since "this court made numerous inquiries of [U.S.] Government counsel as to just what the status of the requests were to get drug samples for testing purposes, to provide evidence for the prosecution, and basically … Mexico just snubbed the United States."  Exhibit F-094.

43.     Nor does this missing evidence appear to involve a mere lack of cooperation among governments.  As noted in Exhibit F-241, Mexican prosecutors recently lost a case filed against a customs official who had supposedly been involved in one of the importations supposedly involving Petitioner's company.  A Mexican judge dismissed the case because of an inability to credibly establish from samples that the chemicals imported by Unimed Mexico were illegal substances, as claimed.[5]

44.     Moreover, as discussed more fully below, various U.S. experts also have questioned the scientific methodology used by the Mexican government's chemists in their described testing of these never-produced samples.

45.     None of this was discussed in the Magistrate Judge's Findings and Conclusions. That is unfortunate.  This is not the first time that serious questions have been raised about the reliability of evidence proffered by Mexico in support of its extradition requests.  *See, e.g., In re: Extradition of Contreras*, 800 F. Supp. 1462 (S.D. Tex. 1992) (eleven witness statements proffered; all eleven witnesses later recanted; extradition denied); *In re: Extradition of Valles*,

---

[5] A Mexican judge has also recently dismissed all of the organized crime and drug-related charges previously filed against Mr. Ye Gon's wife, who was the co-founder of Unimed Mexico.  Exhibit F-260.  This dismissal occurred on April 5, 2011, after the Magistrate Judge had issued his Findings & Conclusions.  It does not appear that Mexico has yet convicted anyone at all who was allegedly involved in any activites associated with this Petitiioner.

268 F. Supp. 2d 758, 770 & 775 (S.D. Tex. 2003) (calling Mexico's extradition request "a textbook case of mistaken identity," such that "Mexico, in the interests of justice, ought to have conceded that fact," yet "[n]evertheless, the Mexican government apparently insists that such matters be resolved in Mexican tribunals, and not in this court"; extradition denied).

## CLAIM ONE – THE JUDICIAL OFFICER WAS NOT AUTHORIZED TO CONDUCT THIS EXTRADITION PROCEEDING, AND JURISDICTION WAS LACKING

46.     Petitioner realleges all previous paragraphs as if fully set forth herein.

47.     Under 18 U.S.C. § 3184, a sworn complaint for extradition submitted to an authorized magistrate can only charge a person "found within his jurisdiction," who then "must be brought before such justice, judge or magistrate to the end that the evidence of criminality may be heard and considered."

48.     Petitioner Ye Gon was not "found" within the jurisdiction of the District of Columbia, but instead was arrested by the U.S. Marshal's Service on U.S. criminal charges in the State of *Maryland*. Petitioner in fact never voluntarily appeared within the District of Columbia prior to the Magistrate Judge's Certificate of Extraditability, since the only times when Petitioner was present within the District of Columbia were when he was being confined by federal officials there against his will. Petitioner has never personally visited the District of Columbia, and he has never appeared voluntarily within the jurisdiction of the District of Columbia, ever in his entire life. Accordingly, Petitioner's extradition hearing needed to be held in the U.S. District Court for the District of Maryland, not in the District of Columbia.

49.     To allow 18 U.S.C. § 3184 to permit the U.S. Government to bring an extradition warrant and proceeding in any jurisdiction where a defendant happens to be confined involuntarily would improperly allow the U.S. Government to engage in unlimited, unilateral forum shopping. The U.S. Government might, for example, choose to simply detain a defendant

who is charged with a criminal or immigration offense at a facility within a jurisdiction that is particularly convenient to the U.S. Government, has more favorable laws, or has proven pliant to the U.S. Justice Department's requests for extradition.  If the location where DOJ houses a detainee were to govern, § 3184's jurisdictional requirement would be rendered meaningless.

50.     Indeed, that is exactly what happened in Petitioner's extradition case, as Petitioner was materially prejudiced by the fact that his extradition proceeding was held in the District of Columbia.  Because Petitioner's extradition case proceeded over his objection in the District of Columbia, the Government (and Magistrate Judge Facciola) relied on the District of Columbia's highly unusual and restrictive local gun laws in order to declare Mexico's firearms charges against Petitioner to be sufficiently analogous to applicable U.S. firearms laws, so as to try to satisfy the "dual criminality" requirement of the U.S.-Mexico extradition treaty, as discussed more fully *infra*.  *See* Findings & Conclusions, at 28 (declaring that dual criminality could be determined according to the law of the state where the fugitive is found); *id.* at 29-30 (claiming that "District of Columbia law thus has essentially the same effect as Mexico's law with respect to certain weapons; that is, members of the military may possess such weapons, but few others may do so.").  In short, the Government materially benefitted from its forum shopping in this case, by relying on D.C.'s gun laws, widely regarded as the most restrictive in the U.S.

51.     The decision in *Pettit v. Walshe*, 194 U.S. 205 (1904) bars such forum shopping. There, the Supreme Court affirmed a grant of a writ of habeas corpus, since the proper judge to hear the extradition proceeding was the "one acting as such within the State in which the accused was arrested and found." *Id.* at 219.  Writing for a unanimous Court, Justice Harlan raised similar forum-shopping concerns.  *See id.* at 218-19 ("Under any other interpretation of the statute [the] Commissioner … could by his warrant cause a person charged with one of the extraditable

crimes and found in one of the Pacific States, to be brought before him at his office in the city of New York, in order that he might hear and consider the evidence of the criminality of the accused.  But as such a harsh construction is not demanded by the words of the treaties or of the statutes, we shall not assume that any such result was contemplated by Congress.").  *See also id.* at 218 (referring to the place that was "in legal effect, the asylum to which he had fled").  *See also* <u>Wright v. Henkel</u>, 190 U.S. 40, 58 (1903) (similarly describing the place where the accused was "found" as "the asylum to which he had fled").  Here, the place of "asylum" to which Mr. Ye Gon allegedly had "fled" was Maryland – not the District of Columbia.  Accordingly, he was "found" in Maryland.

52.     Congress' use of the word "found" does not ordinarily include the location where a person happens to be detained involuntarily.  Congress in fact has shown that it knows how to authorize jurisdiction in a district where a person happens to be confined, when that is its true legislative intent.  In 18 U.S.C. § 3244(5), for example, Congress specifically referred to how certain extradition proceedings (in a different situation) "shall be brought in the United States district court of the *district in which the person is confined*."  The fact that similar language was *not* used in 18 U.S.C. § 3184 reveals a different intention, and supports Petitioner's jurisdictional challenge, under the recognized legal doctrine of *inclusio unius est exclusio alterius.*

53.     In Petitioner's extradition case, the Magistrate Judge gave remarkably short shrift to this jurisdictional issue, even though it was a precondition to his authority to issue any ruling.  No Findings of Fact were made on this issue at all, and the Magistrate Judge's Conclusions of Law on this point consist of just two paragraphs.  *See* Findings & Conclusions, at 15-16.  There, the Magistrate Judge simply states that because Petitioner had originally been arrested in Maryland "based on an indictment returned by a grand jury in this District" (in the U.S. criminal

23

case that was later *dismissed with prejudice*), this meant that Petitioner "was unquestionably lawfully being held in the District of Columbia" – with the Magistrate Judge apparently equating "held in" and "found in" as being the same.[6]  The Magistrate Judge never addressed Petitioner's citations to *Pettit v. Walshe* and *Wright v. Henkel*, or the Supreme Court's understanding in those cases that the place "found" was the Petitioner's place of asylum, or the need to prevent Government forum shopping.  Nor did the Magistrate Judge explain why statutory language describing where "the person is confined," set forth in 18 U.S.C. § 3244(5), was unnecessary under § 3184.  Instead, the Magistrate Judge simply declared summarily, with no citations of authority at all, that its interpretation "[s]urely … comports with the natural and traditional meaning of the word "found" in 18 U.S.C. § 3184,"[7] and then gave the Government the unique and special benefits of its District of Columbia chosen forum.

54.     In doing so, the Magistrate Judge erred as a matter of law.  Proper jurisdiction over Petitioner's extradition proceeding lay in the District of Maryland, the last location where he appeared voluntarily before being detained by the U.S. Government.  That is his "asylum" location where this Petitioner was "found" for purposes of 18 U.S.C. § 3184, and the Certificate of Extraditability issued by a Magistrate Judge of the District of Columbia that lacked jurisdiction under 18 U.S.C. § 3184 cannot support Petitioner's current or continued detention.

55.     Mr. Ye Gon also submits more generally that it was also improper, in a larger sense, for a U.S. Magistrate Judge to decide this case under 28 U.S.C. § 636, Article III of the Constitution and *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50

---

[6] The Magistrate Judge's findings on this point were factually inaccurate.  No indictment was returned in the District of Columbia until July 26, 2007 – *after* Petitioner's arrest in Maryland.  Exhibit F-015.  *Compare* Exhibit F-014 (executed arrest warrant is based on a "Complaint," and reveals a return date of "7/24/07.").

[7] The Magistrate Judge's only two citations addressed why he believed his exercise of jurisdiction would not violate due process – not why District of Columbia jurisdiction would meet the requirements of 18 U.S.C. § 3184.

(1982), and the Fifth Amendment's Due Process Clause, given the fact that the Magistrate Judge was deciding constitutional and other dispositive issues properly decided only by an Article III judge.  While Petitioner was precluded from raising this issue in his extradition proceeding, due to the binding precedent of _Ward v. Rutherford_, 921 F.2d 286 (D.C. Cir. 1990), _cert. denied_, 501 U.S. 1225 (1991), he raises and preserves this issue here.  Petitioner also submits that any deference given in this habeas action to Findings of Fact and Conclusions of Law of this Magistrate Judge, issued in his extradition proceeding, would represent a violation of his rights to a full Article III adjudication of the important claims raised herein.

56.     Finally, Petitioner raises the various broader constitutional challenges (such as separation of powers and advisory opinions) that led U.S. District (now Chief) Judge Royce C. Lamberth of the District of Columbia to strike the federal extradition statutes as unconstitutional in _Lobue v. Christopher_, 893 F. Supp. 65 (D.D.C. 1995), _vacated on other grounds_, 82 F.3d 1081 (D.C. Cir. 1996).  Consistent with Judge Lamberth's reasoning in that case, Petitioner submits that the U.S. extradition statutes themselves are unconstitutional, both facially and as applied to him, and that the Certificate of Extraditability was improper.  Petitioner's current and future detention is improper, and habeas relief should be granted under 28 U.S.C. §2241 & 2243.

## CLAIM TWO – THE U.S.-MEXICO TREATY DOES NOT SUPPORT EXTRADITION DUE TO ITS ARTICLE 6:  THE DOCTRINE OF _NON BIS IN IDEM_

57.     Petitioner realleges all previous paragraphs as if fully set forth herein.

58.     Article 6 of the U.S.-Mexico extradition treaty, entitled "_Non bis in idem_," states:

> Extradition shall not be granted when the person sought has been prosecuted or has been tried and convicted or acquitted by the requested Party for the offense for which extradition is required.

59.     *Non bis in idem*, literally "not twice for the same," is a form of double jeopardy

protection, although its parameters are not necessarily coextensive with the Double Jeopardy

Clause in the U.S. Constitution's Sixth Amendment.

60.     Although many extradition treaties require a final conviction or acquittal before

their *non bis in idem* provisions apply, the U.S.-Mexico extradition treaty does not.  By its

express terms, as noted above, the *non bis in idem* doctrine applies whenever a person has been

"*prosecuted or*" tried (emphasis added).  Here, it is beyond dispute that Mr. Ye Gon was

"prosecuted" by the requested Party (the U.S.), which did so for a period of more than two years,

until U.S. District Judge Emmet Sullivan finally dismissed his U.S. criminal case, as well as all

related U.S. forfeiture actions, with prejudice.  Exhibits D & F-095.  By the express terms of

Article 6, this alone is enough by itself to trigger a *non bis in idem* analysis, which if applicable

necessarily bars extradition.  This plain language of the U.S.-Mexican treaty must be honored,

and cannot be rewritten so that it mirrors different provisions in other extradition treaties, or

yields an interpretation that the Government might now prefer.  Exhibit F-244 (Government's

own filing concedes that "[t]he meaning of a treaty 'is to be ascertained by the same rules of

construction and reasoning which apply to the interpretation of private contracts.").

61.     Analyzing this international legal principle of *non bis in idem*, U.S. courts have

recognized that "[i]t is certainly possible that a treaty could contain a double jeopardy provision

more restrictive – that is, barring more prosecutions – than the [U.S.] Constitution's Double

Jeopardy Clause."  *United States v. Rezaq*, 134 F.3d 1121, 1128 (D.C. Cir.), *cert. denied*, 525

U.S. 834 (1998).  In *Rezaq*, the D.C. Circuit specifically cited in this context the decision in

*Sindona v. Grant*, 619 F.2d 167, 178 (2d Cir. 1980), *cert. denied*, 451 U.S. 912 (1981), in which

the Second Circuit had defined a *non bis in idem* clause more broadly than U.S. domestic law.

The D.C. Circuit declined a broader reading in that case only because "Rezaq has not shown that the Hague Convention falls in this category."  134 F.3d at 1128.  *See id.* at 1130 (Hague "treaty's negotiators considered and rejected the possibility of expressly barring sequential prosecutions through a *ne bis in idem* provision … another [name for this] term is *non bis in idem*").

62.     In Petitioner's extradition hearing, George Washington University School of Law Professor Steven A. Saltzburg appeared as an expert witness.  After graduating from the University of Pennsylvania Law School, Professor Saltzburg clerked for a federal judge in San Francisco, and then clerked for Justice Thurgood Marshall on the U.S. Supreme Court.  Professor Saltzburg taught and held a chair at the University of Virginia Law School before serving as the Wallace and Beverly Woodbury Professor at George Washington's School of Law.  Professor Saltzburg also previously served in the U.S. Department of Justice, as Deputy Assistant Attorney General of the Criminal Division, and as its ex-officio representative to the U.S. Sentencing Commission.  His areas of specialty include criminal law, criminal procedure and litigation, and since 1980 he has been the author of West Publishing Company's nine editions of *American Criminal Procedure*.  As a member of the International Bar Association, Professor Saltzburg has traveled to other countries to speak on comparative criminal procedure, and he also has collaborated on a book published on international human rights and criminal law.  Exhibit G at 76-77.  He has also done a fair amount of treaty-related work, including on the Rome Treaty and its interpretation, and in setting up the International Criminal Court.  *Id.* at 81.

63.     In discussing the U.S.-Mexico extradition treaty's Article 6 provision for "*non bis in idem*," Professor Saltzburg noted that its standards are not identical to the U.S. legal concept of double jeopardy.  While double jeopardy principles have "become an increasingly standard

27

part of international law … very few countries seem to adopt the view of double jeopardy that's as technical as ours." *Id.* at 96.

64.     While the U.S. law of double jeopardy, insofar as federal constitutional law, applies "the *Blockburger* test, [it] is a rather rigid narrow test.  If you look at treaties, extradition treaties," however, "very often what you find are similar provisions to those that are in Article 6 of the Mexico/U.S. treaty, which basically refers to this doctrine more generally, and doesn't say we look to the law, say, of the requested state." *Id.* at 96-97.  Professor Saltzburg noted that the U.S. has sometimes proposed such restrictive language for extradition treaties in the past – this idea that one should look only to the law of the "requested" Party to evaluate the bar on subsequent prosecutions – but that other countries had refused this language, "so they don't accept the idea that the United States simply applies *Blockburger* in the extradition treaty context and nothing else matters." *Id.* at 97.

65.     Professor Saltzburg in fact noted that that, "I don't think most courts in the United States apply *Blockburger* when treaty language like that found in Article 6 is the governing language," and cited this leading case from the Second Circuit, *Sindona v. Grant* (1980).  Exhibit G, at 98.  He noted that, while the D.C. Circuit had left this question open, refusing to address it, "other courts have tended to follow the lead of the Second Circuit and to basically give a broader definition to the bar on success[ive] prosecutions than the *Blockburger* standard." *Id.* at 99.

66.     Professor Saltzburg also explained why this was so, since as some courts had noted, "if you applied *Blockburger* to most extradition situations, th[en] essentially you'd never have a double jeopardy bar, almost never, because … different nations use different language in describing crimes that are similar," and there was no reason "to conclude that these nations negotiating and agreeing to this language essentially wanted it to be virtually meaningless,

toothless. *Id.* at 98. Professor Saltzburg stated that the word "offense" in Article 6 of the U.S.-Mexican extradition treaty was not intended to incorporate the *Blockburger* measure of what the same offense is, in the sense that "to the extent that *Sindona* accurately interprets similar language, the same language in Article 6 has been interpreted by other courts to reject the notion that it was intended to incorporate *Blockburger*. Exhibit G, at 119.

67.     As Professor Saltzburg noted, the Second Circuit's *Sindona* case represents the leading decision on this issue, and Judge Friendly's opinion in *Sindona* has been widely cited. *Sindona* involved a U.S.-Italian extradition treaty that contained a *non bis in idem* provision in its Article VI(1), stating that extradition shall not be granted:

> [w]hen the person whose surrender is sought is being proceeded against or has been tried and discharged or punished in the territory of the requested party for the offense for which his extradition is requested.

68.     As Judge Friendly noted in *Sindona*, "the Government urges that the proper test is that applicable to the double jeopardy clause of the Fifth Amendment, and asserts this to be the [standard] in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932)." 619 F.2d at 178. The Second Circuit, however, unanimously rejected the Government's suggested approach, calling it "a crabbed and wholly inappropriate reading of Article VI(1)." *Id.* at 178. *See also id.* ("Foreign countries could hardly be expected to be aware of *Blockburger*; moreover, as the previous discussion has shown, in construing a double jeopardy clause in a treaty, embodying an ancient and widely recognized principle of civilized conduct, a court should not deem itself bound by a quiddity of the law of the requested party.").

69.     In *Sindona*, as here, the extradition treaty's *non bis in idem* provision referred to the requesting Party's "offense." Citing to a leading treatise, the Second Circuit noted that "the terms 'same offense' and 'same conduct' are subject to broad interpretive leeway." *Id.* at 177.

29

Attempting to provide guidance in this context, the *Sindona* court explained that this phrase

"'same offenses' may range from 'identical charges' *to 'related … but not included (offenses).'"*

*Id.* (emphasis added).  At a minimum, the *Sindona* court held that "the standard to be applied in

construing Art. VI(1) of the Treaty should be at least as broad as that expressed in Mr. Justice

Brennan's concurring opinion in *Ashe v. Swenson* … or in the Petite policy."  *Id.* at 179.  In *Ashe*

*v. Swenson*, 397 U.S. 436 (1970), Justice Brennan's concurrence had adopted a "same

transaction" test of "same offence," *id.* at 454, with multiple prosecutions barred if they "grew

out of one criminal episode."  *Id.* at 449.  *See also id.* at 451 (criticizing Kentucky case in which

"each of 75 poker hands [was declared] a separate "offense"); *id.* at 452 ("the opportunities for

multiple prosecutions for an essentially unitary episode are frightening").  The Petite policy

similarly bars federal prosecution "when there has been a state prosecution for substantially the

same act or acts."

70.    The Magistrate Judge in Petitioner's extradition case rejected this analysis,

holding that that the *Blockburger* same-elements test must be applied here, in part because "in

*United States v. Dixon*, 509 U.S. 688 (1993), the Supreme Court overruled *Grady v. Corbin*, 495

U.S. 508 (1990) insofar as the court looked to a "same conduct" test of offenses rather than the

*Blockburger* analysis when ascertaining whether prosecution for one offense barred prosecution

for another."  Findings & Conclusions, at 37.  With due respect, the Magistrate Judge's statement

completely misapprehended the issue that was before the extradition court.

71.    As the courts have made clear, *see, e.g..,* *Iceland S.S. Co., Ltd. v. U.S. Dept. of the*

*Army*, 201 F.3d 451 (D.C. Cir. 2000); *United States v. Kember*, 685 F.2d 451 (D.C. Cir. 1982),

and as even the Government has conceded, Exhibit F-244, treaties are to be "ascertained by the

same rules of construction and reasoning which apply to the interpretation of private contracts."

In other words, the key issue in this context is essentially one of treaty (contract) interpretation: what did the parties understand when they signed and adopted this treaty?  It does nothing to answer that question – concerning the parties' understanding of the meaning of this U.S.-Mexico treaty's terms *when it was signed on May 4, 1978* – to discuss a U.S. Supreme Court interpretation issued 15 years later, in 1993.  Surely the parties to this treaty could not possibly have known in 1978 that U.S. double jeopardy law would later dramatically change, and that the U.S. Supreme Court would overrule all intervening precedent in 1993 and return to its earlier, strict 1932 *Blockburger* same-elements test.  Because the key issue is *what the parties understood when they signed this treaty*, this Court instead must examine the state of U.S. double jeopardy law *as it existed in 1978*, to determine the understanding of the signatories.  To the extent that U.S. and Mexico had a similar understanding at that time of Article 6's meaning, then the fact that U.S. constitutional double jeopardy law *later* changed is irrelevant to this Court's duty to interpret and apply the treaty (contract) *as the parties understood it when the treaty was signed and adopted*.

72.    Examining that proper issue, it is quite clear that U.S. Double Jeopardy law in 1978 did not apply a strict *Blockburger* same-elements test.  The most recent Supreme Court declaration on the subject at that time appears to be *Brown v. Ohio*, 432 U.S. 161 (1977), in which the U.S. Supreme Court declared that joyriding and auto theft were the "same offense" under the U.S. Double Jeopardy Clause.  In *Brown*, the Supreme Court had even openly declared that "[t]he *Blockburger* test is *not* the only standard for determining whether successive prosecutions impermissibly involve the same offense," *Id.* at 166 n.6 (emphasis added).  The *Brown* Court further stated that "successive prosecutions will be barred in some circumstances where the second prosecution requires the relitigation of factual issues already resolved by the

31

first." *Id.* (citing *Ashe v. Swenson*, 397 U.S. 436 (1970)).   Of course, this is this same *Ashe*

decision referred to in *Sindona* as pertinent to its *non bis in idem* analysis.

73.     The U.S. Supreme Court's stated understanding of double jeopardy in 1977-78, as

expressed by *Brown*, appears very similar to the international understanding of *non bis in idem*

described by Professor Saltzburg in his testimony, and that was codified in the seminal case of

*Sindona*.   Given this common understanding in 1978 that the parameters of *non bis in idem* that

existed between the signatory parties was broader than *Blockburger* when the U.S.-Mexico

extradition treaty was signed in 1978, this Court must apply Article 6 in a manner consistent with

that common understanding.

74.     Indeed, if anything can be said about the contracting treaty parties' understanding

of *non bis in idem* clauses in 1978, it is that *nobody* believed that its principles (or even U.S.

Double Jeopardy Clause principles) at that point were limited to the *Blockburger* test.   Yet the

Magistrate Judge here decided to apply it anyway – and erred in doing so.   Strict application of

*Blockburger*'s same-elements test essentially would mean that no *non bis in idem* defense can

ever prevail, since every foreign crime, at a minimum, contains at least a *jurisdictional* element

different than its U.S. counterpart, and the *Blockburger* test therefore can never be satisfied.   By

this reasoning, every *non bis in idem* clause in an extradition treaty is a nullity.   Given the

recognized rule of contract construction that every term in a contract should be presumed to have

meaning, the Magistrate Judge erred in adopting this approach.   *Accord* Exhibit G, at 98

(Professor Saltzburg: "if you applied *Blockburger* to most extradition situations, th[en]

essentially you'd never have a double jeopardy bar, almost never, because … different nations

use different language in describing crimes that are similar," and there is no reason "to conclude

that these nations negotiating and agreeing to this language essentially wanted it to be virtually

meaningless, toothless.").  *See also id.* ("better reading of language like this" is that an earlier

prosecution by a requested Party subject to *non bis in idem* will bar at least "some prosecutions

for the same transaction or the same conduct.").

75.     The Magistrate Judge acknowledged that he was restating his position set forth in

an earlier, May 2009 opinion that he had entered in Petitioner's extradition case, which had

declared that the *Blockburger* standard would govern this *non bis in idem* issue.  Exhibit F-277.

But that earlier 2009 opinion had been issued a year before Professor Saltzburg provided his

expert testimony, and at a point before *Sindona*'s majority rule had even been brought to the

Magistrate Judge's attention.  In simply reaffirming his earlier position, in his Findings &

Conclusions issued on February 9, 2011, the Magistrate Judge failed to cite to a single court that

had refused to follow *Sindona*, yet inexplicably referred to *Sindona*'s "discredited dictum,"

Findings & Conclusions, at 38, notwithstanding Professor Saltzburg's expert testimony that the

*Sindona* rule instead had been widely followed in most courts – a point the Magistrate Judge

never addressed.

76.     Petitioner requests that this Court apply these principles of *Sindona* here, and

declare that the *non bis in idem* provisions of Article 6 of the U.S.-Mexico extradition treaty bar

Mr. Ye Gon's extradition on most or all of Mexico's criminal charges.  As *Sindona* noted, the

concept of "same offenses" includes "related … but not included offenses."  And here, the U.S.

Government admitted that these offenses are in fact "related."  In Petitioner's U.S. criminal case,

for example, lead U.S. prosecutor Paul Laymon specifically told the U.S. District Judge (prior to

the U.S. criminal case's dismissal), that Petitioner had been charged with "*similar* offenses in

Mexico."  Exhibit F-019.  Assistant U.S. Attorney Laymon's description of what the U.S.

Government was alleging, and his proffer laying out his theory of the U.S. prosecution, also

described the same "transactions" and "episodes" as in the Mexican charges now before this

Court – these are "substantially the same act or acts."  Moreover, even the Complaint in

Petitioner's extradition case specifically noted how "That charge [the U.S. federal criminal case]

"*is related to* YE GON'S criminal activities in Mexico," immediately after which the crimes

charged in Mexico's extradition request were then described.  Exhibit F-029 (emphasis added).

In sum, these U.S. and Mexican prosecutions were more than just cases with certain overlapping

facts.  As defined by Judge Friendly in <u>Sindona</u>, Justice Brennan in <u>Ashe v. Swenson</u>, and the

Petite policy, they represent the "same offenses."

77.    The fact that the U.S. indictment charged a conspiracy does not affect this

conclusion.  The U.S. indictments listed the conspiracy as having taken place in the country of

Mexico.  Exhibits F-015 & F-063.  Moreover, virtually all of *Mexico's* offenses charged in the

Mexican Arrest Warrant *include* a specific reference to Article 13 of the Mexican Criminal Law.

Under that provision, for each of these offenses, Mr. Ye Gon also faces criminal liability *in*

*Mexico* arising from jointly-undertaken activity, including if he was merely one "who agree[d] to

or plan[ned] the crime."  F-035.  It is therefore simply incorrect to view Mexico's charged

offenses as purely substantive charges that are somehow distinct from the U.S. conspiracy

charges.  And the Magistrate Judge's suggestion that a Mexican conspiracy charge is different,

because it "requires proof" that Petitioner engaged in "specific acts identified in the law,"

Findings & Conclusions, at 40, wholly ignores this Article 13 overlay that exists over most of the

Mexican charges against the Petitioner, and is legally incorrect.[8]

---

[8] The Magistrate Judge also claimed that a Mexican conspiracy is somehow different because a "showing must be made that the individual did not have permission from the Mexican government to perform the specific act." Findings & Conclusions, at 40.  But this is not a distinction; if such permission existed, there would be no conspiracy under U.S. law either.  Once again, the Magistrate Judge improperly focused only on <u>Blockburger</u> elements rather than on whether the *offenses* are different (which they are not).

78.     There is no logical way to viably view these as unrelated prosecutions.  In their motion to dismiss the U.S. criminal case, in fact, filed on June 22, 2009, U.S. prosecutors openly noted how "the conduct with which the defendant is charged in the U.S. case occurred largely within the territory of Mexico and much of the evidence and witnesses upon which the government would rely are from Mexico."  Exhibit F-081.  Earlier, when the lead U.S. prosecutor had been asked by the U.S. District Judge if the evidence he planned to use in the U.S. criminal case "would be the same evidence that, for instance, Mexico would use in its prosecution of the defendant?," the U.S. prosecutor replied directly, "I think that would be fair."  Exhibit F-021.  The lead U.S. prosecutor also specifically told the U.S. criminal court judge that Mr. Ye Gon had been "charged with ... similar offenses in Mexico."  Exhibit F-019.

79.     The jointly-undertaken activity described in Mexico's "Organized Crime" charge in particular undoubtedly arises from the same episode and transactions, and is most obviously "related" to the conspiracy alleged in the U.S. indictment.  In fact, in an earlier effort to demonstrate dual criminality, the Government discussed this charge and compared it to U.S. crimes, declaring that, with respect to Mexico's organized crime charge, "such collaborative conduct *is punishable as a felony under [U.S.] federal laws such as ... conspiracies to violate drug laws*," Exhibit F-060 – the same type of charge listed in the U.S. indictment.  Having openly stated that these exact same allegations would support a U.S. drug conspiracy charge (in an effort to gain a favorable dual criminality ruling), the Government nevertheless sought to deny that same inference in an effort to avoid the negative implications of *non bis in idem*.  *See also* In re Extradition of Valles, 268 F. Supp. 2d 758, 771 (S.D. Tex. 2003) (noting how the offenses of criminal association and organized crime are well-fitting analogues).

80.     The Magistrate Judge improperly allowed this.  He joined the Government's view – for dual criminality purposes – that, with respect to Mexico's organized crime charges, "[s]uch substantive conduct is analogous to conduct punishable as a felony under the federal laws of the United States, such as … conspiracies to violate drug laws, see 21 U.S.C. § 846" – the very statute charged against Petitioner in his U.S. prosecution.  *See* Findings & Conclusions, at 24. Yet the Magistrate Judge refused to apply this same analysis in the *non bis in idem* context. Since Petitioner's earlier prosecution by the U.S. Government involved *this very same statutory provision* – 21 U.S.C. § 846 – that the Magistrate Judge *himself* described as an "analogous" offense, Mexico's organized crime charge is barred by *non bis in idem*.

81.     The U.S. indictment's criminal forfeiture allegations, *e.g.,* Exhibits F-016 & F-064, also raised charges of tainted funds that mirror those in Mexico's money laundering charge. *Cf. Sindona*, 619 F.2d at 179 (citing *United States v. Thompson*, 579 F.2d 1184, 1189 (10th Cir.) (en banc), *cert. denied*, 439 U.S. 896 (1978)), and describing how in that case "it was agreed that state and federal charges involved 'same transaction' for purposes of the Petite policy where the act of receiving a large marijuana shipment resulted in *federal* charges of *conspiracy* to distribute and *state* charges of *possession with intent* to deliver).  All U.S. forfeiture allegations against Petitioner were also dismissed with prejudice, and accordingly, Mexico's money laundering charges similarly are barred under Article 6 of the U.S.-Mexico treaty, and its doctrine of *non bis in idem*.

82.     Application of *non bis in idem* to bar all or most[9] of Mexico's charges against Mr. Ye Gon will not set a broad precedent inhibiting future extraditions.  As noted above, "only two

---

[9] The effect of *non bis in idem* on Mexico's firearms charges is less clear.  While U.S. prosecutor Wanda Dixon at one point told U.S. District Judge Emmet Sullivan in Petitioner's U.S. criminal case that the firearms seized after the Mexican search warrant "ha[ve] everything to do with the charges in this case in this country," Exhibit F-025, Petitioner was never actually charged with any weapons-related offenses in the U.S. indictment, and Professor

reported cases in American legal history" exist in which an independent U.S. prosecution has preceded a foreign government's extradition request, verifying that the situations in which a viable *non bis in idem* issue will even arise are exceedingly rare. On those few occasions when a person facing extradition previously has been actively prosecuted and/or convicted or acquitted in the U.S., however, the *non bis in idem* provisions of a treaty cannot be ignored, and must be squarely applied in accordance with applicable law. And it is hardly unfair to apply it squarely here, where the U.S. prosecutors were specifically warned of this very risk, and yet decided to accept that risk proceed with both a U.S. prosecution and Mexico's extradition request.

83.    Under the highly unusual circumstances of this case, involving a rare dismissal with prejudice of a significant U.S. prosecution that had focused on Petitioner's activities in Mexico, the U.S.-Mexico extradition treaty's Article 6 *non bis in idem* provision bars Petitioner's extradition on Mexico's "similar" and "related" drug, organized crime and money laundering charges. And for reasons set forth elsewhere in this Petition, extradition of Mr. Ye Gon to face Mexico's firearms charges also should be barred, based on dual criminality and other grounds.

**CLAIM THREE – THE U.S.-MEXICO TREATY DOES NOT SUPPORT EXTRADITION DUE TO ITS ARTICLE 2: DUAL CRIMINALITY REQUIREMENTS**

84.    Petitioner realleges all previous paragraphs as if fully set forth herein.

85.    The "dual criminality" requirement refers to the legal principle that "an offense is extraditable only if the acts charged are criminal by the laws of both countries." *Collins v. Loisel*, 259 U.S. 309, 311 (1922). "Dual criminality is an essential element of the government's burden of proof to establish a basis for extradition." *In re Extradition of Platko*, 213 F. Supp. 2d 1229, 1236 (S.D. Cal. 2002).

---

Saltzburg stated that application of *non bis in idem* to Mexico's firearms charges "may be broader than I read *Sindona* or any of the other cases." Exhibit G, at 128.

86.     Article 2 of the U.S.-Mexico Extradition Treaty, entitled "Extraditable Offenses," codifies this "Dual Criminality" requirement.  It requires that willful acts that are charged must constitute a felony in both jurisdictions, as Article 2(1) explains:

> Extradition shall take place, subject to the Treaty, for wilful acts which fall within any of the clauses of the Appendix and are punishable in accordance with the laws of both Contracting Parties by deprivation of liberty the maximum of which shall not be less than one year.

87.     Each charged offense must be evaluated individually for dual criminality, and courts should refuse extradition on specified charges when those charges do not satisfy this dual criminality requirement.  *See, e.g., United States v. Fernandez-Morris*, 99 F. Supp. 2d 1358 (S.D. Fla. 1999) (dual criminality lacking); *Brauch v. Raiche*, 618 F.2d 843, 853 (1st Cir. 1980) (reversing in part, because appellant could not be extradited on the charges on which dual criminality was lacking); *Republic of France v. Moghadam*, 617 F.2d 777, 786 (N.D. Cal. 1985) ("the requirements of dual criminality are not met").

### Drug Importation and Transportation

88.     The Government's efforts to obtain extradition on Mexico's drug importation charges fails for lack of dual criminality.  The importation of N-acetyl pseudoephedrine and the type of ephedrine acetate described by the Mexican Government's Central Laboratory do not represent an offense punishable as a felony in the United States.

89.     At his extradition hearing, Petitioner called as an expert witness Dr. Thomas Lectka, who was accepted by the Magistrate Judge as an expert witness in the fields of synthetic and physical organic chemistry.  Exhibit G, at 11.  Dr. Lectka is a full professor of chemistry at Johns Hopkins University.  Dr. Lectka previously obtained a Ph.D. in organic chemistry from Cornell University, and then conducted a post-doctoral fellowship at the University of

Heidelberg in Germany before serving as a NIH post-doctoral fellow for two years at Harvard University.  *Id.* at 10.  He is an academician who has published 60 papers in his stated field; he also performs active research in synthetic and physical organic chemistry.  *Id.* at 11.  The Government offered no rebuttal evidence in response to Dr. Lectka's live testimony, and chose not to call any chemist whatsoever.  *Id.* at 52.

90.     Dr. Lectka explained that the N-acetyl pseudoephedrine and ephedrine acetate described by the Mexican government are not controlled substances in the United States.

91.     Dr. Lectka first accepted the Mexican government's test results as a working assumption, accepting the notion for purposes of his testimony that the substances supposedly contained in the first three shipments into Mexico were in fact N-acetyl pseudoephedrine, and that the fourth shipment was described as a mixture that included ephedrine acetate, just as Mexico reported.  *Id.* at 13-14.  *See also* Exhibit H, at 30 (counsel notes this assumption given to expert Lectka).  Dr. Lectka then proceeded to testify in detail about the chemical properties of both N-acetyl pseudoephedrine and ephedrine acetate.  Exhibit G, at 14 *et seq.*

92.     Dr. Lectka began by discussing N-acetyl pseudoephedrine, and he noted that this chemical product is *not* a controlled substance under U.S. statutory law.  *Id.* at 17-18.  Nor, he explained, is N-acetyl pseudoephedrine a List I chemical either.  List I of the drug codes for schedules of controlled substances, which is issued by the DEA, and which was given to Dr. Lectka when he received his own DEA license, does not include N-acetyl pseudoephedrine.  *Id.* at 18-19.

93.     As Dr. Lectka explained, none of these U.S. statutes or regulations refer to precursors or derivatives of pseudoephedrine.  The only reference contained in these U.S.

statutes and regulations with regard to pseudoephedrine is to the substance itself, plus pseudoephedrine's salts, optical isomers and salts of optical isomers. *Id.* at 21.

94.     While N-acetyl pseudoephedrine might be classified as either a derivative or a precursor of pseudoephedrine, it is not a salt, an optical isomer or a salt of optical isomer of pseudoephedrine. *Id.* at 21 & 53.  Accordingly, N-acetyl pseudoephedrine is neither a controlled substance under U.S. law nor a List I chemical under U.S. law. *Id.* at 22.[10]

95.     Thus, even assuming that the Mexican government is entirely correct that the first three imported shipments did in fact contain N-acetyl pseudoephedrine, that substance would not involve a chemical substance that is controlled under U.S. law. *Id.* at 23.

96.     Dr. Lectka's statements in this regard were also consistent with an Affidavit previously signed by DEA Case Agent Eduardo A. Chavez, and filed in Mr. Ye Gon's U.S. criminal case.  In that Affidavit, DEA Agent Chavez had affirmed under oath that "N-acetyl pseudoephedrine … is not controlled in the United States."  Exhibit F-013, at ¶ 3.

97.     The fourth imported shipment at issue in Mr. Ye Gon's case was not alleged to contain N-acetyl pseudoephedrine, but was initially reported by Mexico's own tests to belong to the chemical group of the amides – a generic term that Dr. Lectka explained may include millions of substances, but which does not imply a controlled substance.  Exhibit G, at 23-24.

98.     Dr. Lectka was advised that the Mexican government said it had performed a follow-up test of this fourth shipment at its Central Laboratory, which claimed that the substance consisted of two substances, described as an acetamide and ephedrine acetate.  *Id.* at 24-25.  The

---

[10] While 21 U.S.C. § 802(34) refers to List I chemicals, § 802(34)(K) does not refer to all pseudoephedrine-related products, but only to "pseudoephedrine, its salts, optical isomers and salts of optical isomers."  Similarly, 21 C.F.R. § 1310.02(a)(11), which contains a separate regulatory description of List I chemicals, refers only to "pseudoephedrine, its salts, optical isomers and salts of optical isomers."  As Dr. Lectka clarified, N-acetyl pseudoephedrine is not a salt, isomer or salt of isomer of pseudoephedrine, and it therefore is neither a controlled substance nor a List I chemical under the U.S. laws or U.S. regulations.

Mexican government did not contend that the acetamide was a controlled substance, *id.* at 26-27, but Mexico did contend that ephedrine acetate is a controlled substance under Mexican law.

99.     As Dr. Lectka explained, however, ephedrine acetate is not a specific chemical – it is an ambiguous term that can refer to more than one chemical substance**.** *Id.* at 28, 61 & 67.

100.     At Petitioner's extradition hearing, Dr. Lectka drew in Court an ephedrine acetate molecule, which he based upon the mass spectral data provided by the Mexican government itself in its Central Lab report, which had referred to molecular ion M+1 208. *Id.* at 28.  Dr. Lectka described this molecule as the most likely chemical substance found by the Mexican Central Lab, given the molecular weight described for the ephedrine acetate in the Mexican Central Lab's own report. *Id.* at 30-31.

101.     Under the United States drug laws, 21 C.F.R. § 1310.02(a)(3) refers only to "ephedrine and its salts, optical isomers and salts of optical isomers."  Just as with pseudoephedrine, Dr. Lectka confirmed that no U.S. statutes or regulations refer to precursors or derivatives of ephedrine.  The only reference contained in these U.S. statutes and regulations with regard to ephedrine is to the substance itself, plus ephedrine's salts, optical isomers and salts of optical isomers.  Exhibit G, at 21.

102.     The ephedrine acetate molecule drawn by Dr. Lectka as the "most likely" chemical substance described by the Mexican Central Lab, is not a salt, optical isomer, or a salt of an optical isomer of ephedrine. *Id.* at 28 & 31.  While there are some types of ephedrine acetate that can constitute salts, isomers or salts of isomers of ephedrine, the mass of that substance would not be the same as what the Mexican Central Lab had reported. *Id.* at 30.

103.     Of the ephedrine acetate substances falling within the chemical weight described in the Mexican Central Lab's report, none would be salts, optical isomers or salts of optical

41

isomers of ephedrine.  While Dr. Lectka could not technically declare such a result chemically impossible, he did describe this chemical possibility as "highly unlikely" and "very unlikely." *Id.* at 29-30.

104.    Thus, even assuming that the Mexican government is correct that this final imported shipment contained a mixture that included ephedrine acetate, the most likely form of that ephedrine acetate, based on the Mexican Central Lab's data, reveals it to be a chemical that would not be a substance controlled under U.S. law.  *Id.* at 29-30.

105.    Dr. Lectka's testimony, which was unrebutted, reveals that even if these substances are exactly what Mexico's evidence claims, Petitioner's alleged "willful acts" of importing them would not have been a felony under U.S. law, where these substances are not controlled.  Dual criminality therefore was never established, and detention and extradition based on these charges would be legally improper.

106.    In the extradition court, the Government ultimately conceded that it "has never claimed that N-acetyl pseudoephedrine is a controlled or listed substance under U.S. law." Exhibit F-243.  This conclusion is fatal to the Government's efforts to prove dual criminality on the *first three* challenged shipments of chemicals imported by Mr. Ye Gon's company into Mexico.  Even if all evidentiary disputes are ignored, and the Mexican laboratory results analyzing the samples taken from the first three shipments are credited in their entirety, the bottom line is this:  Mr. Ye Gon's charged act of importing N-acetyl pseudoephedrine simply does not constitute a felony under U.S. law.

107.    This Government admission *also* is fatal to the *fourth* challenged importation.  If the fourth shipment was a "bad batch" of N-acetyl pseudoephedrine, as Dr. Lectka suggested as a

possibility, then any *attempt* to import N-acetyl pseudoephedrine similarly would *not* involve any intent to import a substance that is controlled or listed under U.S. law.

108.    And as noted, Dr. Lectka also testified – in expert testimony that was  never rebutted – that the type of ephedrine acetate found by the Mexican lab reports for the *fourth* imported shipment was most likely not a salt, isomer, or salt of isomer of ephedrine, and therefore *not a controlled substance or listed chemical under U.S. law.*

109.    In sum, it is apparent that dual criminality cannot possibly be established on Mexico's importation charges from the imported substances themselves, and accordingly, habeas relief ought to be granted under 28 U.S.C. §§ 2241 & 2243 to this Petitioner.

110.    The Magistrate Judge acknowledged this testimony from Dr. Lectka, none of which was ever disputed.  Findings & Conclusions at 21-22.  Nevertheless, the Magistrate Judge suggested that this testimony "misses the mark," since he said that both countries have laws that – *generally* – outlaw the acts of illegally importing chemicals used to make psychotropic drugs. Findings & Conclusions, at 21.  But the straightforward importation of *these* chemicals is *not* in fact illegal as a felony in the United States, which bans outright only the importation of pseudoephedrine and ephedrine, and their salts, isomers and salts of isomers.  Mere importation of the chemicals "N-acetyl pseudoephedrine" and the type of "ephedrine acetate" that the Mexican Central Lab described as involved here, are *not* recognized as felony offenses in the United States.  The Magistrate Judge did not declare otherwise, but improperly tried to sidestep this reality by claiming *generically* that Mexico's charges were sufficiently "analogous" to "*similar* provisions in American law" (emphasis added), and that "[viewed] *as a whole*, the Mexican indictment reads *like* those filed on a daily basis in United States federal and state courts."  This "close enough" approach failed to honor the legal requirements of dual criminality.

43

111.     Any theory that the dual criminality requirement can be met by a broad analogy to U.S. laws that regulate controlled substances *generally* would improperly emasculate the dual criminality requirement that is a part of this treaty.  Here, we clearly have a situation in which the importation of non-salt/non-isomer pseudoephedrine and ephedrine products is *not* "prohibited in both countries."  Mexico's charged acts, purporting to allege only that Petitioner imported these chemicals, do not and would not violate U.S. law.  This point is not even in dispute.  As noted, the U.S. Government itself ultimately admitted before the extradition court that it "has never claimed that N-acetyl pseudoephedrine is a controlled or listed substance under U.S. law." Exhibit F-243.  And Dr. Lectka's unrebutted testimony confirms that the fourth shipment's claimed substance also was not a controlled or listed substance in the U.S.

112.     The U.S.-Mexican treaty says nothing whatsoever, and does not even intimate, that its dual criminality requirement can be satisfied merely by having charged acts found by "analogy" to be "similar" to what the requested country declares illegal "as a whole."  Any such reading would potentially expand – and dramatically so – the number of offenses that are extraditable under the treaty, in ways that there is no reason to believe its drafters contemplated. Extradition treaties are important bilateral documents, often negotiated by the countries' chief diplomats over a period of years, with language carefully crafted to set forth in detail the resolution of various common and conflicting interests of the signatories, which cannot be ignored.  The Magistrate Judge erred in finding dual criminality based on mere analogy to America's criminal laws generally – an expansive theory which could also have unintended consequences and create diplomatic uncertainty in how courts will read similar provisions in virtually every other U.S. extradition treaty containing a dual criminality clause.

113.    For example, allowing dual criminality to be found based on mere "analogy" to "similar" general laws viewed "as a whole" would mean that a U.S. company, operating in another country and in *full compliance* with that country's *specific* pollution standards, might still face extradition if its output, by "analogy," ran afoul of the requesting country's pollution laws "generally," because both country's laws are supposedly "directed at the same basic evil."[11] Any such standard of dual criminality would be undoubtedly broader, arguably ephemeral, and wholly unworkable in practice.  And more importantly, it is simply not the standard that was established in this carefully-crafted treaty.

114.    Finding dual criminality based on alleged generic similarities of each party's laws "taken as a whole" – even when the specific charges *do not* represent a crime – would essentially rewrite dual criminality case law dating back a century or more.  The Magistrate Judge rejected Petitioner's approach, even characterizing it at one point as a "cramped reading of the requirement of dual criminality.  Exhibit F-259.  But instead of looking at charged acts in "general" terms, as the Magistrate Judge did here, the Supreme Court already has made clear, including almost 90 years ago in *Collins v. Loisel*, 259 U.S. 309 (1922), that the proper question is whether "the *particular* act *charged* is criminal in both jurisdictions."  *Id.* at 312 (emphasis added).  *See also* Exhibit F-243 (Government admits that "the question is whether the acts that form the basis of the charges for which extradition is sought would be crimes in both the requesting and the requested country"; citing *Collins*).  Here, the "particular act[s]" involved in the four Mexican shipments allegedly imported by Unimed were said to consist of N-acetyl

---

[11] Indeed, an American executive wrongly being extradited on such pollution charges might even see in his own court's opinion approving extradition the exact same (and erroneous) explanatory language contained in the extradition opinion herein:  "[W]hile the two countries' laws may not regulate exactly the same chemicals, the underlying criminal conduct being targeted is the same, and therefore the requisite dual criminality is present."  Findings & Conclusions, at 25.

pseudoephedrine and an ephedrine acetate that Dr. Lectka confirmed, in unrebutted testimony, is not a salt, isomer or salt of isomer of either pseudoephedrine or ephedrine – and their importation does not violate U.S. law.  *Accord* <u>*Mironescu v. Costner*</u>, 480 F.3d 664, 665 (4th Cir. 2007) (dual criminality involves whether "the *alleged* conduct *would have been a violation of American criminal law, if committed here*") (emphasis added).  Dual criminality has not been established on Mexico's drug importation charges.

115.    The Magistrate Judge also suggested a possible alternative theory of dual criminality – claiming that "Mexico relies on evidence showing that the respondent was importing N-acetyl pseudoephedrine chemicals and ephedrine acetate in order to manufacture drugs that are controlled by United States law."  Findings & Conclusions, at 23.

116.    The problem with this theory, however, is that there was never any reliable evidence to establish it.  Even if the imported chemicals are assumed to be exactly the substances that Mexico claims, nothing ever linked those imported shipments to any illegal manufacture of *another* substance.  Not one of the four shipments or its contents was ever traced to the manufacture of any other substance at all, and the reality is that no one ever declared what happened to these specific substances after they were imported into Mexico.  While this *theory* was suggested by the Government for the first time in briefing after Dr. Lectka testified at Petitioner's extradition hearing, the Government conspicuously failed to identify any record evidence establishing this needed link.  In fact, the Government had admitted in Petitioner's extradition proceeding that "Mexico has not set out to prove … that Ye Gon mass produced methamphetamine itself," Exhibit F-245 to -246, and the bottom line is that *no evidence at all* was presented to establish that *any* of these four shipments were ever used to make any other

substance after they were imported;[12] indeed, the fourth shipment was never even received, but was seized prior to delivery and apparently destroyed by Mexican officials.  The Magistrate Judge thus erred in *assuming*, without any record evidence at all, that such a conversion surely must have occurred with these shipments after the substances were imported into Mexico.

117.    And more importantly, these linkages are simply not part of Mexico's charged offenses – this link to manufacturing other drugs that would be illegal in the U.S. is not a charged act.  It is, instead, a wholly uncharged act recently raised, and entirely irrelevant to the Mexican prosecution.  Stated differently, if Petitioner were to be extradited, no Mexican court will ever need to (or in fact ever will) determine if these allegedly imported substances were designed to manufacture drugs that would be U.S. controlled substances.  Mere importation of N-acetyl pseudoephedrine or ephedrine acetate of this type, without more – which is not a crime in the U.S. – could nevertheless yield a conviction in Mexico.  This, of course, is exactly what the dual criminality doctrine was designed to prevent – a person who would be innocent in the U.S. being extradited to face serious felony charges in Mexico that the U.S. would not regard as criminal acts.  And even if these acts had been charged, the Magistrate Judge erred in referring to and relying on supposed "evidence" in this regard that in fact was never presented.

---

[12] In a later footnote, the Magistrate Judge acknowledged Petitioner's main argument against dual criminality argument – that "N-acetyl pseudoephedrine and the form of ephedrine acetate imported by him are not controlled substances and are not listed chemicals under United States law, and that therefore, their importation and transportation would not be unlawful in the United States."  But he then held that, "because federal law prohibits the possession, manufacture, distribution, and importation of 'any … chemical' which may be used to manufacture a 'listed chemical' such as pseudoephedrine, pseudoephedrine or ephedrine, [Petitioner's] argument is without merit."  Findings & Conclusions at 25 note 10.  But the Magistrate Judge's ruling misquotes the U.S. law's requirements, by omitting a crucial element.  U.S. law in fact *does not* automatically bar the importation of any chemicals which may be used to manufacture listed chemicals.  To constitute a violation of U.S. law, 21 U.S.C. § 843(a)(6) & (7) *also* require that the importation occur "knowing, intending or having reasonable cause to believe, that it *will be used* to manufacture a controlled substance or listed product."  As noted, there was no evidence presented that these imported chemicals ever were so converted, or that Petitioner knew or had reasonable cause to believe that it would be converted to substances deemed illegal under U.S. law.  Mexico's charged  acts also never asserted such a link.

**Drug Possession**

118.   The Magistrate Judge also found that a dozen plastic bags of a pseudoephedrine hydrochloride were found in Petitioner's office in Mexico City, in March 2007.  Findings & Conclusions, at 9.  No quantity for these substances was ever specified by the Magistrate Judge, or by the Mexican officials seeking Petitioner's extradition.

119.   As Exhibit F-171 reveals, however, a photograph of one of these baggies clearly lists it as being a sample from a specified "Lot" number.  As Dr. Lectka explained, it is a routine practice for pharmaceutical companies to keep samples of lots that they legally sell, in case quality control or other issues arise.

120.   In this case, Petitioner's companies had been involved in the substantial *legal* importation and sale of such products – in fact, *33.875 tons* of ephedrine, pseudoephedrine, and pseudoephedrine hydrochloride prior to 2005, pursuant to a permit from Mexico's Federal Commission Against Risks to Public Health, known as COFEPRIS – as the Magistrate Judge expressly found.  Findings & Conclusions, at 3.  The most plausible conclusion is that type-labeled baggies were merely batch lot samples from Petitioner's legally-sold pharmaceuticals.

121.   Moreover, even if the possession of these substances arguably represented anything other than mere possession of a batch lot, the simple possession of even recognized controlled substances is only a misdemeanor offense in the U.S., under 21 U.S.C. § 844, and extradition based on Mexico's simple possession charge would be unwarranted.

**Diversion of Sulfuric Acid**

122.   The Magistrate Judge also made factual findings that "traces" of sulfuric acid had been found in Petitioner's Toluca pharmaceutical plant, and further noted that sulfuric acid is treated as an "essential chemical product" under Mexican law, whose diversion for the unlawful

48

production of psychotropic substances can give rise to a criminal violation of *Mexico's* health laws.  Findings & Conclusions, at 9.

123.    The Magistrate Judge never declared that the possession or use of sulfuric acid can represent a violation of U.S. law, and with good reason.  As Dr. Lectka testified, sulfuric acid is an extraordinarily common solvent that is not only legal under U.S. laws, but also such a common substance that it is found in virtually every operating chemistry lab, and it is widely sold over the Internet.  Exhibit G, at 48-49.  The Government never explained, and the Magistrate Judge never declared, that this charge meets the U.S.-Mexico treaty's dual criminality requirement.

124.    Nor was any evidence presented – none whatsoever – that this sulfuric acid was ever used to make psychotropic substances.  The Government's primary expert report said merely that N-acetyl pseudoephedrine can be converted to pseudoephedrine *hydrochloride* by treating it with "heated *hydrochloric*."  But no *hydrochloric* acid was ever found in the Toluca plant – only *sulfuric* acid was.  While the Toluca plant's possession of common, ordinary sulfuric acid is alleged to be a crime, no evidence has been presented to establish its diversion, ever, to produce any narcotic or illegal drug.  As the Government's own chemistry report revealed, if used in clandestine operations, sulfuric acid can produce ephedrine *sulfate*, pseudoephedrine *sulfate*, amphetamine *sulfate*, etc.  Yet a review of the numerous trace samples allegedly taken from this same Toluca lab shows that not one test yielded any type of allegedly improper "sulfate"-related product.

125.    Possession of sulfuric acid is not a felony crime in the United States; if it were, probably almost every American chemist would be a felon.  And there was no evidence presented or found by the Magistrate Judge to establish that the mere "traces" of sulfuric acid,

allegedly found at Petitioner's Toluca plant, were ever diverted for the production of any improper substance, particularly since no illegal "sulfate" product was ever found there. Dual criminality is absent, and Petitioner cannot possibly be legally held or extradited based on this charge arising from mere traces of common sulfuric acid.

### Mexico's Other Alleged Criminal Offenses

126.    Each of Mexico's other charged offenses is necessarily dependent, directly or indirectly, upon the validity of Mr. Ye Gon's drug charges as a predicate offense. Mexico's Money Laundering charge, for example, depends on theory that the money seized represented the proceeds of illegal drugs. Mexico's Organized Crime charge, in turn, is dependent on these same predicate offenses of illegal drug dealing and money laundering. As for Mexico's Firearms offenses, the Government tries to prove dual criminality by alleging these weapons' proximity to these same drugs that it claims were illegal. Accordingly, a finding of non-extraditability on Mexico's drug offenses also necessarily bars Petitioner's continued detention and the Mexican government's ability to obtain his extradition based on these other dependent charges. Moreover, these other charges suffer from their independent infirmities of their own.

### Possession of Firearms

127.    As the Magistrate Judge noted, "Mexico alleges that Ye Gon's conduct violated two separate provisions of the laws prohibiting unlawful possession of firearms reserved for the use of the military." Findings & Conclusions, at 28. More specifically, the Mexican government charged Mr. Ye Gon with violating Articles 8 & 11 (b) and (c), Section III of its Federal Criminal Code, and Article 83-Ter.[13] Article 11 identifies certain groups of firearms that

---

[13] Insofar as the fifth weapon – the one found in a file cabinet of his Mexico City office – the Mexican Government also alleged that Mr. Ye Gon was also responsible under Article 13 of Mexico's Federal Criminal Code, which creates equivalent liability for those involved in jointly-undertaken activity.

constitute "weapons … for the exclusive use of the Mexican Army, Navy and Air Force," and describes them as "weapons destined for war."  Article 8 states that "[n]either ownership nor possession of the[se] weapons … is permitted, excluding those exception cases indicated by this Law."  Article 83-Ter sets forth the various penalties for such unauthorized possession.

128.    As the Magistrate Judge also found, five firearms were allegedly seized.  Four of these five firearms were found in Petitioner's house, "in a locked, hidden room off the master bedroom in Ye Gon's home," near a large amount of cash.  Findings & Conclusions, at 28.  The fifth firearm was found in a file cabinet in his personal office in Mexico City, allegedly in the same general location where the 12 sample baggies of pseudoephedrine hydrochloride had been found.  Findings & Conclusions, at 28.

129.    There is no suggestion that Mr. Ye Gon ever improperly brandished or used any of these five firearms; rather, the Mexican government charges mere status offenses, claiming that Mr. Ye Gon violated its laws simply because he possessed firearms that "were of a kind reserved for the exclusive use of the military."  The charges themselves, as set forth in the Mexican Arrest Warrant, mention nothing at all about the proximity between any of these firearms and any money or drugs.  Nor do the charges in the Mexican Arrest Warrant say that the fifth gun had an "obliterated" serial number; it alleges only that this firearm had "no serial number visible."  Exhibit E, at 638, ¶ 8.

130.    There is no contention made – nor could there be – that Mr. Ye Gon's possession of the four firearms found in his home, or the fifth firearm found inside a cabinet drawer in his personal office, on March 15, 2007 was by itself illegal under U.S. law.  Our country obviously has no law comparable to the Mexican federal offense that bans the simple possession of specified firearms by persons who are not authorized by its organized military to have them.

131.    Faced with the reality that the U.S. has no comparable crime, the Government tried to recharacterize these offenses that Mexico charged during Petitioner's extradition proceeding.  The Government claimed that dual criminality might exist for the first four firearms because they were allegedly found near money in Mr. Ye Gon's home that it contended was drug-related; the Government argued this fact might support dual criminality under a theory that the firearms were possessed "in furtherance of" a drug trafficking offense under 18 U.S.C. § 924(c).  On the fifth firearm, the Government tried to claim it was found near the pseudoephedrine hydrochloride samples; it also claimed that its serial number was obliterated, which it said would allow for dual criminality under 18 U.S.C. §§ 924(c) and 924(o).

132.    The Government said that its view that dual criminality existed under 18 U.S.C. § 924(c) was established by the case of _United States v. Wahl_, 290 F.3d 370 (D.C. Cir. 2002).  But _Wahl_ is not at all comparable.  In _Wahl_, "the firearm was found on top of the entertainment center immediately in front of Wahl when the police first entered."  _Id._ at 376.  A plastic bag with 47 baggies of cocaine base was found just below, protruding from the VCR's videotape slot.  _Id._ at 373.  That is a far cry from here, where Mr. Ye Gon was not even in the country of Mexico when the seizure of the instant firearms allegedly occurred.

133.    Moreover, even if closer proximity existed, _Wahl_ itself specified that mere proximity is not enough for § 924(c) liability: "Wahl _argues correctly_ that even under the amended statute, _the mere presence of a firearm at the scene of drug trafficking is insufficient to support a conviction under section 924(c)_."  290 F.3d at 375 (emphasis added).  Yet the Magistrate Judge oddly and inexplicably relied on _Wahl_ as his basis for a finding that a § 924(c) violation had been established here, Findings & Conclusions, at 29, without ever addressing this

_Wahl_ quotation that Petitioner had specifically cited, and without ever explaining why more than mere proximity had been established.

134.   Any determination that dual criminality existed under 18 U.S.C. § 924(c) was necessarily dependent on a factual finding that the firearms were possessed in furtherance of a "drug trafficking crime," _as that term is defined in § 924(c)(2), and understood under U.S. law_. The four firearms located in Mr. Ye Gon's home were not "at the scene of drug trafficking" – since no drug transaction was ever alleged to have taken place at Mr. Ye Gon's personal residence, and no illegal substances were ever found there.  The evidence, even if credited entirely in Mexico's favor, showed only that guns had been found near money.

135.   As for the fifth charged firearm, it was allegedly found in a file cabinet in Mr. Ye Gon's Mexico City office, where the 12 baggies of pseudoephedrine hydrochloride were also found.  Even if one ignores the fact that these were obviously mere "Lot #" samples, the drug charge arising from those drugs was for _simple possession_ – not a drug _trafficking_ offense that could support a § 924(c) charge.  All of the firearms also were found months after Mr. Ye Gon had already left Mexico.  In short, any alleged § 924(c) violation would depend on a finding that it was in furtherance of a recognized U.S. drug trafficking crime, yet the Government's proffered evidence wholly failed to support such a finding.

136.   More importantly, even if a § 924(c) offense could arise from these facts, the Government's claims of a drug connection are not a part of the Mexican _charges_ on which extradition is being sought.  Even if proximity existed, in other words, the bottom line is that § 924(c)'s "in furtherance" requirement is not a part of the Mexican charges, and will never need to be established in Mexico.  Stated differently, if Mr. Ye Gon is extradited on these firearms charges under Articles 8 and 11, no Mexican court or jury will ever decide if these firearms were

*in fact* used "in furtherance" of a drug trafficking offense (as 18 U.S.C. § 924(c) requires) or if the firearm found in his office had an "obliterated" serial number (as 18 U.S.C. § 924(o) requires).  These facts were not a part of the Mexican arrest warrant's charges, and more importantly, the elements of the charged Mexican crimes require *only* that a person *possess* the specified firearms *without authorization* from the Mexican military establishment.  *See* Exhibit F-032 (Diaz Lopez lists elements of Mexico's firearms charges).  No crime appears to even exist in Mexico for possessing a firearm in furtherance of a drug offense, or possessing a firearm with an obliterated serial number.  This is not "dual" criminality – it is an entirely different type of criminality, since a person wholly innocent of 18 U.S.C. §§ 924(c) and 924(o) offenses could easily be convicted of the mere status offense that Mexico charges under Articles 8 and 11 of Mexico's Federal Criminal Law.

137.    While two separate jurisdictions need not name the same crime, and the scope of each jurisdiction's laws need not be fully coextensive, dual criminality nevertheless depends on "if the particular act *charged* is criminal in both jurisdictions."  <u>Collins v. Loisel</u>, 259 U.S. 309, 312 (1922).  Here, the Mexican arrest warrant does not charge that any of these firearms were used "in furtherance" of a drug offense, nor does it charge that the fifth gun had an "obliterated" serial number; at most, it says no serial number was "visible."  More importantly, these are not acts that support the charged offenses – they are *uncharged* facts *irrelevant to* the Mexican criminal charges – facts that need not be proved, and that will never be decided if this case is returned to Mexico for a later prosecution on those offenses.  Even if the legal concept of dual criminality might allow this Court to go beyond the crimes identified, and to look at charged acts, this Court simply cannot look to *uncharged* acts as a basis for trying to establish that Petitioner's activities also constitute a violation of U.S. law.  *See* <u>United States v. Sensi</u>, 879 F.2d

54

888, 894 (D.C. Cir. 1989) ("it is the acts or underlying conduct *supporting the charges* which must correlate") (emphasis added).  *See also* <u>United States v. Peterka</u>, 307 F. Supp. 2d 1344, 1351 (M.D. Fla. 2003) (uncharged act could not support dual criminality; proffered evidence involved a wire transfer in 1998, but this did not support the charge of alleged wrongdoing in 2000); <u>Mironescu</u>, *supra*.

138.     Here, Mexico's "charged" offense is simply that Mr. Ye Gon possessed firearms "reserved for the exclusive use of the military."  *See also* Exhibit E, at 637, ¶ 6 (charging Mr. Ye Gon with "committing the crime of bearing firearms which use is reserved for the Army, Navy and Air Force").  That charge is decidedly *not* a crime in the U.S., and dual criminality is lacking.  Neither the Magistrate Judge nor the Government cited to a single case in which an American court has ever before extradited another person to face a mere firearms possession offense of the type charged by Mexico.  A review of the published case law reveals none outside of this case.  Stated simply, this Magistrate Judge appears to be *the first in American history* to allow a person to be extradited to face a criminal offense that codifies a principle (that only a federal military gets to decide who can *possess* firearms) so antithetical to the values enshrined in our Second Amendment – as our Supreme Court described in detail in <u>District of Columbia v. Heller</u>, 128 S. Ct. 2783 (2008).  *Compare* <u>In re Petition of France for the Extradition of Sauvage</u>, 819 F. Supp. 896, 899 (S.D. Cal. 1993) (France charged that Sauvage possessed a "stock of war weapons," but "[n]o request for extradition is brought for firearms violations").

139.     Here, Mexico's statute criminalizing the mere possession of firearms without military authorization has no substantial U.S. analogue.  Mexico has no "obliterated serial number" or § 924(c)-type law.  And the U.S. flatly (and constitutionally) rejects Mexico's paradigm that the Executive Branch of the Union, through the Ministries of the Interior and

National Defense, shall control all the firearms within the country.  In short, the two countries' criminal laws cited are not "aimed at the same category of conduct," *id.* at 1125, and the dual criminality requirement cannot be established.  *Cf.* <u>United States v. Khan</u>, 993 F.2d 1368 (9th Cir. 1993) (dual criminality was not satisfied for 21 U.S.C. § 843 (using a communication facility to facilitate a drug crime) since no Pakistani crime was presented as analogous to 21 U.S.C. § 843).[14]

140.    The Magistrate judge perhaps recognized that dual criminality could not easily be established under U.S. federal law.  Accordingly, the Magistrate Judge went further, declaring that he would also look to and consider District of Columbia law in this context.  The Magistrate Judge declared this to be proper, based on his claim that Petitioner had been "found" in the District of Columbia, rather than in the State of Maryland.[15]

141.    Procedurally, Petitioner was never even given an opportunity to address this novel argument that dual criminality might be found in the District of Columbia's local gun laws.  The idea of looking at local (as opposed to federal) firearms laws for dual criminality purposes had been raised for the first time in a Government reply filing.  In response to this suggestion, Petitioner moved for leave to file a surreply, specifically asking to address this issue, Exhibit F-248, but this motion was denied.  Exhibit F-258.  Petitioner was allowed no input on these D.C. gun laws.

---

[14] Indeed, any effort to interpret the provisions in 18 U.S.C. § 924(c) and 924(o) so broadly for dual criminality purposes as to declare that it would be illegal, within the U.S., to passively possess firearms within one's own home, or in a file cabinet of one's office, as was alleged here, may also be unconstitutional as applied, under the Second Amendment's individual right to keep and bear arms, or the Ninth Amendment's penumbral rights of privacy and self-protection.

[15] As noted above, Petitioner in fact was "found" in Maryland, and his extradition hearing should have been held there.  If it had been, this issue never would have arisen, since Maryland has no state law similar to D.C.'s alleged ban on the possession of semi-automatic weapons.  The Government thus benefitted directly (and improperly) by choosing to hold Petitioner's extradition case in the District of Columbia, and then invoking D.C.'s local laws.

142.    Examining those laws now, it is apparent that the Magistrate Judge's analysis was legally flawed.  There is no evidence whatsoever that the AK-47 allegedly seized was an automatic (as opposed to semiautomatic) weapon, yet the Magistrate Judge somehow declared it to be a "machine gun" under D.C. law.  To do this, the Magistrate Judge said that D.C. Code § 22-4501 defines the term "machine gun" by referencing the definition in a regulatory provision, D.C. Code § 7-2501.01(10).  The Magistrate then claimed that this regulatory provision defines "machine gun" as any firearm "which shoots, is designed to shoot, or can be readily restored to shoot, *automatically* more than one shot without manual reloading, by a single function of the trigger." (emphasis added).

143.    The Magistrate Judge's analysis ignored the fact that the definition it cited was not the one in effect at the time of Petitioner's alleged offense.  A closer review of the statute reveals that D.C. Code § 7-2501.01(10) was amended in 2009.  Before that time (and at the time of Petitioner's alleged offense), D.C. defined a "machine gun" quite differently, and as follows: "Machine gun means any firearm which shoots, is designed to shoot, or can be readily converted or restored to shoot: (A) Automatically, more than 1 shot by a single function of the trigger; [or] (B) Semiautomatically, more than 12 shots without manual reloading."  The only firearm at issue here was an AK-47, an obvious *semiautomatic*, and no evidence was ever presented that it was capable of firing more than 12 shots without manual reloading.

144.    The Magistrate Judge also never explained how this charged weapon met the definition of an "automatic" weapon under D.C. law, other than to cite to a single unpublished decision issued by a local D.C. trial judge.  And his reliance on that opinion, *District of Columbia v. Beretta U.S.A. Corp.*, No. 2000-CV-428B, 2006 WL 1892023 (D.C. Super. May 22, 2006) is even more troubling.  That case involved a *civil* case, not a criminal prosecution at all.

57

And more importantly, the judge in that case actually made *no judicial findings* that an AK-47 was a "machine gun" under D.C. law, as the Magistrate Judge tried to claim.  Instead, the D.C. trial judge's opinion merely noted that she was merely "tak[ing] as true" the allegations of the Plaintiffs' Complaint.  *See id.* at note 3.  Moreover, even as alleged in that Complaint, the contention of the Plaintiffs had merely been that an AK-47 would qualify as a machine gun <u>or</u> *assault weapon*, as defined in D.C.'s Strict Liability Act.  This distinction is fatal to dual criminality, since D.C. Code § 22-4514(a) appears to *criminalize* only the possession of machine guns, and <u>not</u> assault weapons, by persons who are not in the military.  In short, it seems apparent that an AK-47 is not (even under D.C. local law) a "machine gun," and the Magistrate Judge's strained effort to find dual criminality on Mexico's firearms charges in this manner is telling, and illustrative of his generally uncritical, across-the-board adoption of the Government's proposed findings in support of its extradition request.

145.     This Magistrate Judge erred in becoming the first judge in U.S. history to legally authorize extradition on a foreign crime that, on its face, punishes as a felony the non-military possession of firearms.  Probable cause and dual criminality have not been established for Mexico's charged firearms offenses against Mr. Ye Gon, and it would be improper, and even unconstitutional, to detain him further or extradite him on such charges.

**Money Laundering in Mexico**

146.     Mexico has also charged that Petitioner committed "money laundering."  More specifically, Mexico's specific allegations are found in the Arrest Warrant's Paragraph Fourteen, where Petitioner and other named persons are charged in a single count with "probable responsibility in committing the crime of conducting operations using money laundered funds, in the modality that either acting on their own, or through an intermediary, they *maintained funds in Mexican territory* with the knowledge that the funds had an illegal source (with the purpose of

58

concealing their origin, location, destination or ownership), as established in and punished by Article 400 bis of the Federal Criminal Code, under the terms of Article 13, Section III of the same code."

147.    In its attempts to seek Petitioner's extradition, the U.S. Government has included in its allegations of the extradition Complaint a wide-ranging set of facts, which include transferring cash to bank accounts in the United States, China and Europe, to pay companies like Chifeng Arker and various equipment suppliers, as well as to Petitioner's brother and business partner, and to fund Petitioner's allegedly lavish purchases and gambling in Las Vegas.  These listed transactions do not allegedly include any wire transfers described as being made to individual underworld figures or cartel members; instead, they appear to have involved wire transfers made to various legitimate businesses located around the world, often for machinery and equipment.  Many of these wires also occurred *prior to the first challenged importation* at issue here.  And most importantly, these transfers of funds to locations *outside of Mexico* do not establish Mexico's *charged* offense, which (as noted) alleges merely that Petitioner and others "*maintained* funds *in Mexican territory.*"

148.    The Magistrate Judge improperly reached beyond Mexico's charged offense in order to find dual criminality.  *See* Findings & Conclusions, at 26 (discussing not only funds found in Petitioner's closet, but also Petitioner's alleged "funneling [of] cash proceeds through Mexican money exchanges in order to pay [foreign] suppliers").  In essence, the Magistrate Judge rewrote Mexico's charge in order to find dual criminality, since it could never be established from Mexico's charge alone.  In his efforts to try to establish a "financial transaction," for example, the Magistrate Judge pointed to four types of uncharged acts that

might qualify.  *See* Findings & Conclusions at 27.  But not one of these categories involved *maintaining* funds *in Mexican territory*.  Instead, each involved payments "to" others.

149.    Nor was it ever established that Petitioner and the others named actually knew that any funds maintained in Mexico had an illegal source.  The Government tries to suggest that the funds found in Petitioner's home necessarily represented the proceeds of Unimed's four challenged imported containers of chemicals, but it was never adequately established in this record that these funds in Petitioner's home came from that source, as opposed to the tens of thousands of tons of chemical products (including pseudoephedrine and ephedrine) that it was recognized that he had earlier imported *legally*.  The Magistrate Judge referred to Petitioner's "unexplained wealth," Findings & Conclusions, at 26, but it was the Government's burden to establish probable cause – not Petitioner's obligation to explain it away.  Even if these funds had been linked to these imports – which they never were – it was never established that Petitioner knew that the source of these funds was illegal, since his Government-approved chemist, Bernardo Mercado Jiminez, swore that he had specifically told Petitioner otherwise, and since these chemicals are not universally considered to be controlled substances (such as in the U.S.).

150.    More importantly, even if such evidence did exist, dual criminality on this charge is lacking.  In finding dual criminality, the Government argued, and the Magistrate Judge relied on a single U.S. statute – 18 U.S.C. § 1956(a)(1).  *See* Findings & Conclusions at 26-27.  But § 1956(a)(1) establishes a U.S. crime only if a person "conducts or attempts to conduct … *a financial transaction*," while "knowing that the property *involved in a financial transaction* represents the proceeds of some form of unlawful activity."  Here, as noted above, Mexico's money laundering charge does not allege that Petitioner engaged in a financial transaction – and in fact, it claims exactly the opposite – that he "maintained funds in Mexican territory," knowing

that the funds had an illegal source.  As Mexico's Affiant, Diaz Lopez, acknowledged in his description of this Mexico's crime's elements, Mexico need only prove that Petitioner "knowingly possessed proceeds" – not that he engaged in any financial transaction.  *See* Exhibit F-032, at ¶ 30.  The necessary dual criminality on Mexico's money laundering charge does not exist, and Petitioner's detention and extradition are inappropriate based on this charge.

151.    The Magistrate Judge had no choice but to acknowledge – as was clear – that Mexico's money laundering statute does not require a financial transaction, whereas the U.S. law does.  Findings & Conclusions, at 26.  He nevertheless found dual criminality, again by using a *generic* comparison of the laws.  But generic similarity is no more adequate here than in the pollution example above.  Mexico's crime – that Petitioner merely "maintained funds" that allegedly were derived from criminal conduct, is not a crime in the United States, since all agree that the U.S. money laundering crime requires a "financial transaction."[16]  Nor was a "financial transaction" ever charged here by Mexico.  This is not a charged act, but a series of *uncharged* acts that will be *irrelevant* to the Mexican case.  If Petitioner were to be extradited, for example, the issue of whether he engaged in a "financial transaction" will simply never be decided, since it is not an element of the Mexican crime *or even a charged act.*  He could be convicted based solely on the funds held at his house – *which is not a U.S. crime.*

152.    The very purpose of dual criminality is to ensure that a charged act is illegal in both countries – that *both countries* recognize the *charges* as constituting a *criminal offense*.  Here, the U.S. does not recognize "maintaining funds" as a crime.  And if extradition were to

---

[16] Like the example of U.S. executives charged with foreign pollution violations, referenced above, many wealthy persons in the U.S. would likely be surprised indeed to learn they can be extradited based on a foreign charge that they simply "maintain funds" allegedly derived from illegal conduct, unless they "explain" their wealth.  Under proper dual criminality analysis, no such person can be extradited from the U.S. unless the requesting country also alleges, or at least charges, an act revealing a financial transaction, so that their charged activities are also illegal under U.S. law.

occur, the U.S. requirement of a "financial transaction" would never get adjudicated in Mexico. America's requirement of a "financial transaction" could and likely would be wholly ignored, and it is clear that Petitioner could be convicted of a Mexican crime based solely on charged acts that would not be illegal in the U.S. – exactly what the dual criminality doctrine is designed to prevent.

**"Organized Crime"**

153.    The Mexican government also charges Mr. Ye Gon with an "organized crime" offense, allegedly for the purpose of repeatedly committing drug crimes and operations with illegal funds.

154.    A closer look at this charge, however, reveals that Mexico's alleged "criminal organization" in reality consists of nothing more than certain employees and business associates of Mr. Ye Gon's companies.  According to the Complaint filed in this extradition proceeding, Petitioner's so-called "'trusted team' of collaborators" included his company chemist, his sister-in-law, a Unimed Pharm Chem engineer, and his personal driver.  Findings & Conclusions at 13-14.  The Government's position appears to be that Mr. Ye Gon and his small band of so-called trusted insiders – a handful of people, several of them family members, and none with any described criminal record or known past involvement with illegal drugs – were able to build what might be described as the most lucrative criminal drug ring in history, allegedly amassing hundreds of millions of dollars, all within a period of time that lasted less than two years.

155.    For purposes of dual criminality, as noted above, Mexico's charged acts of organizational crime are only illegal under U.S. law if the predicate offenses are illegal.  In other words, the organization would only be "criminal" if its members engaged in illegal drug transactions or money laundering.  But as noted above, the chemical substances charged by Mexico here are not listed or controlled substances in the U.S., and Mexico's charged acts of

money laundering, which do not include "financial transactions," do not represent illegal conduct in the U.S.  Because Mexico's organizational crime charge relies on these predicate acts that are themselves not illegal in the U.S., Mexico's organizational crime offense also fails to satisfy the U.S.-Mexico treaty's dual criminality requirement.

## CLAIM FOUR – THE U.S.-MEXICO TREATY DOES NOT SUPPORT EXTRADITION DUE TO ARTICLES 2 & 10:  PROCEDURAL INSUFFICIENCY OF THE EVIDENCE

156.    Petitioner realleges all previous paragraphs as if fully set forth herein.

157.    Article 3 of the U.S.-Mexico extradition treaty, entitled "Evidence Required," clarifies that the standard of admissibility for evidence in an extradition proceeding must satisfy the requirements of United States law:

> Extradition shall be granted only if the evidence be found sufficient according to the laws of the requested Party … to justify the committal for trial of the person sought if the offense of which he has been accused had been committed in that place.

158.    The vast bulk of evidence submitted by the Government fails to meet the threshold standards for *reliability* set forth in the Treaty.  As noted by Professor Saltzburg, a noted expert in the laws of evidence in the U.S. (which is the "requested Party" whose laws control this issue), even though the Federal Rules of Evidence do not apply in extraditions, the Government's excerpted filings – without any attribution, and lacking the minimum standards of reliability that a Court would expect in any preliminary hearing – fall short of the mark.

159.    As Professor Saltzburg noted, many of the Government's proffered Exhibits D-1 through D-49 in this case contain a footnote which states:  *"What follows are the reliable excerpts of the complete text of the witness' statement, and they are parts relevant to the request for extradition of ZHENLI YE GON.  In the text of the statement extracts, where words were*

*omitted, ellipses were inserted and sentences and paragraphs were formulated with grammatical changes to facilitate the reading thereof."* Exhibit G, at 85.

160.    This footnote, which is repeated in the vast majority of the Government's Exhibits D-1 through D-49 – including all of the Government's proffered witness statements, as well as accounting and other reports – does not say who decided what would be excerpted.  It does not say who is representing that the footnote is reliable.  It does not say who made the determination that these were the relevant portions.  It does not who made the "grammatical changes to facilitate the reading thereof," or what those grammatical changes were.  It does not say who made these admitted changes to the text, who compared the excerpted document to the original, or who prepared the summaries.  *Id*. at 86-87.

161.    Professor Saltzburg noted that the presentation of such statements in U.S. courts would be "highly unusual," since "there is no indication as to who prepared the statements, how they were prepared, when they were prepared, what ground rules were used in order to determine the grammatical changes that were going to be made, and what ground rules were used to determine what was relevant in the statements and what was not relevant and should not be included."  *Id.* at 87.  There was also "no indication as to who did this, whether it was the same person as to all statements, whether different people did it, whether they used the same set of standards.  So basically what we have are essentially naked statements that do not appear to be the original statements of anyone, but appear to be summaries that are created by an unknown person in an unknown way."  *Id.* at 87-88.

162.    According to Professor Saltzburg, the use of such evidence also "would create a problem in any proceeding because if I can't answer these questions" then it is difficult "to decide whether these are reliable.  And the normal way a judge would do it is to understand who

64

made the statements, how they were made, and to the extent changes were made, who it was that authorized the changes and by what procedure and according to what kinds of judgments and standards.  And none of that is, as I saw it, in the documents that were provided as part of the extradition proceeding."  *Id.* at 88.

163.    The fact that the Federal Rules of Evidence do not apply in an extradition setting did not change Professor Saltzburg's opinions.  He noted that an extradition court still must make an independent determination of probable cause, and that this determination at an extradition hearing is slightly more demanding than what is required in the context of a search warrant or arrest warrant – since it is more akin to the probable cause standard used at a preliminary hearing.  Professor Saltzburg indicated that it would only be natural at a preliminary hearing for a judge to ask and expect to know who is vouching for a document being presented, to ensure that it is "reliable and accurate and prepared in a way that I can trust."  *Id.* at 89.

164.    While a separate arrest warrant does exist here, Professor Saltzburg noted how "[a]ll those questions are as unanswerable when you look at the application for the arrest warrant as they are when you look at the other documents that are presented."  *Id.* at 90.  While acknowledging that the Mexican Arrest Warrant in this case and its accompanying application are certainly lengthy, Professor Saltzburg noted that the length of a statement is not determinative:  "An untrue statement can be long or short.  The longer it is doesn't make it truer."  *Id.* at 111.

165.    As Professor Saltzburg also noted, "Article 10, Subdivision 3 [of the U.S.-Mexican extradition treaty] makes absolutely clear that there must be an arrest warrant submitted to the Court, and then evidence sufficient for the Court to find the probable cause that is required under the treaty."  When asked if this separate "evidence" requirement could be satisfied by

Mexico submitting "simply a summary of what's in the arrest warrant," Professor Saltzburg was

clear:  "I don't believe that's a fair reading of Article 10, Subdivision 3, [which] says there

should be an arrest warrant and evidence in addition to the arrest warrant that is sufficient to

satisfy the standard that is set forth in American law, that is, the law of the requested jurisdiction.

So, I believe that the arrest warrant alone does not satisfy Article 10, Subdivision 3."  *Id.* at 91.

166.    Professor Saltzburg was referring to Article 10 of the U.S.-Mexico extradition

treaty, which is entitled, "Extradition Procedures and Required Documents."  In addition to the

documents required in all extradition requests, additional documents are required if a person has

not yet been convicted in the other jurisdiction, as Article 10(3) notes:

> In addition, when the request for extradition relates to a person
> who has not yet been convicted, it shall be accompanied by:
>
> (a)  A certified copy of the warrant of arrest issued by a judge or
>      other judicial officer of the requesting Party;
>
> (b)  Evidence which, in accordance with the laws of the requested
>      Party, would justify the apprehension and commitment for trial
>      of the person sought if the offense had been committed there.

As Professor Saltzburg explained, subsections (a) and (b) set out separate and independent

requirements.

167.    These specified procedural requirements of the U.S.-Mexican treaty are in

addition to 18 U.S.C. § 3190's separate U.S. statutory procedural requirements.  *Cf. In re*

*Extradition of Strunk*, 293 F. Supp. 2d 1117, 1119 (E.D. Cal. 2003) ("all provisions of the

extradition treaty must be honored including those which set minimum standards for permitting

extradition in the first place").  And as this treaty provision makes clear, this requirement for

submission of "evidence" is supplemental to, and distinct from, mere submission of the certified

arrest warrant.  When evidence is lacking in this context, it is not a sufficient answer for the

Government to declare that this Court can simply "look in the arrest warrant." *Cf.* <u>Parretti v.</u>

<u>United States</u>, 122 F.3d 758 (9th Cir. 1997) ("the government, in relying solely on the existence

of the French arrest warrant, has failed to satisfy the probable cause requirement."), *op.*

*withdrawn on other grounds*, 143 F.3d 508 (9th Cir.), *cert. denied*, 525 U.S. 877 (1998).

168.    In this regard, Professor Saltzburg noted that the Mexican arrest warrant itself,

which had been submitted by a Mexican prosecutor, did not contain or attach any original signed

statements of the witnesses.  Exhibit G, at 91.  Nor, in the arrest warrant application, which itself

contains excerpts, did the Mexican prosecutor answer any of the various questions previously

noted, concerning who excerpted these statements, how they were excerpted, what the standards

were, or when the excerpts were actually made.  *Id.* at 92.  It was not clear who took these

witness statements, and no one vouched to the extradition court either that the statements were

true or that the summaries were actually true and accurate summaries of what the witnesses said.

*Id.* at 93.

169.    Professor Saltzburg also indicated that U.S. case law is clear that, in making a

probable cause determination, the credibility of affiants is something a court may properly

consider; "it has been true since *Aguilar versus Texas*, *Spinelli versus United States*, and

continuing through *Illinois versus Gates*, which sets forth the totality of the circumstances test….

[O]ne of the basic questions every judge called upon to make a probable cause determination

asks is why should I believe this person…. And that requires some assessment of reliability."  *Id.*

at 94.  Looking at the Government's presentation in the instant case, Professor Saltzburg noted

that "I don't see how anyone could trust these statements without knowing how they were

prepared, without knowing whether someone is vouching for them being accurate summaries,

saying that they were compiled in an accurate way, knowing that the person actually compared

them to the originals…. It is hard to figure how to weigh any of these given the absence of information about the circumstances of their preparation." *Id.* at 94-95.

170.    In the context of the application of United States law at preliminary hearings in criminal courts, Professor Saltzburg indicated that he had never seen a court accept a prosecutor's sworn criminal complaint as the evidence of probable cause. *Id.* at 95.  He also stated that "I've never seen a proceeding in which a judge accepted summaries of supposed statements without the foundation that I previously described, and then relied on these summaries to find probable cause." *Id.* at 95.

171.    While law enforcement officers, in affidavits submitted in preliminary hearings, often describe statements made by others, Professor Saltzburg said, "I've never seen a law enforcement officer submit to the Court a document that purports to be the statement of a third party, but isn't a complete document and has been altered in some ways to make it better reading, and doesn't explain who it is that prepared the document, how it was prepared, *it just doesn't happen*." *Id.* at 109 (emphasis added).

172.    Professor Saltzburg compared the situation to a preliminary hearing in which a law enforcement officer is shown a hundred statements and then is asked what they are.  "And the officer says:  Those are summaries of statements that were given by witnesses.  They've been changed and things are omitted and language has been changed to make them more readable.  And the officer is asked:  Well, who prepared these summaries?  He says:  I don't know.  And when were they prepared?  I don't know.  And who is it that's vouching for their accuracy?  I don't know.  *I don't think a judge would be inclined to rely on those statements*." *Id.* at 112 (emphasis added); *id.* at 114 ("those are things the Court I think probably would want to know, but you can't tell from anything in the materials I saw.").

173.     As Professor Saltzburg also clarified, the mere fact that the Arrest Warrant was a lengthy submission in no way established the truth of its assertions, or probable cause.  *See also Republic of France v. Moghadam*, 617 F. Supp. 777, 784 (N.D. Cal. 1985) ("the fact that the government appears to have been somewhat overzealous in the extradition proceedings … casts doubt on the presence of probable cause.").  This conclusion is bolstered by the fact that the only person who has actually filed a sworn, substantive Affidavit of any kind in this case (in the Arrest Warrant or the extradition request) is a lone prosecutor who suddenly resigned in the midst an ongoing corruption investigation in Mexico.

174.     Shortly after Professor Saltzburg completed his testimony on May 14, 2010, the Government sent a letter to Petitioner's counsel, attaching certain additional witness statements – although these were sent without any English translations.

175.     The fact that the Government made this supplemental production did not change Professor Saltzburg's opinion about the sufficiency of its submissions.  Exhibit H, at 8.  At a June 3, 2010 evidentiary hearing, Professor Saltzburg returned to testify, and he noted that the U.S.-Mexican extradition treaty requires that the Government's submissions be translated into English, and someone also must take responsibility for saying that the translation is an accurate translation, which had not been done here.  *Id.* at 9.  The Government's filing purported to submit original statements, but did not add anything to what had been submitted to the Court without this judge having Spanish proficiency.  *Id.* at 10 – a lack of proficiency that the Magistrate Judge openly acknowledged.  *Id.* at 11.

176.     According to Professor Saltzburg, the accuracy of the translation of Government's Exhibits D-1 through D-49 was not adequately established at that stage in the extradition court. *Id.* at 15.  He noted that there were three things about the statements actually proffered by the

Government as evidence that remained unusual.  First, while *these* statements had been presented in English, "no one has said how they got translated or who the translator was or who's vouching for the translation."  Second, "the statements are edited statements by the affidavit of the prosecutor who says they're edited."  And third, "words were changed in the statements.  So we know they're not a hundred percent translation, that there are words that have been changed."  As Professor Saltzburg noted, "Someone should tell the Court … who's vouching for the translation and whether they're going to tell the court that in doing the translation while some words actually may have been omitted, meaning was not changed."  *Id.* at 16.

177.    As Professor Saltzburg reminded the Court, U.S.-Mexican extradition treaty requires that all documents "presented by the requesting party in accordance with the provisions of this treaty shall be accompanied by a translation in the language of the requested party."  Article 10 Section 5.  But at that point, and for many months thereafter, the Government did not provide any such translations of its supposedly more complete witness statements, even after Petitioner complained that such translations were required under the U.S.-Mexican treaty.

178.    On January 26, 2011, the Magistrate Judge issued a Minute Order, directing the Government to file, within 10 days, English translations of all the affidavits submitted by the Mexican government in support of its request for Petitioner's extradition.  The Minute Order also declared that "[i]t is further ordered that these translations, when filed, will be deemed admitted into evidence along with the original Spanish versions," and that "[u]pon the filing of these translations, the court will issue its Findings of Fact and Conclusions of Law."  Exhibit F-250.

179.    The next day, Petitioner's counsel filed a "Motion for Reconsideration of January 26, 2011 Minute Order."  Exhibit F-251.  Petitioner's Motion explained that the Magistrate Judge could not properly deem translations admitted into evidence before they even existed.

70

And Petitioner also requested that he be given a similar period of 10 days, after receipt of the Government's translations, to examine those translations, hire independent translators as warranted, and submit objections to the Court.  The Magistrate Judge ultimately denied this request.  Exhibit F-259.[17]   Before these 10 days had even elapsed, the Magistrate Judge issued his Certificate of Extraditability, along with his Findings of Fact and Conclusions of Law, on February 9, 2011.  Less than 48 hours before, on the evening of February 7, 2011, the Government had submitted translations of 16 witness statements, but had also included a caveat with that submission: "The original authenticated and certified set of translated and Spanish affidavits is still being processed through diplomatic channels and will be filed with the Clerk's Office as soon as it is available."  The Government also noted that there were other important documents, such as more complete versions of its accounting and other forensic reports that had previously been submitted only in excerpted form, for which the complete versions were yet to be translated.  The Government said that it hoped to submit those translations by February 14, 2011.  Exhibit F-256 to -257.

180.    The Magistrate Judge did not wait until February 14.  Instead, on February 9, 2011, he authorized Petitioner's extradition, less than 48 hours after the Government had first provided Petitioner's counsel with hundreds of pages of translated filings.  The Magistrate Judge declared that it was "inconceivable" that Mexico's Spanish translations could contain material inaccuracies.  Exhibit F-259.

181.    Consistent with his January 26, 2011 Minute Order, which had said the Findings and Conclusions would simply issue upon the Government's filing of these translations, the

---

[17] In this same Motion for Reconsideration, Petitioner also renewed his request to be allowed to file a surreply that would allow him to address the Government's newly raised theory that dual criminality on Mexico's firearms charges could be based on D.C.'s local gun laws.  This request was also denied by the Magistrate Judge.

Magistrate Judge's Findings and Conclusions do not indicate that they were reviewed at all.  *See* Findings & Conclusions at 2-3 note 3 (referencing documents relied upon; more complete witness statements not listed).  Instead, the Findings & Conclusions reveal that the Magistrate Judge had decided to examine the Spanish witness statements submitted by the Government on his own, by "ask[ing] the Court's official interpreter to translate those portions" that he felt it necessary to to review, and then having "[t]he Court interpreter review[] the witness' statements with me," Findings & Conclusions at 33-34, outside of the presence of the parties.[18]  This information relayed to the Magistrate Judge by this interpreter, about what these witness statements supposedly said, and what those English translations supposedly revealed, were therefore placed outside of Petitioner's ability to evaluate, correct or even know.  Such off-the-record discussions should not have occurred in Petitioner's extradition case.  And the purpose of the U.S.-Mexican treaty's translation requirement, designed to prevent a relator with fair notice of all the evidence against him, was violated by the Government's production of eleventh-hour translations of only some of its unedited documents – particularly since Petitioner's extradition counsel at that time does not speak Spanish.

182.    The Magistrate Judge also incorrectly claimed that "all of the evidence submitted by Mexico has been authenticated in accordance with 18 U.S.C. § 3190," Findings & Conclusions at 35, and that "complete statements of witnesses" were "certified to be authenticated by a Department of State official."  *Id.* at 36.  As noted, the original authenticated and certified set of translated and Spanish affidavits was not filed, but was "still being processed through diplomatic channels."  It was never filed in the extradition court.  For § 3190's automatic authentication to apply, "the certificate" (not a copy thereof) had to be offered as proof – as the

---

[18] There is no indication that the Magistrate Judge undertook any similar effort to ask the Court's interpreter to examine or translate the various *exculpatory* Spanish documents that Petitioner had introduced in his defense.

Government no doubt realized when it advised the Magistrate Judge that it hoped to file that original "as soon as it is available."[19]  The Magistrate Judge's claim that 18 U.S.C. § 3190's presumption of authenticity and admissibility could legally extend to "all of the evidence submitted by Mexico" was therefore incorrect.  And no copies or translations of the complete accounting or other forensic reports were ever submitted or translated at all – yet the Magistrate Judge, at various points in his Findings & Conclusions, clearly relied on the offending "excerpts" of those same documents that had previously been submitted with the Mexican Arrest Warrant.

183.    In rejecting Professor Saltzburg's characterization of the Mexican Arrest Warrant's evidentiary summary as being insufficient to justify extradition, the Magistrate Judge also declared that the Arrest Warrant's evidentiary summary in fact "must be viewed as the judicial determination by a sovereign and signatory to a treaty."  Findings & Conclusions at 31.  In other words, the Magistrate Judge said that this Mexican Arrest Warrant was not merely the "attestation of a police officer" or prosecutor, but in fact represented "judicial findings" by a judge who was "making detailed findings of fact."  Findings & Conclusions at 31-32.

184.    The Magistrate Judge's characterization of the Mexican Arrest Warrant has no basis in fact, and appears to be legally inaccurate.  On its face, the Mexican Arrest Warrant is stamped, on every page, with the seal of the Mexican prosecutor's office: "Procuraduria General de la Rupublica."   The only "Decision" listed in the entire Arrest Warrant, as the Government had previously acknowledged, does not begin until page 635 of its English version, and no factual findings are found thereafter.   And more fundamentally, as the very first paragraph of the Arrest Warrant attests, the judge's decision on whether to issue this Arrest Warrant needed to be made "within 24 hours."  It is utterly inconceivable that a Mexican judge could have not only

---

[19] The original was never filed.  And even if a *copy* of the State Department's certification could suffice, the copy of the certification  issued here was remarkably vague, referring only generically to "supporting documentation" that was being attached and certified – without ever specifying exactly what the "supporting documentation" was.

examined all of the pertinent evidence in this wide-ranging and complex case, but also issued

634 pages of detailed factual findings of fact, all within the space of 24 hours.

185.    The Magistrate Judge also never addressed Professor Saltzburg's separate basis

for denying extradition – that Mexico's submission of an Arrest Warrant alone was insufficient

to meet the requirements of the U.S.-Mexican extradition treaty, since Article 10 Section 3

requires reliable evidence that is separate and apart from what is in an Arrest Warrant.  The

Magistrate Judge's citation to other courts' acceptance of indictments or affidavits that contained

summaries of evidence, *see* Findings & Conclusions at 32 – in cases involving *other countries'*

treaties with the U.S. – thus misses the point.  The *U.S.-Mexican* treaty requires *both* an Arrest

Warrant and separate evidence – which also must satisfy the standards of the requested Party

(U.S. law).  As Professor Saltzburg explained, no separate evidence had been submitted here,

much less submitted in a sufficiently reliable and translated format, as the U.S.-Mexican treaty

required.  Indeed, even if the Arrest Warrant alone could suffice (which it cannot), the Magistrate

Judge himself acknowledged that its descriptions were incomplete, and only contained "portions

of the statements on which Mexico relies."  Findings & Conclusions at 33 ("the warrant does not

appear to contain complete statements for every witness").

186.    At bottom, the Government's exttradition submissions failed to satisfy the

procedural requirements of the U.S.-Mexico extradition treaty – both with respect to Article 10

Section 3's requirement that there be evidence separate from the arrest warrant, and Article 3's

requirement that the evidence be found "sufficient according to the laws of the requested Party."

Mexico's almost universally-excerpted submissions did not satisfy Article 3, and its later

submissions were never certified by an original certificate of the U.S. Department of State, with

complete versions of Mexico's accounting and forensic reports also never submitted at all

"accompanied by a translation in the language of the requested Party," as required by Article 10

Section 5.  The Magistrate Judge erred in considering and relying on this evidence, in violation

of the U.S.-Mexico treaty, and in denying Petitioner such process.  The procedural expectations

for extradition set forth in Article 3 (entitled "Evidence Required") and Article 10 (entitled

"Extradition Procedures and Required Documents") were not satisfied, and the procedural flaws

in Petitioner's extradition hearing warrant habeas relief under § 2241 & 2243.

**COUNT FIVE – LACK OF PROBABLE CAUSE**

187.    Petitioner realleges all previous paragraphs as if fully set forth herein.

188.    Petitioner is almost 50 years old.  Prior to 2005, and for more than four decades,

he had never before been convicted, charged, or even suspected of any wrongdoing in his entire

life.  Petitioner was tested for drugs upon his arrest in the U.S., and everyone who was arrested in

Mexico as affiliated with Petitioner's companies was also given a drug test.  No one affliated

with this Petitioner or any of his businesses has ever tested positive for any illegal drugs.

189.    This is not a case in which Petitioner allegedly handled "street" drugs.

Pseudoephedrine and ephedrine products are not inherently illegal substances.  As the U.S. Drug

Enforcement Administration Case Agent acknowledged under oath in Petitioner's U.S. criminal

case, these substances for many years were widely used as byproducts in over-the-counter cold

medications such as Sudafed, and all are considered legitimate pharmaceutical ingredients.  *See*

F-013, at ¶ 3 (DEA Agent Chavez admits under oath that "[p]seudoephedrine/ephedrine are

legitimate pharmaceutical chemicals which are commonly used in cold and allergy

medications.").

190.    For a period of several years, prior to July 1, 2005, Petitioner's Unimed Mexico

company had been *legally authorized* by the Mexican government to import and transport

pseudoephedrine and ephedrine products into Mexico.  The U.S. government admitted in U.S.

extradition proceedings that "Ye Gon did indeed have general permission to import those

substances" prior to July 1, 2005.[20]  The Mexican government not only knew that this was

happening, but also affirmatively granted Mr. Ye Gon's company express permission to import

these products, through multiple written permits that authorized the importation of literally

thousands, and even tens of thousands of kilograms of ephedrine and pseudoephedinre products

at a time.

191.    Petitioner's relevant background began when he emigrated from China to Mexico

in or around 1990, after which he became married to his current wife, Tomoiyi Marx-Yu, who is

a Mexican citizen.  During the 1990s Mr. Ye Gon held managerial positons in Mexico for several

different companies, including El Asturiano, Shen Hai Co., Ltd. and Miles Profit Industries.

192.    In the late 1990s and early 2000s, Mr. Ye Gon started his own businesses and

incorporated a variety of companies, engaging in an array of business activities, most of which

have never been questioned.  Mr. Ye Gon's companies that he either owns or in which he has

had a controlling interest include the following entities:

(i)      Ultra International, Inc.

(ii)     Unimed Pharm-Chem (USA) Corp.

(iii)    Unimed Nutrition, S.A. de C.V.

(iv)     Universal Transportation, S.A. de C.V.

(v)      Elite Transportation, S.A. de C.V.

---

[20] On June 2, 2009, the U.S. prosecutor affirmatively stated that "the government acknowledges that part of the defendant's business was legitimate.  We know that he legitimately imported a number of substances from China. We acknowledge and have always acknowledged that he legitimately imported some ephedrine and pseudoephedrine from China that he then turned around and legitimately sold to pharmaceutical companies in Mexico that he was permitted to sell to."  Exhibit F-074.

(vi)     Unimed (Hong Kong) Company Limited;

(vii)    Unimed Pharmaceutical, S.A. de C.V.

(viii)   Constructura e Inmobiliaria Federal, S.A. de C.V. and

(ix)     Unimed Pharm Chem Mexico, S.A. de C.V.

193.     As Mexico's own proffered accounting excerpts reveal, by March 28, 2003, Unimed Pharm Chem Mexico, S.A. de C.V. ("Unimed Mexico")'s stated capital had been increased to 15,048,000.00 Mexican pesos.  By April 19, 2005, Mr. Ye Gon's stake in Unimed Mexico had grown to 57,000,000.00 Mexican pesos.  A real estate company that Petitioner owned, Constructura e Inmobiliaria Federal S.A. de C.V., also had 60,000,000.00 Mexican pesos in cash verified against 100,000,000.00 Mexican pesos in stated capital.  And by October 10, 2005, Petitioner also had 300,000,000.00 Mexican pesos of corporate capital in Unimed Pharmaceutical, S.A. de C.V.  In Mexico, such stated capital is required to be verified.  And significantly, all of the equity noted above was owned by Mr. Ye Gon *prior to* the date when the Mexican government first accused Mr. Ye Gon of engaging in any wrongdoing.  It is apparent that Petitioner held *many hundreds of millions* of pesos of capital in these companies before the first challenged shipment entered Mexico, on December 5, 2005. Mr. Ye Gon also owned substantial physical assets.  Mexican records reveal that Petitioner had purchased his home in Mexico City, valued at approximately US$32 million, before any allegations of wrongdling arose in 2005.  Of his companies' two warehouses in Mexico City, one was valued at over US$1 million, with US$270,000 worth of equipment; the other was worth US$530,000, not including his Toluca pharmaceutical plant.  It is apparent that Mr. Ye Gon had attained substantial wealth even before any of Mexico's allegations of wrongdoing ever arose.  Exhibits F-037 *et seq.*

194.    Mr. Ye Gon's success as a businessman was obvious.  Even the U.S. prosecutor referred to Mr. Ye Gon, in U.S. court proceedings shortly after his arrest in 2007, as "a very sophisticated businessman."  Exhibit F-020.  This sophistication in business undoubtedly is what led Mexico's then-sitting President, Vicente Fox, to confer Mexican citizenship on Mr. Ye Gon personally, at a public ceremony in 2002.

195.    In addition to his relationship with the party of President Fox, Petitioner also became associated with the political party PRI ("Partido Revolucionario Institucional," or the "Institutional Revolutionary Party"), Mexico's principal opposition party, and in fact had actually become an honorary Senator, through his relationships with a PRI politician.  *See* Exhibit F-282 (copy of Mr. Ye Gon's honorary Senator credentials in Mexico).

196.    In short, before any of the Mexican government's allegations of wrongdoing arose, Mr. Ye Gon was already a very wealthy man, gaining in prominence, as a Chinese national newly installed as a citizen of Mexico.  Before the allegedly "anonymous" tip came in that supposedly sparked Mexico's criminal investigation, Petitioner was also attempting to alter the business establishment's status quo, by attempting to build the most sophisticated pharmaceutical plant in all of Central and South America, as discussed in more detail below.

### Mexican Importing Business

197.    Petitioner's companies were heavily involved in importing, and Mexican records confirm that, from January 2002 to October 2006, Mr. Ye Gon's companies conducted 291 import operations.  These imports came from a variety of different places, including, Canada, China, England, Germany, Israel, Hong Kong and the United States. These imports into Mexico also arrived at various locations inside Mexico, via the international airport in Mexico City, and at various ports in Mexico, such as Nuevo Laredo, Tamaulipas, Manzanillo, Colima, Veracruz

and others.  Although most of Petitioner's imports involved pharmaceutical products, Petitioner's companies also imported a variety of non-pharmaceutical products, ranging from furniture, surgical and light fixtures, to boilers and nuclear reactor-related products.

198.    Between the years 2001 and 2004 – even years before any allegations of wrongdoing – Mexico's accounting excerpts show that Petitioner's company's pharmaceutical imports involved 36 national clients and amounted to 109,970,121 Mexican pesos.  Records also reveal that Mr. Ye Gon's companies imported a large number of different pharmaceuticals, all undeniably legitimate, such as testosterone, metronidazol, penicillin, sulfate de gentamicina, as well as numerous other chemical products.  These imports sometimes involved huge quantities amounting to thousands of metric tons.  For example, records show that Mr. Ye Gon's company on occasion imported 60,000 to 80,000 kg of such products at a time, including bulk quantities of 10,000 kg of penicillin and 20,000 kg of cloranfenicol.  On one occasion, records reveal that Mr. Ye Gon's company imported a bulk quantity of 30,000 kg of naproxen, which is used in pain relief medication. During this process, Petitioner received numerous permits issued by Mexico which authorized Unimed Mexico to import in bulk quantities these and other chemicals.

199.    Mexican records also show that Mr. Ye Gon was selling some of these pharmaceutical products at substantial mark-ups, sometimes even at several multiples of their imported cost.  Mexican records suggest that this was a lucrative business.

200.    Indeed, even after Mr. Ye Gon was arrested in 2007, large quantities of chemical and pharmaceutical products that his companies had arranged to import continued to arrive at Mexican ports – none of which involved any allegedly improper substances. Yet the contents of the containers of the shipment of these chemicals were also seized by the Mexican government and apparently auctioned off, with Mexico apparently retaining the proceeds.

201.     Petitioner also did import into Mexico large amounts of pseudoephedrine and ephedrine products – legally.  As the Magistrate Judge expressly acknowledged, "[f]rom 2003 to July 2005, Unimed *legally* imported *33.875 tons* of ephedrine, pseudoephedrine, and pseudoephedrine hydrochloride pursuant to a permit from COFEPRIS."  Findings & Conclusions, at 3 (emphasis added).

202.     During this time, at least ten separate audits of Unimed Mexico were carried out by Mexican officials between 2002-06.  No improprieties such as diversions of these pseudoephedrine products were ever noted during these audits, because none were found.  Nor is there any suggestion that Mexican officials or auditors were ever turned away from Petitioner's plants, or that the Mexican officials' audits were ever restricted by Mr. Ye Gon in any manner.

203.     On July 1, 2005, Mexico stopped certain companies, including Unimed Mexico, from further importing ephedrine and pseudoephedrine-related products.  Significantly, however, at that time, Petitioner's companies still had on hand an unsold balance of 9 metric tons of pseudoephedrine hydrocloride, plus 806 kilograms of pseudoephedrine sulfate on-hand, which had been *legally* imported with Mexican permits issued in 2004.  Exhibit F-033 note 4.

204.     This quantity of almost 10 metric tons of pseudoephedrine-related products had not been illegally sold or diverted by Mr. Ye Gon or his company; instead, when the Mexican government inquired in March 2006, every bit of this substance was found in the company's warehouse, where it had sat untouched for almost two years since its importation and some 9 months after the Mexican government's ban on further imports were put into effect, on July 1, 2005.  Mr. Ye Gon's company then resold these pseudoephedrine-related products with the full consent and approval of the Mexican government, and in full compliance with the Mexican government's directions.  Exhibit F-001 to -009.  No one has ever denied these facts, and the

Magistrate Judge never explained how this scrupulous adherence to the law, for a period of years, when Mr. Ye Gon easily could have been tempted to sell *10 tons* of *finished* pseudoephedrine products if he had chosen to do so, could be reconciled with his finding that Petitioner suddenly turned to crime in order to import *unfinished* pseudoephedrine precursors.

205.   Of Petitioner's companies' 291 import operations, virtually all involved inoffensive chemicals such as Testosterone or its esters, Nortestosterone, D-2 Acid, Furaltadone, Procainic penicillin G, and other non-psychotropic chemicals.  In fact, of Mr. Ye Gon's companies' 291 import operations, only 4 have ever been challenged:

- shipment on 5 December 2005 of 20,000 kg that the Mexican government contends included N-acetyl pseudoephedrine;

- shipment on 3 January 2006 of 29,400 kg that the Mexican government contends included N-acetyl pseudoephedrine;

- shipment on 3 July 2006 of 20,067 kg that the Mexican government contends included N-acetyl pseudoephedrine; and

- shipment in November 2006 of 19,797 kg that the Mexican government contends contained a mixture that included ephedrine acetate.

206.   The Mexican government claims that Chifeng Arker Pharmaceutical Technology Co., Ltd. ("Chifeng Arker"), a large and established Chinese state-owned company, shipped products in sealed containers to Unimed Mexico, and that the substances in these four challenged containers were improperly labeled and later certified by Petitioner and others as *non*-controlled substances.[21]  But Bernardo Mercado Jiminez, Mexico's government-approved chemist who was

---

[21] The Magistrate Judge also attempted to suggest that the company that was listed as shipping these products, Emerald Import & Export Corp. was not an actual company doing business in Hong Kong.  Findings & Conclusions at 6 ¶ 20.  In so finding, the Magistrate Judge ignored the records presented by Petitioner, such as Exhibits F-172 *et seq.*, showing that Emerald Import & Export Corp. is duly incorporated in the British Virgin Islands as an offshore

assigned to Unimed Mexico, has sworn under oath that he did not know, and did not believe, that

these substances that Unimed Mexico imported into Mexico were psychotropic drugs prohibited

under Mexican law.  Jiminez also swore that he advised Mr. Ye Gon, who is *not* a chemist, that

"the chemicals being imported into Mexico by Unimed during 2005-06 were legal chemical

substances that were not controlled or restricted under Mexican law."  Exhibit F-144.  The

Magistrate Judge's Findings & Conclusions never discuss Jiminez's sworn exonerations of

Petitioner.

207.    The Magistrate Judge does, however, reference an earlier contract that Unimed

Mexico had signed with Chifeng Arker some 2-3 years before these shipments, on September 24,

2003.  The Magistrate Judge claims that, "[a]ccording to the terms of the contract, Chifeng Arker

agreed to sell and Unimed agreed to purchase a minimum of 50 tons of the chemical annually."

Findings & Conclusions at 4.  But the Magistrate Judge's characterization of this contract is

incorrect.  What the contract *actually* said was merely that "Arker agrees to sell and Unimed

agrees to purchase minimum 50.0 tons of the intermediate per year *starting from the date on*

*which the facility of Unimed is in normal production status.*"

208.    The Magistrate Judge's attempts to suggest that the 2003 Chifeng Arker contract

was inherently nefarious, and part of an agreement to perform illegal acts, is wrong.  When this

contract was signed in 2003, Unimed Mexico was regularly receiving permits to legally import

ephedrine and pseudoephedrine-related products into Mexico.  The contract was entered into

prior to any allegation of wrongdoing against Unimed Mexico, and the contract relates to a

---

business company, and Exhibits F-183 *et seq.*, consisting of Packing Lists and Commercial Invoices that Emerald
Import & Export Corp. sent to Unimed Mexico, listing Emerald Import & Export Corp.'s Hong Kong street address.
No evidence supported the Magistrate Judge's bald conclusion that that Petitioner knew that Emerald Import was
unregistered in Hong Kong, or was not a viable company.  Findings & Conclusions at 6 ¶ 21.  Indeed, as Exhibit F-
057 verifies, on September 17, 2008, even the U.S. government itself apparently conceded Emerald Import's
corporate existence, by seeking permission from the U.S. federal court to depose a person described as "Mr. Li Wei
Hui, Emerald Import and Export, Shanghai, China," as a part of its U.S. criminal case.

period of time when the Mexican government itself had authorized Mr. Ye Gon's company to legally import and distribute both ephedrine and pseudoephedrine-related products, as one of the largest such importers in Mexico.  While Petitioner did not, in 2003, have authority to also manufacture these products in Mexico, that did not mean that such permissions could not be attained in the future.  Even the Government admitted, in Petitioner's extradition case, that "at the time that contract was entered into, there was at least the possibliity he could do that lawfully."  Exhibit H, at 89.

209.    And as noted, samples supposedly taken from these challenged shipments have since been destroyed.  And although the fourth shipment was seized in its entirety, that massive seizure too (almost 20,000 kg) apparently was ordered destroyed by Mexico.  Exhibit F-026.

210.    While Petitioner was unable to retest the samples themselves, Petitioner did submit, in both his U.S. criminal case and his extradition case, letters from experts challenging the methodology and accuracy of the test procedures in the Mexican laboratories.  None of these criticisms were ever addressed by the Magistrate Judge in his Findings & Conclusions.

211.    Petitioner's submissions included an expert opinion by Vedoster Ingram, a former forensic chemist of the U.S. Drug Enforcement Agency.  Ingram declared that, upon examining the test results of the Mexican laboratories, he found the testing of the samples "deficient both procedurally and substantively."  In a letter dated June 14, 2007 setting out his opinion, Ingram stated that a combination of valid tests would be required in the forensic community for the identification of a drug, and that "none of these approaches were utilized in this instant situation to establish the identification of the samples confiscated from [Unimed Mexico]."  Ingram also observed that the analysis by the Mexican laboratories was conducted "without a blank test run or against any standard; therefore, questions persist regarding instrument contamination and

reliability."  Ingram was of the view that "no conclusions can be established as to the identification of the confiscated samples due to insufficient testing."  Exhibit F-188 *et seq.* (Vedoster Ingram letter and resume).

212.    Petitioner also submitted letters from another expert, Dr. Laverne L. Brown, an Assistant Professor in Howard University's Department of Pharmaceutical Services.  Dr. Brown opined that the results of the tests by the Mexican authorities are "unreliable and inconclusive" and "scientifically unreliable."  Exhibit F-196 *et seq*.  No expert witness was ever called on behalf of the Mexican government in Petitioner's extradition proceedings to offer a counter opinion or report to refute these expert opinions tendered by Mr. Ye Gon.

213.    As previously noted, questions about Mexico's ability to prove that these substances are the controlled substances claimed appear to be more than abstract concerns.  In July 2010, Juan Llaca Diaz, a man allegedly linked to Mr. Ye Gon's importations challenged herein, was acquitted in Mexico, after Mexican prosecutors were reportedly unable to prove key parts of their case, including that the substance imported was in fact a precursor chemical used to make methamphetamine.  Exhibit F-241.

**The Toluca Pharmaceutical Plant**

214.    Long before any allegations of wrongding arose, records also reveal that Petitioner attempted to build the largest and most sophisticated pharmaceutical plant in Central and South America.  Records of the company dating at least as far back as 2003 reveal years of effort to obtain the necessary approvals from the Mexican government to build this plant, as well as to work with various consultants and contractors on its construction.

215.    Petitioner's real estate company, Constructora e Immobiliaria Federal S.A. de C.V., invested 49,200,000.00 Mexican pesos to purchase the raw property in Toluca for the site

of this pharmaceutical plant.  Blueprints and design specifications were prepared by Vectech, a company from the U.S. engaged as a consultant, to build 24 production lines, for the manufacture of, *inter alia*, antibiotics and hormones.  Exhibit F-200.  Substantial investments or set-asides had been made by Mr. Ye Gon's company for this state-of-the-art plant and a hostel to house Mexican employees, including the purchase of high-end equipment from Germany and Italy, such as tablet making machinery and accessories acquired at a cost of 1,265,835 Euros, 5,000,000 Euros assigned for equipment purchases from Bausch and Strauble, 4,000,000 Euros for equipment purchases from Bosch, and a tube line from Marchesini Group, an Italian company, for the sum of 1,000,000 Euros.  Overall, one summary shows approximately US$23 million spent or set aside by Petitioner's companies for the Toluca plant's equipment, mostly from Bosch and Uhlmann. Exhibit F-213.  While the full three-story plant was still under construction at the time of Mexico's seizure, there were certain parts of the plant, including the office and accomodation for the employees, that had already largely been completed, and the plant was partly operational, with some processing lines having taken shape, with gleaming high-end quiprement installed.  Exhibit F-215 (excerpt from Mexican reports containing a copy of photographs taken at the time of Mexico's search, and contained within Mexico's seizure report prepared a few days later, revealing the large, partially-constructed facility); Exhibit F-214 (copy of mostly-completed hostel structure).  The U.S. lead prosecutor later told the Court after Mr. Ye Gon's arrest that, "I visited this plant, I walked around it, it's there, it's in business, it's a sophisticated lab….  It contains what appears to be very expensive equipment."  Exhibit F-022.

216.    Despite Ye Gon's massive investments in setting up a state-of-the-art pharmaceutical plant, the Mexican government now claims that the Toluca plant was used for the manufacture of psychotropic drugs.  However, no large pallets of pseudoephedrine, ephedrine or

methamphetamine were ever found by the Mexican government at the Toluca plant.  Nor were

any large amounts or even small collections of such drugs found.  At most, the Mexican

government claims that "trace" amounts of illegal substances were found inside this mammoth

plant, at a time many months after Mr. Ye Gon's challenged imports had been imported into

Mexico.

217.    Throughout the U.S. criminal proceedings, Mr. Ye Gon's attorneys submitted that

any residue found in his Toluca plant's warehouse was the result of a reprocessing of the 9-10

metric tons of leftover pseudoephedrine products that had been left in his warehouse after

Mexico's importation ban was put into effect.  Noting that pseudoephedrine hydrochloride can

harden upon exposure to and absorption of moisture, and that it had to be broken down and

reprocessed before it could be sold, Mr. Ye Gon's counsel explained that this process of

pulverisation and purification of the leftover 9-10 tons of pseudoephedrine-related products was

bound to leave some residue in the factory.

218.    At Petitioner's extradition hearing, his expert witness, Dr. Lectka, confirmed in

his testimony that if pseudoephedrine hydrochloride is stored for a long time, it could absorb

moisture or oxygen in the atmosphere and be transformed from a free flowing powder into a

crusty chunky rock-like substance.  It could also discolor over time, changing from a white

substance to a yellowish or brown substance.  Exhibit G, at 33 & 61-64.  These changes in the

physical condition of the product would affect its ability to be sold and would likely require it to

be reprocessed through a straightforward purification process and then be repackaged for sale.

*Id.* at 33-34.  Dr. Lectka testified that if pseudoephedrine hydrochloride were reprocessed in this

manner, it would "very likely" have left trace amounts of pseudoephedrine at the factory.  *Id.* at

34.  Dr. Lectka also explained that it would not be surprising to find traces of ephedrine, given

the possibility of contamination during the production of the pseudoephedrine hydrochloride by the manufacturer. *Id.* at 35-36.

219.     Although the Mexican government also contended that its forensic chemists found traces of N-acetyl-methamphetamine at the Toluca plant, the Mexican government's gas chromatography and mass spectometry charts which purported to find these traces were examined by Dr. Lectka, and he opined that the charts did not satisfactorily establish that N-acetyl-methamphetamine had in fact been found. *Id.* at 44-45.  Dr. Lectka testified that the Mexican government's chart had a missing molecular ion, and that molecular ions are extremely helpful in determiniing molecular weights used to identify chemical substances because they represent the mass of a molecule. Dr Lectka testified that the evidence that N-acetyl-methamphetamine was present in the Toluca plant was inconclusive. *Id.* at 44-47.  He also noted that the Mexican government's charts possessed an element of sloppiness, since the chemist's signatures were placed over the mass spectra on the charts, thereby obscuring data of interest from subsequent reviewers. *Id.* at 47.

220.     While the Magistrate Judge ominously described how substances found at the Toluca plant had included "white crystalline powder," Petitioner's expert witness, Dr. Lectka, confirmed that a number of the other chemical substances undeniably sold to Unimed legally, including such items such as Naproxen, which is used in the pharmaceutical product "Alleve," also consist of white powdery substances. *Id.* at 40-42.

221.     The Magistrate Judge also found that "Ye Gon reported no income for that plant, or Unimed."  Findings & Conclusions, at 10.  But of course, no extradition is being sought by Mexico – nor could it viably be sought – for improper tax reporting.  And even if it could, it has never been established that any reportable "income" in fact had yet emanated from this massive

pharmaceutical plant in which Petitioner had invested so heavily, and which was not yet fully operational.

222.    At bottom, most of the accusations of criminal activity at the Toluca plant cited by the Magistrate Judge – e.g., Findings & Conclusions at 8-15, appear to arise from allegations made by former employees at Petitioner's Toluca plant.  But as noted previously, many of these former employees had previously been fired from Petitioner's companies.

223.    Courts cannot assume probable cause from a Government's filing, but instead must "make an independent determination from evidence as to probable cause."  _In re Petition of France for the Extradition of Sauvage_, 819 F. Supp. 896, 903 (S.D. Cal. 1993).  _See also United States v. Fernandez-Morris_, 99 F. Supp. 2d 1358, 1366 (S.D. Fla. 1999) (court "must scrutinize the evidence carefully to determine at least a reasonable probability that the petitioner is guilty of the crime.").  Probable cause in the extradition context has been deemed analogous to preliminary hearings in U.S. criminal cases.  _Collins v. Loisel_, 259 U.S. 309, 315 (1922) (requiring proof that "would justify his apprehension and commitment for trial").  Before finding probable cause, the Magistrate Judge was "required under the statute and the treaty to make a specific finding as to the sufficiency of the evidence to establish probable cause."  _Application for the Extradition of D'Amico_, 185 F. Supp. 925, 931 (S.D.N.Y. 1960), _app. dismissed_, 286 F.2d 320 (2d Cir.), _cert. denied_, 366 U.S. 963 (1961) (granting habeas relief where "there is real doubt as to whether the Commissioner actually made a finding that there was probable cause").  The probable cause standard requires "evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt."  _Coleman v. Burnett_, 477 F.2d 1187, 1202 (D.C. Cir. 1973).  An evaluation of probable cause turns on the totality of the circumstances.  _Illinois v. Gates_, 462 U.S. 213 (1983).  Probable cause means more

than a reasonable suspicion.  *Rice v. Ames*, 180 U.S. 371, 374 (1901) ("A citizen ought not to be deprived of his personal liberty upon an allegation which, upon being sifted, may amount to nothing more than a suspicion.").  *See also* *Terry v. Ohio*, 392 U.S. 1 (1968) (distinguishing between the term "probable cause" and the lower standard of "reasonable suspicion").

224.    Probable cause also must be "based upon competent evidence."  *Parretti v. United States*, 122 F.3d 758, 771 (9th Cir. 1997).  "Conclusory statements do not satisfy the probable cause standard for extradition."  *United States v. Peterka*, 307 F. Supp. 2d 1344 (M.D. Fla. 2000); *accord* *United States v. Fernandez-Morris*, 99 F. Supp. 2d 1358, 1365 (S.D. Fla. 1999); *In re Lehming*, 951 F. Supp. 505, 517 (D. Del. 1996).  As several courts have noted, "[t]he improbability or the vagueness of testimony may destroy the probability of guilt."  *Republic of France v. Moghadam*, 617 F. Supp. 777, 782 (N.D. Cal. 1985); *Freedman v. United States*, 437 F. Supp. 1252, 1266 (N.D. Ga. 1977) (same).

225.    Just as a person's prior criminal history can be a factor appropriately considered in a finding that probable cause exists, a person's lack of criminal history is a factor mitigating against a finding of probable cause.  *See, e.g.,* *United States v. $14,665*, 33 F. Supp. 2d 47 (D. Mass. 1998); *United States v. $31,990*, 1992 U.S. Dist. LEXIS 12650, at *11-12 (N.D.N.Y. 1992).  Here, Mr. Ye Gon's age and experience as a successful businessmen prior to these allegations in 2005-07, and the total lack of any evidence presented of alleged wrongdoing by him in the decades leading up to the instant allegations, strongly weighs against probable cause.

226.    Petitioner acknowledges the deferential standard of review applicable when a habeas court reviews probable cause in an extradition context, with courts traditionally limited to reviewing whether there is "any evidence" in the record to support the probable cause finding.  *See, e.g.,* *Haxhiaj v. Hackman*, 528 F.3d 282 (4th Cir. 2008) (review is limited to "whether there

is 'any evidence' in the record supporting the probable cause finding of the magistrate judge.").

Despite that limited review, however, there are at least certain specific offenses here on which no

probable cause exists, since the proffered evidence does not match Mexico's charged offenses.

**Drug Charges**

227.    Mexico's drug charges and proffered evidence, for example, are inconsistent:

| Type of Drug Offense | Lopez Statement (Arrest Warrant p.1-2, ¶B-C) | Lopez Statement (Extradition Affidavit p.7-8) | Offense Charged (Arrest Warrant p.635-37) |
|---|---|---|---|
| **Importation** | ***N-Acetyl-pseudoephedrine acetate*** and ephedrine acetate, derivatives of pseudoephedrine | ***N-Acetate-pseudoephedrine*** and ephedrine acetate, derivatives of pseudoephedrine | ***acetylpseudoephedrine*** and ephedrine acetate, chemical derivatives of pseudoephedrine |
| **Transportation** | ***N-acetyl-pseudoephedrine***, a derivative of pseudoephedrine | ***N-Acetyl-pseudoephedrine acetate*** and ephedrine acetate, derivatives of pseudoephedrine | ***n-acetylpseudoephedrine acetate***, a derivative of pseudoephedrine |
| **Possession** | psychotropic substances for the purpose of producing narcotics | Pseudoephedrine, ephedrine, ***N-actylmethamphetamine,*** ephedrine, ***acetate, ephedrine hydrochloride*** | Possession of for manufacturing purposes ***[no chemical specified]*** |
| **Manufacture** | Pseudoephedrine, Ephedrine, ***Pseudoephedrine Hydrochloride*** and ***Methamphetamine Hydrochloride*** | Pseudoephedrine, ephedrine, ***N-acetylmethamphetamine,*** ephedrine, ***acetate, ephedrine hydrochloride*** | as pseudoephedrine, ephedrine, ***pseudoephedrine hydrochloride*** and ***methamphetamine hydrochloride*** |
| **Diversion** | Essential chemical products (sulfuric acid) to produce narcotics | Essential chemical products called sulfuric acid in order to product psychotropic substances named ***N-acetylmethamphetamine, Ephedrine Acetate, Ephedrine, Pseudoephedrine,*** and ***Methamphetamine*** | Essential chemical products (sulfuric acid) to produce ***narcotics (n-acetylpseudoephedrine acetate,*** ephedrine acetate, ephedrine, pseudoephedrine, and methamphetamine |

228.     In the extradition court, the Government even admitted "a mischaracterization of the evidence by the Mexican judge who issued the arrest warrant."  Exhibit F-133.  *See also* Exhibit F-134 (admitting "imprecise nomenclature" that "continues throughout the arrest warrant"); Exhibit F-135 (claiming Mexican judge "did not use the correct nomenclature").

229.     The Mexican Arrest Warrant – its only charging document – never charged Mr. Ye Gon with the importation or transportation of **_N-acetyl pseudoephedrine_,** and neither the Arrest Warrant nor any other evidence established that the substance identified in the submitted proffers was the same as the substance that the Arrest Warrant charged.  The Magistrate Judge never addressed this problem, and instead simply proceeded as if the Mexican Arrest Warrant had charged Petitioner with N-acetyl pseudoephedrine – essentially changing the offenses charged.  There was simply no evidence presented by the Government on the first three challenged shipments to establish any probability that Mr. Ye Gon committed the offenses *that the Mexican arrest warrant actually charged*.  The same is true with respect to the Mexican government's other varying descriptions of the alleged controlled substances involved, with the charges and proof rarely if ever matching up.  Accordingly, the Magistrate Judge's findings of probable cause were improper.

**"Organized Crime"**

230.     With respect to Mexico's "Organized Crime" charge, probable cause also was lacking.  Article 2 Section I of Mexico's Law against Organized Crime requires that Mexico prove that "either permanently or repeatedly, three or more persons agree[d] to organize themselves or organize[d] themselves to carry out conduct that in and of itself or that in conjunction with other conduct, has the purpose or results in the commission of one of one of the

following crimes … drug crimes, as provided in articles 194 and 195 first paragraph[22] … [or] "money laundering, provided for in article 400 Bis." Exhibit F-036.  There was never any reliable evidence presented to establish that "three or more persons" agreed to organize permanently or repeatedly in order to establish any specific predicate offense.  While the Magistrate Judge did name four of Petitioner's employees as Petitioner's supposed associates, Findings & Conclusions at 12 & 24, no evidence was ever presented that any one of the predicate offenses in this case was actually caused or facilitated by a specific organized effort involving three or more identified individuals.  For example, insofar as the funds found in a room of Mr. Ye Gon's home, the Mexican government's excerpted evidence claims that only Mr. Ye Gon himself (and no one else) had a key to that room.  Nor is it evident which three persons were supposedly involved in which (drug or money laundering) offenses.  The necessary linkages were never alleged or established, and the U.S. Magistrate Judge erroneously failed to engage in this required analysis before finding probable cause on this charge.

**Money Laundering in Mexico**

231.    There also is insufficient probable cause in this record to establish that Mr. Ye Gon or the others named actually knew that any funds they maintained in Mexico had an illegal source.  The Government tries to suggest that the funds found in Mr. Ye Gon's home necessarily represented the proceeds of Unimed's four challenged imported containers of chemicals, but it was never adequately established in this record that these funds in his home actually came from such sales.  The Government refers to Mr. Ye Gon's unexplained wealth, but it is the Government's burden to establish probable cause, not Mr. Ye Gon's to explain it away.  Even if

---

[22]  Section 194's reference to production, transportation and importation is also limited to "narcotics" only.  No evidence has been presented that any of the chemical substances at issue in this case represents a "narcotic" drug.

the source of Mr. Ye Gon's funds that were seized might rise to the level of reasonable

suspicion, that does not equate to probable cause.  Moreover, even if these funds could be linked

to the challenged imports, as opposed to his tens of thousands of metric tons of legal sales of

pseudoephedrine and ephedrine products and other pharmaceuticals, it has never been

established in this record that Mr. Ye Gon himself knew that the source of the funds was illegal,

since his Government-approved chemist, Bernardo Mercado Jiminez, swore that he specifically

told Mr. Ye Gon otherwise, and as noted, these chemicals are not controlled within the U.S.

### Limits Placed on Petitioner's Ability to Challenge Probable Cause

232.    In the extradition hearing and other proceedings that led to his finding of probable

cause generally, the Magistrate Judge also declared that evidence offered by Petitioner to

"contradict" (instead of merely "explain") the Government's proffered evidence would not be

considered.  Exhibit F-278.  While this limitation may help explain why the Magistrate Judge

failed to address many of the numerous facts raised by the Petitioner in his defense at his

extradition hearing, Petitioner challenges herein, as a constitutional violation of due process, this

odd legal distinction that other courts have described as a "somewhat murky principle," *Gill v.*

*Imundi*, 747 F. Supp. 1028, 1040 (S.D.N.Y. 1990) that involves a "metaphysical" distinction that

is "extremely difficult to apply."  *In re Extradition of Strunk*, 293 F. Supp. 2d 1117, 1122 (E.D.

Cal. 2003).  As noted in *Illinois v. Gates*, *supra*, probable cause is a determination that must be

based on the "totality of the circumstances," and this "totality" should not have been artificially

restricted by excluding so-called "contradictory" evidence.  Petitioner should have been able to

present and have considered all available evidence, including evidence that might be labeled as

"contradictory," and the Magistrate Judge's unwillingness to consider such responsive evidence

renders his decision legally invalid, and justifies habeas corpus relief.

233.    The Magistrate Judge's findings of probable cause, based only on an uncritical acceptance of what the Mexican government proffered, should not stand.  This Court should find that probable cause is lacking, and grant this Petitioner habeas corpus relief.

### [CLAIM SIX – SUBMITTED UNDER SEAL]

### CONCLUSION

234.    Mr. Ye Gon has already been incarcerated for almost five years, first on U.S. criminal charges that have since been dismissed, and since then based on the extradition proceedings challenged herein.  Petitioner's period of confinement has included over two years spent in extremely harsh solitary confinement involuntarily, in the maximum South 1 Unit of the D.C. Jail, where the depravity of daily life was previously described in a pleading filed in the extradition court.  *See* Exhibit F-188 (describing inmates' favorite pastime of hurling a putrid combination of human feces and rancid milk at one another, and other activities that finally led to Petitioner's detention transfer).  While Mr. Ye Gon is not a U.S. citizen, the decision in this case will not only affect his own life, but those of his three sons, who are U.S. citizens.

235.    Never before in American history has a case of this type brought together such factors as three recanting witnesses; a related U.S. prosecution that was dismissed with prejudice after a concession of "evidentiary problems;" the resignation of the requesting Party's only extradition Affiant amidst a major corruption investigation that also led to the jailing of his boss; a presentation of evidence that does not conform to the governing treaty's procedural requirements, and foreign crimes that are not substantially analogous to viable U.S. crimes for dual criminality purposes.  Petitioner is a businessman who in more than 25 years of adulthood was never previously convicted or even suspected of any wrongdoing, ever.  He entered the United States legally, and he is here under and with the full right to receive the protections of our

94

laws; he may not now be taken from that protection except in accordance with those laws. Petitioner's present detention and prospective future extradition are legally unwarranted, and habeas corpus relief under 28 U.S.C. § 2241 & 2243 should be granted.

236.   Accordingly, although his separate habeas corpus action filed in the District of Columbia currently remains pending in the D.C. Circuit, Petitioner seeks the following relief:

## PRAYER FOR RELIEF

WHEREFORE, Petitioner prays for this Court to immediately halt his extradition to Mexico and that Petitioner be allowed to remain in these United States; and

WHEREFORE, Petitioner also prays that a Writ of Habeas Corpus shall be issued, directed to the Respondents, requiring them to show cause why Petitioner should not remain in the United States and avoid extradition to Mexico; and

WHEREFORE, Petitioner also prays that this Court declare the following:

(a)   the judicial officer who issued Mr. Ye Gon's Certificate of Extraditability was not legally authorized to conduct the extradition proceeding and issue that Order;

(b)   the U.S. District Court for the District of Columbia did not have proper jurisdiction over Petitioner, since he had been arrested in the State of Maryland, rather than in the District of Columbia, and since he had never voluntarily appeared in the District of Columbia,

(c)   while a U.S.-Mexican extradition treaty was in full force and effect, its provisions do not legally support Petitioner's current detention or prospective extradition to Mexico, for the reasons (including *non bis in idem*) set forth herein,

(d) the crimes for which surrender was requested are not covered by the applicable U.S.-Mexican extradition treaty, and are barred by the legal doctrine of dual criminality, and

(e) there was not sufficient evidence to support a finding of probable cause as to each charge for which extradition is sought, and

WHEREFORE, Petitioner also prays that he be released from his current and future custody and restraint by officers of the United States and others associated therewith, and that any responsibilities owed to this Court related to his possible extradition be terminated, and

WHEREFORE, Petitioner prays that this Honorable Court allow Petitioner to supplement the record with more complete documentation, to hold an evidentiary or other hearing on this matter, and allow further amendment of this Amended Petition as warranted.  Petitioner also prays that a writ of habeas corpus granting full relief be issued, pursuant to 28 U.S.C. §§ 2241 & 2243.

Respectfully submitted,

  /s/ John C. Lowe
John C. Lowe (Virginia State Bar No. 7726)
John Lowe, P.C.
5920 Searl Terrace
Bethesda, MD  20816
Telephone:  (301) 320-3300
Email:  johnlowe@johnlowepc.com

  /s/ Gregory S. Smith
Gregory S. Smith (Admitted *Pro Hac Vice*)
Law Offices of Gregory S. Smith
913 East Capitol Street, S.E.
Washington, D.C. 20003
Telephone:  (202) 460-3381
Email:  gregsmithlaw@verizon.net

*Counsel for Petitioner*

96

**CERTIFICATE OF SERVICE**

I hereby certify that on May 21, 2012, I served a copy of this Corrected Amended

Petition for Habeas Corpus by a Person in Federal Custody Under 28 U.S.C. § 2241 & 2243, on

all required parties, by electronically filing a copy thereof in this Court's Electronic Case Filing

(ECF) system, which automatically provides service of this pleading on all counsel of record

herein.

.                                        ____/s/ Gregory S. Smith_____
                                         Gregory S. Smith