IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

JAN 17 2014

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

ZHENLI YE GON,                    )
                                  )
            Petitioner,           )        Case No. 7:11-cv-00575
                                  )
      v.                          )        AMENDED MEMORANDUM OPINION
                                  )
ERIC HOLDER, JR., et al.,         )        By: James C. Turk
                                  )            Senior United States District Judge
            Respondents.          )
_____)

Petitioner, Zhenli Ye Gon ("Ye Gon"), filed this petition for habeas corpus under 28

U.S.C. § 2241 challenging the decision to extradite him to Mexico to face criminal charges for

drug-related offenses (including importation into Mexico of psychotropic substances, the

transportation and manufacture of psychotropic substances, and possession of such substances

for the purpose of producing narcotics), participation in organized crime, weapons offenses, and

money laundering. The case has been fully briefed and is ripe for disposition. The Court has

considered the legal memoranda filed and the applicable law. The Court heard oral argument on

the case on November 14, 2013, and also notes the record contains the transcript of the hearing

held before Magistrate Judge Ballou on October 9, 2012. For the reasons stated herein,

Respondents' Motion to Dismiss Certain Respondents is **GRANTED** and the petition is

**DENIED**.

## I.     FACTUAL FINDINGS AND PROCEDURAL BACKGROUND

### A. The Mexican Criminal Charges Against Ye Gon

The D.C. District Court (the "extradition court") gave a detailed and comprehensive

discussion of the background of this case, including the factual underpinnings of the Mexican

charges against Ye Gon, in its extradition decision. See In re Extradition of Ye Gon, 768 F.

Supp. 2d 69, 73-79 (D.D.C. 2011). The factual findings of the extradition court are entitled to significant deference on habeas review. Haxhiaj v. Hackman, 528 F.3d 282, 287 (4th Cir. 2008). The Court adopts the factual findings of the extradition court as its own, unless otherwise noted herein, and will discuss the facts as needed in the context of the legal arguments raised.

Ye Gon's lengthy legal path began when the United States government filed a criminal complaint on July 16, 2007 in the D.C. District Court charging him with violating American drug laws relating to the importation of illegal drugs. Ye Gon was arrested in Maryland on July 24, 2007, and transferred to the custody of the Marshal in the District of Columbia. He remained in custody during the pendency of the criminal proceedings. The Government filed a superseding indictment on November 16, 2007 charging Ye Gon with a single count of conspiring to aid and abet the manufacture of 500 grams or more of methamphetamine, knowing that it was to be imported into the United States from Mexico, in violation of 21 U.S.C. §§ 959, 960, and 963, and 18 U.S.C. § 2. See United States v. Ye Gon, Cr. No. 07-181, Superseding Indictment, Count One (D.D.C. November 6, 2008); ECF No. 42-2, Ex. F-63-65. The Government also sought the forfeiture of all money and property that constituted or derived from the illegal activity alleged in the single-count superseding indictment. Id. The criminal case remained pending until 2009 when the Government moved to dismiss all charges without prejudice. Eventually, with the Government's consent, the court dismissed all criminal charges with prejudice under Fed. R. Crim. P. 48(a).

Ye Gon was initially detained during his criminal case in the District of Columbia. While the case was still pending, he was moved to a detention facility in Orange, Virginia, which is located in the Western District of Virginia.

The extradition case began on September 15, 2008 with the Government filing a complaint in the D.C. District Court to extradite Ye Gon to Mexico ("Extradition Complaint") to face prosecution on drug charges, money laundering, and the illegal possession of guns. The extradition court conducted extensive proceedings, including a multi-day evidentiary hearing, before issuing a certificate of extraditability on February 7, 2011. Ye Gon, 768 F. Supp. 2d 69.

Ye Gon filed his petition for a writ of habeas corpus in the Western District of Virginia on February 9, 2011, thereby preventing his referral to the Secretary of State for surrender to the Mexican government. See 18 U.S.C. §§ 3184, 3186; see also ECF No. 102 at 12-13 & n.5 (explaining policy of the Department of State to suspend its review of an extradition order during the pendency of a habeas petition before the district court). Ye Gon also filed a duplicate petition in the D.C. District Court, which issued the extradition decision. This Court, concluding that both district courts had concurrent jurisdiction, transferred this case to the D.C. District Court, which concluded that it did not have jurisdiction over the habeas action and transferred the action back to this Court. The D.C. District Court held that because Ye Gon was detained in a facility in the Western District of Virginia, a habeas petition could only lie against Ye Gon's immediate custodian—in this case, the warden of the facility in Orange, Virginia. ECF Nos. 33, 34. See Rumsfeld v. Padilla, 542 U.S. 426 (2004).

**B. Respondents' Motion to Dismiss Certain Respondents**

Initially, the Court addresses Respondents' pending motion to Dismiss Certain Federal Respondents, ECF No. 102, in which Respondents seek dismissal of all Respondents except Gerald S. Holt (U.S. Marshal for the Western District of Virginia) and Floyd Aylor (Warden of the Central Virginia Regional Jail where Ye Gon is currently being held). Specifically, they seek dismissal of U.S. Attorney General Eric Holder, Jr., U.S. Secretary of State Hillary Rodham

Clinton,[1] and U.S. Marshal for the District of Columbia Edwin D. Sloane.[2] Respondents contend that Holder, Clinton, and Sloane are not proper Respondents pursuant to Padilla, which held that the proper respondent in a federal habeas petition is generally "the warden of the facility where the prisoner is being held, not the Attorney General or some other remote supervisory official." 542 U.S. at 435. They also rely on a number of other cases applying Padilla.

Ye Gon does not object to dismissing Eric Holder, Jr., ECF No. 103 at 1 n.1, and Holder is hereby dismissed. As to the other respondents, Ye Gon offers no legal authority to keep U.S. Marshal Sloane and Secretary of State Clinton in this case. Instead,  he seems to be concerned that the government may intentionally take some action in any short period in which his case is not technically "pending"—e.g., if his habeas petition is denied, during the time between the denial and his filing of a notice of appeal—or that it may transfer him to frustrate efforts to enforce this Court's orders. His first concern is now moot. This Court initially stayed his extradition from the entry of judgment in this case for a thirty-day period to allow him to file a notice of appeal with the agreement of counsel for Respondents, as expressed at the November 14, 2013 hearing. That stay was then temporarily extended until January 31, 2014. See ECF No. 126. The Court has now, in a separate opinion entered this same day, extended that stay for the entire pendency of Petitioner's appeal before the Fourth Circuit.

---

[1]  Because the Court concludes that the Secretary of State is not a proper Respondent, it is not necessary to order the substitution of John Kerry for Clinton. Cf. Fed. R. Civ. P. 25(d) (allowing sua sponte substitution for a public officer sued in his official capacity).

[2]  Sloane was added as a Respondent *sua sponte* by this Court when it transferred the case to the District of Columbia. See ECF No. 16. Respondents explain that even though Ye Gon's warden is his only physical custodian, they do not seek the dismissal of Holt as a respondent since the federal government is Ye Gon's legal custodian. ECF No. 102 at 3, 5. Additionally, in the appeal from the dismissal of Ye Gon's D.C. habeas petition, the United States represented to the U.S. Court of Appeals for the District of Columbia Court that it would not "challenge [the Western District of Virginia's] ability to order Ye Gon's release should it grant his petition on the merits." Ye Gon v. Sloane, No. 11-5342 (D.C. Cir. Oct. 25, 2012) (citing record of oral argument).

Ye Gon's concern over being transferred is unfounded in light of the "well-established" rule that "jurisdiction attaches on the initial filing for habeas corpus relief, and it is not destroyed by a transfer of the petitioner and the accompanying custodial change." Sweat v. White, 829 F.2d 1121, 1987 WL 44445, at *1 (4th Cir. 1987) (unpublished) (citing Santillanes v. U.S. Parole Comm'n, 754 F.2d 887, 888 (10th Cir. 1985); see also United States v. Little, 392 F.3d 671, 680 (4th Cir. 2004) (jurisdiction is determined at the time the petition is filed). Thus, even if he were transferred after judgment in this case, the Fourth Circuit could still consider his appeal and enforce orders regarding his custody. Cf. Sweat, supra.

In any event, even if his concerns had merit, Padilla and the other cases cited by Respondents show that Sloane and the Secretary of State are not proper Respondents in this case.[3] Accordingly, the Court **GRANTS** the Motion to Dismiss Certain Federal Respondents, ECF No. 102, and **DISMISSES** Attorney General Holder, U.S. Marshal Sloane, and U.S. Secretary of State Clinton from the case. The remaining Respondents are hereby collectively referred to as "the Government" in the Court's analysis below.

## II.     ANALYSIS AND CONCLUSIONS OF LAW

### A.  General Standard of Review

The extradition of a person found in the United States to Mexico is governed by the provisions of the federal extradition statutes, 18 U.S.C. §§ 3181 et seq., and the Extradition Treaty between the United States and Mexico. See Extradition Treaty, U.S.-Mex., May 4, 1978, 31 U.S.T. 5059, T.I.A.S. No. 9656 ("Treaty"), attached as ECF No. 41, Ex. C  (the "Extradition

---

[3] In a footnote, the Padilla Court declined to address "whether the Attorney General would be a proper respondent to a habeas petition filed by an alien detained pending deportation" but cited to a circuit split on the issue. See 542 U.S. at 435 n.8. Since Padilla, however, the only court to find the Attorney General as a proper party (the Ninth Circuit) has withdrawn its opinion. See Nken v. Napolitano, 607 F. Supp. 2d 149, 158 (D.D.C. 2009). Accordingly, the D.C. District Court, in its opinion to transfer the case back to this Court, held that Ye Gon's immediate custodian, and not the Attorney General or U.S. Marshal, is the proper respondent in this case. ECF No. 34 at 9 n.5.

Treaty"). Every extradition request requires the court to find that: 1) the judicial officer has jurisdiction to conduct an extradition proceeding; 2) the court has jurisdiction over the fugitive; 3) the person before the court is the fugitive named in the request for extradition; 4) there is an extradition treaty in full force and effect; 5) the crimes for which surrender is requested are covered by that treaty; and 6) there is competent legal evidence to support the finding of probable cause as to each charge for which extradition is sought. In re Extradition of Rodriguez Ortiz, 444 F. Supp. 2d 876, 881-82 (N.D. Ill. 2006) (citing Fernandez v. Phillips, 268 U.S. 311, 312 (1925), Eain v. Wilkes, 641 F.2d 504, 508 (7th Cir. 1981), and In re Extradition of Fulgencio Garcia, 188 F. Supp. 2d 921, 925 (N.D. Ill. 2002)). Upon finding sufficient evidence to support extraditing the fugitive, the court then certifies him as extraditable to the Secretary of State, who ultimately decides whether to surrender him to the requesting country. 18 U.S.C. §§ 3184, 3186, 3196.

There is no direct appeal from a decision granting a certificate of extradition. Rather, a person certified for extradition files a petition for habeas corpus under 28 U.S.C. § 2241 challenging his detention pending his extradition. A habeas court sitting in review of an extradition decision has a role which is "quite narrow, [and is] limited to consideration of whether the extradition court properly exercised jurisdiction, whether the crime upon which extradition is sought qualifies under the relevant treaty as an extraditable offense, and whether the record contains sufficient evidence to support the extradition court's probable cause determination." Haxhiaj, 528 F.3d 282, 286 (4th Cir. 2008) (citations omitted). Furthermore, a habeas court may consider certain limited constitutional claims. See Plaster v. United States, 720 F.2d 340, 348-49 (4th Cir. 1983). In Mironescu v. Costner, 480 F.3d 664 (4th Cir. 2007), for example, the Fourth Circuit expressly recognized that a habeas court reviewing an extradition

order "unquestionably" has jurisdiction "to adjudicate claims that governmental conduct is in violation of the Constitution." Id. at 670. Any constitutional claim must relate to alleged constitutional violations by the United States government. That is, the habeas court cannot consider assertions that "the other country's judicial procedures do not comport with the requirements of our constitution." Plaster, 720 F.2d at 349 n.9 (citing Neely v. Henkel, 180 U.S. 109 (1901)).

The habeas court gives a highly deferential review to the probable cause determination in the extradition court:

> In reviewing the extradition court's finding of probable cause under § 3184, a federal habeas court applies a standard of review that "is at least as deferential, if not more so, than that applied to a magistrate judge's decision to issue a search warrant." Ordinola [v. Hackman, 478 F.3d 588, 609–10 (4th Cir. 2007)] (Traxler, J., concurring). "Just as the magistrate judge's underlying determination is not a mini-trial on the guilt or innocence of the fugitive, . . . habeas review should not duplicate the extradition hearing." Id. at 610. Accordingly, our limited function in performing habeas review of the decision to issue a certificate of extradition is to determine whether there is "any evidence" in the record supporting the probable cause finding of the magistrate judge.

Haxhiaj, 528 F.3d at 287 (some citations omitted) (emphasis in original).

Legal conclusions by the extradition court, however, are reviewed *de novo* by a habeas court. See, e.g., Ross v. U.S. Marshal for E.D. of Okla., 168 F.3d 1190, 1195 (10th Cir. 1999) (issue of whether dual criminality requirement is satisfied is a legal question reviewed *de novo*); United States v. Merit, 962 F.2d 917, 919 (9th Cir. 1992) ("We review *de novo* questions regarding interpretation of, and jurisdiction under, the [extradition] treaty, including compliance with dual criminality and specialty requirements.") Accordingly, this Court reviews the factual findings only for clear error but reviews legal conclusions *de novo*. See Ordinola, 478 F.3d at

7

610 (Traxler, J., concurring) ("We review the extradition court's factual findings for clear error and its conclusions of law *de novo*.") (citation omitted).

## B. Ye Gon's Claims

Ye Gon asserts five claims for relief in his Corrected Amended Petition. Separately, Ye Gon has asserted two additional claims, 6A and 6B, which are also part of his Petition. The Court placed Claim 6B under seal with the consent of all of the parties. Each of these claims will be considered in order.

### 1. Claim 1: The Extradition Court Properly Exercised Jurisdiction Over Ye Gon.

In Claim 1, Ye Gon challenges the jurisdiction of the extradition court contending that (a) that the court did not have personal jurisdiction to bring an extradition proceeding in the District of Columbia, (b) a magistrate judge has no constitutional authority to conduct extradition proceedings, and (c) the federal extradition statute, 18 U.S.C. § 3184, is unconstitutional. Each argument fails.

#### a. The extradition court had personal jurisdiction over Ye Gon.

The jurisdiction of a district court to hear extradition proceedings is set forth in 18 U.S.C. § 3184, which states in relevant part:

> Whenever there is a treaty or convention for extradition between the United States and any foreign government, or in cases arising under section 3181(b), any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State, may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, or provided for under section 3181(b), issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or magistrate judge, to the end that the evidence of criminality may be heard and considered.

Whether the extradition court had personal jurisdiction over Ye Gon to hear the extradition complaint turns on whether he was "found within" the District of Columbia when he was arrested on the extradition complaint. Ye Gon was detained in a D.C. prison facility and undoubtedly in D.C. when the Government filed its extradition complaint. Ye Gon contends, however, that he was never "found" in D.C. because he came there in 2007 against his will, and only after his arrest in Maryland on the federal criminal charges. Ye Gon asserts that he did not flee to or establish D.C. as his place of asylum, and thus that he was not "found" there for purposes of extradition jurisdiction. The extradition court found that it properly had personal jurisdiction over Ye Gon because he was being lawfully held in D.C. such that he was "found" there when the Government filed its extradition complaint. The court reasoned that interpreting § 3184 to extend personal jurisdiction over persons lawfully detained in a district comports with both the "natural and traditional meaning of the word 'found[,]'" and with traditional principles of territorial jurisdiction. See Ye Gon, 768 F. Supp. 2d at 79-80 (citing Burnham v. Sup. Ct. of Cal., 495 U.S. 604, 610 (1990) and Pennoyer v. Neff, 95 U.S. 714, 733 (1877)).

Both parties rely on Pettit v. Walshe, 194 U.S. 205 (1904), to support their respective positions. In Pettit, a New York judicial officer (a commissioner) issued an arrest warrant on an extradition complaint for Walshe, a British national, who had been convicted in Great Britain of murder and other crimes, but had escaped prison and fled to the United States. Id. at 214-15. The U.S. Marshal arrested Walshe in Indiana intending to return him directly to New York to answer the extradition complaint. Walshe filed a habeas petition in Indiana challenging his removal to New York. The Indiana circuit court held that under the treaty between the United States and Great Britain and the extradition statute (the predecessor to § 3184), only an Indiana court, where

9

Walshe was found and arrested, had jurisdiction to consider the evidence of criminality and rule on the extradition request. The Supreme Court affirmed:

> By that proviso it is made the duty of a marshal arresting a person charged with any crime or offense to take him before the nearest circuit court commissioner or the nearest judicial officer, having jurisdiction, for a hearing, commitment, or taking bail for trial in cases of extradition. The commissioner or judicial officer here referred to is necessarily one acting as such within the state in which the accused was arrested and found. So that, assuming that it was competent for the marshal for the district of Indiana to execute Commissioner Shields' warrant within his district, as we think it was, his duty was to take the accused before the nearest magistrate in that district, who was authorized by the treaties and by the above acts of Congress to hear and consider the evidence of criminality. If such magistrate found that the evidence sustained the charge, then, under § 5270 of the Revised Statutes, it would be his duty to issue his warrant for the commitment of the accused to the proper jail, there to remain until he was surrendered under the direction of the national government, in accordance with the treaty.

Id. at 219-20. In concluding that the New York tribunal lacked jurisdiction to order Walshe's extradition to Britain, the Court noted that extradition proceedings may be held "where the accused was found and arrested." Id. at 218. The commissioner or judicial officer authorized to act on an extradition request is "necessarily one acting . . . within the state in which the accused was arrested and found." Id. at 219.

Ye Gon argues that Pettit requires holding extradition hearings only in the place where the extraditee is arrested, or what he calls the place of asylum. See ECF 63 at 23 (citing to Pettit and Wright v. Henkel, 190 U.S. 40, 58 (1903) as describing the place found as "the asylum to which he had fled"). Ye Gon thus contends that the Government could bring extradition charges in Maryland only—where he was initially arrested on the U.S. criminal charges—and that he was not "found" in the District of Columbia, where he was brought by authorities after his arrest on the criminal charges.

The United States lawfully arrested Ye Gon and transferred him to D.C. to face the criminal charges pending at that time. Ye Gon was lawfully detained in D.C. on the federal

criminal charges in D.C. when the Government filed its extradition complaint. Section 3184 vests the court with the jurisdiction to hear an extradition proceeding "upon complaint made, under oath, charging any person found within his jurisdiction, with having committed [an extraditable offense in the requesting country]." Here, Ye Gon was "found" in the District of Columbia when the Government filed the extradition complaint, thereby vesting the D.C. District Court with the jurisdiction to hear the proceedings.

Ye Gon suggests, without factual support, the Government acted in bad faith by bringing the criminal charges in D.C. as a means to seek a favorable forum in the extradition case, especially on the dual criminality issue. The Court refuses to embrace the pure conjecture required to accept Ye Gon's argument that the Government tactically planned to bring the criminal charges in D.C. so that it would have a favorable forum in an extradition proceeding. Ye Gon's theory seems particularly improbable given that the Government filed the extradition complaint a year after it initiated the criminal case against Ye Gon. Instead, applying Pettit, the Court concludes that the proper jurisdiction for Ye Gon's extradition proceeding, and where he was "found" under § 3184, is where he was physically present when arrested on the extradition complaint. See also Atuar v. United States, 156 F. App'x 555, 559 n.5 (4th Cir. 2005) (unpublished) (agreeing with the parties' stipulation that West Virginia had jurisdiction over the extradition hearing because Atuar was incarcerated there at the time the extradition proceedings were initiated, and citing Pettit). Therefore, the D.C. District Court had jurisdiction over Ye Gon under § 3184 to hear this extradition matter.

### b. A U.S. Magistrate Judge has constitutional and statutory authority to conduct extradition proceedings.

Courts have nearly uniformly held that U.S. magistrate judges are authorized to conduct extradition proceedings. In particular, while a judge on the D.C. Court of Appeals, Justice

Ginsburg stated that § 3184 allows "any magistrate authorized so to do by a court of the United States" to "preside over and decide international extradition proceedings." Ward v. Rutherford, 921 F.2d 286, 287 (D.C. Cir. 1990); accord Lo Duca v. United States, 93 F.3d 1100, 1108-09 (2d Cir. 1996). The local rules of the extradition court expressly state that U.S. Magistrate Judges "shall have the duty and the power to . . . [c]onduct international extradition proceedings pursuant to 18 U.S.C. § 3181 et seq." D.D.C. Crim. Rule 57.17(a)(6).

Allowing a magistrate judge to perform this function does not violate the U.S. Constitution. The issue in an extradition proceeding "is not punishability, but prosecutability," Lo Duca, 93 F.3d at 1104 (citations omitted). The determination of whether an individual is subject to extradition to a foreign country is "an assignment in line with [a magistrate judge's] accustomed task of determining if there is probable cause to hold a defendant to answer for the commission of an offense." Id. (quoting Ward, 921 F.2d at 287). For these reasons, the Court rejects Ye Gon's contention that a U.S. Magistrate Judge does not have the constitutional authority to conduct extradition proceedings.

### c. Ye Gon lacks standing to assert that the federal extradition statute is unconstitutional because it violates the separation of powers doctrine.

Ye Gon relies upon Lobue v. Christopher, 893 F. Supp. 65 (D.D.C. 1995), vacated 82 F.3d 1081 (D.C. Cir. 1996), to assert that the federal extradition statutory scheme is unconstitutional and violates the separation of powers doctrine. Ye Gon asserts that the extradition statute improperly vests the Secretary of State with the authority to review the decisions of extradition courts and to choose not to extradite a person for whom a court has issued a certificate of extradition. In Lobue, two prospective extraditees, who were wanted in Canada and were in the constructive custody of the marshal for the Northern District of Illinois, brought a challenge in the D.C. District Court to the constitutionality of the extradition statute

and attempted to assert their claims on behalf of a class. 893 F. Supp. at 66-67. The district court

found the statute unconstitutional. Id. at 75-76, 78. On appeal, the circuit court vacated that

decision, and held that the D.C. District Court did not have subject matter jurisdiction to issue

the declaratory judgment because the prospective extradites were in the custody of the marshal in

the Northern District of Illinois and that any challenge to the statute should be in that district.

Lobue, 82 F.3d at 1082. Ye Gon can point to no case which has followed Lobue, and the Court is

not inclined to follow a vacated decision that has no precedential value.

The Court also finds that Ye Gon does not presently have standing to raise the separation

of powers claim. In re Extradition of Lang, 905 F. Supp. 1385 (C.D. Cal. 1995), holds that

essentially no injury or harm can come to a potential extraditee from a review by the Secretary of

State because either: (a) a federal judge declines to order extradition, in which case the Secretary

cannot extradite him; or (b) a federal judge orders extradition, and the Secretary declines to

extradite him, in which case no harm to him occurs. Lang, 905 F. Supp. at 1391-92. Based on

this, the Lang Court reasoned that the possibility of a "separation of powers" violation is illusory,

and that no petitioner can ever have standing to assert it.

Ye Gon argues a third possibility exists—that the Secretary of State may change "the

charges of extradition." He cites as an example a hypothetical case where a certificate of

extraditability is issued on some charges but not others, and asserts that the Secretary of State's

decision could then require a review of the judicial decision. See ECF No. 71 at 8 n.6. Even if Ye

Gon were correct and such a result could give rise to a separation of powers argument, that has

not yet happened in this case, since the Secretary has not yet ordered Ye Gon's removal.

Accordingly, this argument is premature. As to this portion of Claim 1, therefore, the Court

denies it without prejudice. The remainder of Claim 1 is denied with prejudice.

## 2. Claim 2: The *non bis in idem* provision in Article 6 of the Treaty does not bar extradition.

Ye Gon contends that under Article 6 of the extradition treaty, the United States cannot extradite him, at least on the drug charges, because the voluntary dismissal with prejudice of the criminal indictment in the D.C. District Court amounts to a prosecution and acquittal of those charges. Article 6 of the extradition treaty between Mexico and the United States, entitled "Non bis in idem," states as follows:

> Extradition shall not be granted when the person sought has been prosecuted or has been tried and convicted or acquitted by the requested Party for the offense for which extradition is required.

ECF No. 41, Ex. C, Treaty, at 6. The Latin term "non bis in idem" means "not twice for the same thing," Black's Law Dictionary 1150 (9th ed. 2009), and is a principle of international law, akin to the Fifth Amendment's prohibition on double jeopardy. United States v. Jeong, 624 F.3d 706, 711 (5th Cir. 2010).

### a. Ye Gon was not "prosecuted or . . . tried and convicted or acquitted . . . ." in the criminal case in the United States.

The threshold question under Article 6 is whether Ye Gon "has been prosecuted or has been tried and convicted or acquitted" of the criminal charges in the D.C. District Court. When interpreting the language of a treaty, the Court must

> begin with the language of the Treaty itself. . . . [T]he clear import of treaty language controls unless application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories. . . . To the extent that the meaning of treaty terms are not plain, we give great weight to the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement.

Iceland S.S. Co.-Eimskip v. U.S. Dep't of the Army, 201 F.3d 451, 458 (D.C. Cir. 2000) (internal citations and quotation marks omitted); Plaster, 720 F.2d at 347 (stating virtually

identical standards and relying on <u>Sumitomo Shoji Am., Inc. v. Avagliano</u>, 457 U.S. 176, 180

(1982)).  The Court should also construe the Treaty "to effect [its] purpose, namely, the

surrender of fugitives to be tried for their alleged offenses." <u>See</u> <u>Ludecke v. U.S. Marshal</u>, 15

F.3d 496, 498 (5th Cir. 1994) (citations and internal quotation marks omitted).

Ye Gon contends that he was "prosecuted" for purposes of extradition under Article 6

when the Government charged him criminally in the District of Columbia, vigorously pursued

those charges through two years of proceedings, and then elected to dismiss the criminal action

with prejudice.  The Government counters that Article 6 does not apply unless Ye Gon has

actually been "convicted or acquitted."  In essence, the intent imbedded in the Treaty could not

have meant that merely charging a defendant in the United States invokes the protections of

Article 6, and that reading the Treaty so broadly "effects a result inconsistent with the intent or

expectations of its signatories." <u>See</u> <u>Iceland S.S. Co.-Eimskip</u>, 201 F.3d at 458.

The Government filed criminal charges against Ye Gon in this country and pursued them

for two years. It contested the attempts of Ye Gon to obtain a bond for his pre-trial release, and

otherwise actively sought to convict him of the criminal charges. The exact reasons the

Government elected not to prosecute Ye Gon remain unclear. Initially, the Government told the

court it sought dismissal because it had "evidentiary concerns" in light of changed

circumstances, including a recanting witness and another who was reluctant to testify. <u>See</u> ECF

No. 42-2 at Ex. F-82. The Government elaborated on its reasons in a supplemental filing,

explaining:

> As set forth in our motion to dismiss, the [G]overnment has concluded, after
> balancing the relative strengths and weaknesses of the American and Mexican
> prosecutions as well as the strong interest of Mexico in pursuing its charges
> against its own citizens for conduct occurring in Mexico, that it is preferable to
> defer to Mexico's extradition request and allow that country's case to take
> precedence. In reaching this decision, and in setting forth in full the basis for the

> [G]overnment's motion to dismiss these charges, we have in no way meant to
> suggest that we have any doubts about the defendant's guilt or that we believe we
> do not have a provable case. We submit only that, as between the two countries'
> prosecutions, there are sufficient reasons . . . to defer to Mexico's request for the
> return of its citizens for trial there.

ECF No.75, Ex. Q at 7 (Supp. Gov't Mot. to Dismiss dated June 24, 2009). After a hearing, the

presiding judge in the criminal case entered a written order, prepared by the Government,

dismissing the indictment with prejudice, but the court never stated reasons for dismissing the

criminal charges with prejudice.

At least one district court has interpreted Article 6 of the Extradition Treaty and refused

to read it broadly to prevent extradition to Mexico of a defendant who pled guilty to criminal

charges in the United States and faced different criminal charges in Mexico arising from the

same incident. In re Extradition of Montiel Garcia, 802 F. Supp. 773 (E.D.N.Y. 1992), involved

a defendant (Garcia) who allegedly sexually assaulted a seven-year old relative while in Mexico

and took pictures of the victim's exposed genitalia. 802 F. Supp. at 775. Garcia then brought the

camera and film back to the United States, where he attempted to have the pictures developed.

Id. Garcia pled guilty in a New York federal court to transporting child pornography in interstate

or foreign commerce. Id. While the federal criminal charges were pending, Mexico requested

Garcia's extradition to face sexual assault charges. Id. Garcia challenged his extradition to

Mexico claiming that during the course of the plea discussions, the prosecution indicated that if

he did not plead guilty to the transportation charge, the United States would charge him under 18

U.S.C. § 2251(a) with inducing, enticing, or coercing the victim to engage in sexually explicit

conduct. Id. Garcia claimed that Article 6 of the Extradition Treaty barred his extradition to

Mexico because he was subject to prosecution on the child obscenity charges in the United

States, and the prosecutor had threatened to file charges under § 2251(a), but ultimately choose

not to pursue them. Id. at 779. The court rejected Garcia's argument, stating that it "decline[d] to hold that a decision not to prosecute on certain charges is the functional equivalent of a prosecution on those charges for purposes of a double jeopardy claim." Id.

The fundamental purpose of an extradition treaty is to return persons to the requesting country to face trial on certain criminal charges. Extradition treaties are read broadly to achieve this goal.[4] Ye Gon's broad interpretation of Article 6 to prohibit the extradition of any person merely charged, but never tried and convicted or acquitted, would substantially undermine the intent of the treaty. Instead, the interpretation of the treaty by the contracting parties is entitled to great weight. See Iceland S.S. Co.-Eimskip, 201 F.3d at 458; Ordinola, 478 F.3d at 603 (in determining definition of "political offense" in a treaty, "we must afford 'great weight' to the meaning attributed to the provision by the State Department, as it is charged with enforcing" it). Here, the proper reading of the treaty language requires that a person have gone through the criminal process and either been convicted or acquitted. Accordingly, the Court concludes that a prosecution alone is insufficient to trigger the protections of Article 6 and instead that both: (1) a prosecution or a trial is required; and (2) a conviction or an acquittal is required.

Alternatively, Ye Gon argues that dismissal of the federal criminal charges with prejudice is an acquittal because double jeopardy bars prosecuting him again in the United States on the same charges. The Supreme Court held in United States v. Martin Linen Supply Co., 430 U.S. 564 (1977) that for jeopardy to attach in a criminal prosecution which is dismissed prior to trial, the dismissal must represent a "resolution, correct or not, of some or all of the factual elements of the offense charged." Id. at 571. The "key issue" as to whether jeopardy has attached before a

---

[4] Both parties expend great effort in explaining the meaning of Article 6 and how it should read depending upon where punctuation could be inserted. The plain meaning of the language requires no grammatical editing, and the Court will not alter or otherwise change the punctuation in the treaty language just to achieve a particular conclusion.

trial on the merits "is whether the disposition of an individual's indictment entailed findings of fact on the merits such that the defendant was placed in genuine jeopardy by the making of such findings." United States v. Dionisio, 503 F.3d 78, 83 (2nd Cir. 2007). The Fourth Circuit recognized that even a dismissal with prejudice before evidence at trial began was insufficient for jeopardy to attach. United States v. Cooper, 77 F.3d 471, 1996 WL 67171 at *4-*5 (4th Cir. Feb. 15, 1996) (collecting cases holding that double jeopardy did not prohibit a second prosecution where the first prosecution ended before the court heard any evidence, or that a dismissal with prejudice did not implicate jeopardy).

Here, the Government dismissed the federal criminal case against Ye Gon with prejudice pursuant to Rule 48(a). The exact reason the Government dismissed its case is subject to some debate—either its evidence was weak or it chose to defer to a Mexican prosecution of Ye Gon. Ultimately, the reason for this dismissal is of no consequence, because the district court never addressed the elements of the criminal charges in the United States, and Ye Gon was never in jeopardy of a finding of guilt on the merits. In short, Ye Gon was never placed in jeopardy of being convicted and the dismissal did not actually represent a "resolution . . . of some or all of the factual elements of the offense charged." Cf. Serfass v. United States, 420 U.S. 377, 389 (1975) (jeopardy did not attach to a pretrial dismissal of an indictment); Dionisio, 503 F.3d at 83. Thus, this Court declines to hold that the dismissal under Rule 48(a) here is the equivalent of an acquittal under the Treaty. Ye Gon's alternative claim that he was effectively "acquitted" under the Treaty, therefore, is unpersuasive.

### b. Mexico and the United States charged Ye Gon with different offenses, and thus, Article 6, the *non bis in idem* clause, does not apply.

The Government argues that the *non bis in idem* clause does not bar Ye Gon's extradition for the additional reason that the U.S. and Mexican charges are not the same, and Article 6

prevents his extradition to Mexico to face criminal prosecution only for the same criminal offense for which he was prosecuted or tried and either convicted or acquitted. Analysis of this argument requires a comparison of the offenses charged in both countries. Here, the charges are clear enough, but the test to compare them is not well established.

The superseding indictment in the federal criminal case charged Ye Gon with a single count of violating 21 U.S.C. §§ 959, 963, and 960, and 18 U.S.C. § 2, alleging that he aided and abetted "in the manufacture of 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, intending and knowing that it would be unlawfully imported into the United States from Mexico, and elsewhere, outside of the United States . . . ." ECF No. 42-1, Pet. Ex. F at 15. The indictment also includes a forfeiture request. See id.

The Mexican arrest warrant submitted as part of the extradition request charged Ye Gon with:

> 1. Participation in organized crime, for the purpose of repeatedly committing drug crimes and operations with illegal funds;

> 2. Drug-related offenses in the forms of:

>> a. importation into Mexico of psycho tropic substances, namely, N-acetyl pseudoephedrine acetate and ephedrine acetate, derivatives of pseudoephedrine,

>> b. transportation of psycho tropic substances, namely, N-acetyl pseudoephedrine, a derivative of pseudoephedrine,

>> c. manufacture of psycho tropic substances, namely, pseudoephedrine, ephedrine, pseudoephedrine hydrochloride, and methamphetamine hydrochloride,

>> d. possession of psycho tropic substances for the purpose of producing narcotics,

>> e. diversion of essential chemical products, namely sulfuric acid, to produce narcotics;

3. Violations of the Federal Law on Firearms and Explosives in the form of possession of firearms reserved for the exclusive use of the Army, Navy and Air Force; and

4. Money laundering, by himself or through an intermediary, by having custody of funds within Mexico, knowing that the funds have their source in an illegal activity, with the intention to impede knowledge of their source, location, destination, or ownership.

See ECF No. 50, Ex. 1 (Translated Mexican Arrest Warrant) at 6-7. The elements of each

offense in the Mexican arrest warrant are listed after each charge. Id. at 7-9.

The Government asserts that the Court should compare the charges under the well-

recognized "same elements" test announced in Blockburger v. United States, 284 U.S. 299

(1932) for resolving double jeopardy challenges. "Under the Blockburger analysis, successive

prosecutions do not violate the Double Jeopardy Clause if 'each offense contains an element not

contained in the other.'" United States v. Hall, 551 F.3d 257, 267 (4th Cir. 2009) (quoting United

States v. Dixon, 509 U.S. 688, 696 (1993)). The application of Blockburger to the charges from

both countries necessarily yields the conclusion that Mexico has charged Ye Gon with different

offenses from those he faced in the United States. Simply put, the respective nations' offenses

are not identical—each includes an element that the other would not. Thus, if Blockburger is the

proper test, clearly Article 6 would not bar Ye Gon's extradition.

Ye Gon counters, however, that the Blockburger test is inapplicable in the extradition

context and instead argues that the Court must take a broader approach, rather than narrowly

considering the specific elements of each offense. Ye Gon urges the Court to analyze the

different criminal charges under the test articulated in Sindona v. Grant, 619 F.2d 167 (2d Cir.

1980),[5] which he contends more accurately reflects the intent of the treaty drafters.

---

[5] Ye Gon offers specific arguments as to why extradition for the money laundering charges, drug and conspiracy charges, and organized crime charges are all barred by Article 6, although he admits that extradition on the firearms challenges would not be prohibited by Article 6. See D.E. 63, at 35-37; ECF

The extradition court adopted <u>Blockburger</u> as the appropriate test, [6] and rejected <u>Sindona</u>, concluding that the authorities relied on in <u>Sindona</u> have since been rejected in U.S. double jeopardy case law and thus, "the theoretical underpinning of the <u>Sindona</u> decision—that as a matter of domestic law, a same conduct test defines the reach of the double jeopardy clause under American law—has not survived." <u>Ye Gon</u>, 768 F. Supp. 2d at 92. The Government relies heavily on <u>Elcock v. United States</u>, 80 F. Supp. 2d 70 (E.D.N.Y. 2000) to dispute <u>Sindona</u>'s application to analysis of the criminal charges in this case. <u>See</u> ECF No. 63, at 62-67. Notably, other than <u>Elcock</u> and <u>Sindona</u> and a few other less helpful cases, there are few cases on the topic as to the proper test to be applied, [7] and the parties have cited to no cases from either the Fourth Circuit or the D.C. Circuit that directly address this issue. Thus, the proper test to be applied is an open issue.

In <u>Sindona</u>, the Italian government sought the extradition of Michele Sindona, an Italian businessman charged with a number of crimes related to "fraudulent bankruptcy" arising from the collapse of an Italian bank that Sindona had formed from the merger of two banks he controlled. Italy charged that Sindona hid "an enormous mass of the financial assets" of the two

---

No. 71, Reply at 23-26; <u>see especially</u> D.E. 63, at 36 n.9 (not challenging extradition for the firearms charges on this ground).

[6] The extradition court first set forth its conclusion that the <u>Blockburger</u> same elements test should apply in a May 2009 opinion, reported at <u>In re Extradition of Ye Gon</u>, 613 F. Supp. 2d 92, 97-98 (D.D.C. 2009). It then reaffirmed that conclusion in its later final opinion issued in February 2011. <u>Ye Gon</u>, 768 F. Supp. 2d 69.

[7] As noted in a leading treatise on international extradition, as of 2007, there were only "four reported federal decisions and one state decision" referring to the doctrine of *ne bis in idem* and of those, only two— <u>Sindona</u> and <u>Montiel Garcia v. United States</u>, 802 F. Supp. 773 (E.D.N.Y. 1993) "have any substantive discussion whatsoever of the doctrine." M. Cherif Bassiouni, <u>International Extradition: United States Law and Practice</u>, at 756 n.386 (5th ed. 2007). Later in his treatise, Bassiouni also discusses <u>Elcock</u>. The Court's additional research has found some additional reported and unreported decisions, some of which are cited by the Government at ECF No. 65, at 71 n.33. None of these additional cases contain extensive analysis informing the specific issues here.

pre-merger banks and that he financed the business ventures of a group of foreign and Italian corporations by placing funds from the two banks on time deposits with foreign banks and by falsifying balance sheets and books. Id. at 170.

The United States also brought charges against Sindona alleging "many of the same generic forms of fraudulent conduct described in the Italian reports, although in connection with" two United States banks that had also filed for bankruptcy. Id. at 171. The charges included alleged acts and fraudulent transactions between the two Italian banks and the U.S. banks, as well as a conspiracy to harm and defraud American investors. Id. at 171-72. Those charges remained pending without final adjudication on the merits when the Second Circuit considered the appeal of the decision to extradite Sindona to Italy.

Sindona argued that the *non bis in idem* clause in the extradition treaty between Italy and the United States prevented his return to face the same charges filed in the United States. Id. at 176. The Government urged the court to adopt the Blockburger test to guide its *non bis in idem* analysis. The Sindona court rejected the Blockburger test in the context of an international extradition, finding that Blockburger did not mark the outermost protections of the Fifth Amendment protection against double jeopardy, that foreign governments would not be aware of Blockburger, and that criminal statutes in the United States and foreign countries would almost invariably not have the same elements, thus rendering the treaty provision ineffective. Id. at 178. The court affirmed the use of a modified and flexible test of "whether the same conduct or transaction underlies the criminal charges." Id. In describing this test, the court looked to two sources: (1) Justice Brennan's concurrence in Ashe v. Swenson, 397 U.S. 436 (1970), which required combining into one prosecution "all the charges against a defendant which grow out of a single criminal act, occurrence, episode or transaction"; and (2) the Department of Justice's so-

called Petite Policy,[8] which "prohibit[s] a subsequent prosecution 'for substantially the same act or acts.'" Id. In essence, the Sindona court determined that in the context of an international extradition, the rigid comparison of the elements of the offense as required under Blockburger reads the *non bis in idem* clause too narrowly. Instead, it ruled courts must look at the offenses much more broadly to determine whether both countries seek to prosecute the defendant for the same underlying criminal conduct. Ultimately, the Sindona court concluded that the Italian and United States prosecutors sought to punish different conduct:

> The Italian prosecutor charged a gigantic fraud perpetrated on the Italian banks which generated funds that permitted Sindona to engage in allegedly criminal activities in Italy and other countries including the United States. The concern of the Republic of Italy is the harm done to depositors in the Italian banks; that of the United States is the damage to American depositors and investors. The crimes charged in the American indictment, while serious, are on the periphery of the circle of crime charged by the Italian prosecutors. Although the alleged Italian crime may have been the "but-for" cause of the alleged American offenses in providing Sindona with the wherewithal, it is not the crime for which the United States is proceeding against him. . . [The *non bis in idem* provision] of the Treaty could not have been intended to have the consequence that substantial elements of crime should be left unpunishable.

Sindona, 619 F.2d at 179.

Even if the Court were to apply Sindona here, the broader, more flexible test announced in Sindona does not afford Ye Gon the protection he seeks under Article 6. A close view of the particular charges in both the United States and Mexican indictments reveals that the "more flexible" test announced in Sindona is more limited than Ye Gon suggests. He emphasizes the Government's statements—in the federal criminal case against him—that its evidence "would be the same evidence that . . .Mexico would use in its prosecution of the defendant," and that Ye Gon has been "charged with . . . similar offenses in Mexico." Id. at ECF No. 63. Ex. F-19. These

---

[8] Petite v. United States, 361 U.S. 529, 530-31 (1960).

apparent concessions, however, do not mean that the charges in the two countries are the same, even under Sindona.

The single charge in the U.S. indictment is for conspiracy to manufacture and import methamphetamine, a controlled substance, into the United States. This federal criminal charge is "on the periphery of the circle of crime charged by [Mexican] prosecutors," see Sindona, 619 F.2d at 179, and the Mexican charges extend far beyond the narrow focus of the federal criminal case against Ye Gon. Mexico has charged Ye Gon with importing into its country the precursor elements necessary for the manufacture of methamphetamines, money laundering, and the illegal possession of weapons—acts which the United States never attempted to prosecute. Put simply, the acts for which Mexico seeks to prosecute Ye Gon are significantly broader than the U.S. charge. They are not "substantially the same act or acts." Cf. Sindona, 619 F.2d at 178.

Furthermore, the reasoning in Sindona that Italy sought to punish a different harm than the United States applies equally here. The focus of the federal criminal prosecution was on the harm caused by the manufacture of illegal drugs for importation into the United States. The Mexican prosecution, in contrast, had a much broader focus on the importation of the precursors of illegal drugs to use in the manufacture of illegal drugs, the alleged illegal possession of guns, and laundering money to hide this illegal activity in Mexico. So, as in Sindona, the harms to the two countries are distinct.

The Sindona court also noted that neither sovereign could prosecute Sindona for the bulk of the matters charged in the other country's indictment and concluded that the *non bis in idem* clause "could not have been intended to have the consequences that substantial elements of crime should be left unpunishable." Id. at 179. Again, the same is true here. It is unlikely that the United States would have jurisdiction to prosecute Ye Gon for the entire scope of the Mexican

24

charges, e.g., the possession of illegal weapons in Mexico, the importation of precursor

substances for the purpose of manufacturing illegal drugs,[9] and money laundering using Mexican

or other non-United States financial institutions. In short, barring Ye Gon's extradition to

Mexico based upon the federal criminal prosecution would leave "substantial elements of

crime . . . unpunishable." See id. This is a result never intended by the Extradition Treaty drafters

under Article 6.

For all of these reasons, Claim 2 of the Petition is denied.

### 3. Claim 3: The Dual Criminality Requirements of the Treaty are Met.

In his third claim, Ye Gon challenges his extradition on the grounds that the Mexican

charges do not satisfy the Extradition Treaty's "dual criminality" requirement, which generally

requires that Ye Gon's alleged criminal activity be a crime in both nations.

The dual criminality requirement of the Extradition Treaty is set forth in Article 2, which

states:

> 1. Extradition shall take place, subject to the Treaty, for wilful acts which fall within any of the clauses of the Appendix and are punishable in accordance with the laws of both Contracting Parties by deprivation of liberty the maximum of which shall not be less than one year.
>
> 2. . . .
>
> 3. Extradition shall also be granted for wilful acts which, although not being included in the Appendix, are punishable, in accordance with the federal laws of both Contracting Parties,

---

[9] The Government in the federal criminal case suggested that all the drugs Ye Gon was manufacturing were likely destined for the United States. See ECF No. 72-5, Pet. Ex. J, Transcript of September 7, 2007 Bond Hearing, at pages 69-73. The Government based this statement primarily on the fact that Ye Gon allegedly received U.S. currency and that most Mexican drug traffickers send methamphetamine to the United States and not to other countries. But to prosecute Ye Gon, the U.S. Government had to prove that Ye Gon knew or should have known that his methamphetamine would be imported into the United States. The Mexican government, by contrast, could prosecute Ye Gon for any and all of the methamphetamine, regardless of where it was distributed.

by a deprivation of liberty the maximum of which shall not be
less than one year.

   4.  Subject to the conditions established in paragraphs 1, 2 and 3,
       extradition shall also be granted:

       (a) For the attempt to commit an offense; conspiracy to
           commit an offense; or the participation in the execution of
           an offense; . . .

ECF No. 41, Ex. C, Treaty at 4.

   Each charged offense must be evaluated separately to determine if it satisfies dual

criminality. Notably, the law requires that the act charged be criminal in both countries, not that

the offenses are named the same or have the same elements. Collins v. Loisel, 259 U.S. 309, 312

(1922) (dual criminality is satisfied "if the particular act charged is criminal in both

jurisdictions"). Thus, this Court rejects many of Ye Gon's arguments regarding dual criminality,

which erroneously look to the *elements* of each offense, because the question for purposes of

Article 2 is much broader, i.e., whether the *acts* for which Mexico seeks to prosecute Ye Gon

constitute a felony in both countries. See id. Ye Gon relies upon Collins to argue that the only

"acts" that are permitted to be reviewed for purposes of dual criminality are those contained in

the Mexican charging document. But this is really a variation of the argument that the Court

should look to the elements of the particular offenses, since a charging document often might

contain only the limited facts required to set forth the elements of a crime. It is also inconsistent

with the way courts have interpreted Collins. See, e.g., Clarey v. Gregg, 138 F.3d 764 (9th Cir.

1998) (discussing dual criminality under the U.S.-Mexico Treaty and noting that "although some

analogy is required . . . differences between statutes aimed at the same category of conduct do

not defeat dual criminality;" instead, dual criminality is satisfied where both countries' laws are

directed to "the same basic evil") (citations omitted); United States v. Sensi, 879 F.2d 888, 894

(D.C. Cir. 1989) (noting that "the central focus [of the dual-criminality rule] is on the defendant's acts" and that "it is the facts or underlying conduct supporting the charges which must correlate"). Here, the facts found by the extradition court, which this Court must adopt unless clearly erroneous, support the finding that Ye Gon's acts constitute crimes in both countries.

The extradition court, as summarized by the Government in its brief, ECF No. 50 at 29-31, found the following evidence supported the Mexican drug charges:

> (1) in September 2003, Petitioner, [through one of his companies, Unimed Pharm Chem ("Unimed")] contracted with the Chinese company Chifeng Arker to purchase large quantities of an intermediate chemical that could be used to manufacture pseudoephedrine and pseudoephedrine hydrochloride, and to obtain technical assistance from Chifeng Arker in how to manufacture those substances, Findings ¶¶ [1-2], 5-7; (2) Petitioner began to obtain property for, and to build, a pharmaceutical manufacturing plant in Toluca shortly after signing the Chifeng Arker contract, id. ¶ 13; (3) Chinese workers helped with the start-up of that plant, as contemplated by the Chifeng Arker contract, id. ¶ 13; (4) Petitioner lost his lawful ability to import psychotropic substances in July 2005, ¶¶ 11-12; (5) between December 2005 and December 2006, Petitioner unlawfully imported N-acetyl-pseudoephedrine on three occasions and ephedrine acetate (which is a controlled substance under U.S. law) on a fourth, ¶¶ 14-18, 22-26, 29-33; (6) at least one of the unlawful and clandestine shipments of N-acetyl-pseudoephedrine was sent to the Toluca plant, ¶ 28; (7) that chemical, when treated with heated hydrochloric acid, produces pseudoephedrine hydrochloride, a controlled substance under Mexican and U.S. law, ¶ 36; (8) according to workers at the plant, the plant received daily shipments of a white hard chemical substance that was heated with hydrochloric acid to obtain a white crystalline powder, ¶ 35; (9) also according to plant workers, at the end of the day, that powder was bagged and driven away by Ye Gon or his personal driver, ¶ 46; (10) according to a Unimed employee, Ye Gon's driver was seen entering the premises of Unimed's warehouse and office in Mexico City after work hours and disabling the security cameras, ¶ 47; and, (11) in a search of Ye Gon's office at the Unimed warehouse in March 2007, law enforcement agents found a dozen bags of a white powder substance that was tested and found to be pseudoephedrine hydrochloride, ¶48.

In addition, the extradition magistrate credited evidence that Ye Gon tried to conceal his manufacturing activities: i.e., according to a former Unimed

accountant, the product from the Toluca plant was not recorded in Ye Gon's inventory, ¶50; according to the accountant and other Unimed employees, transactions involving the plant were conducted in cash, and envelopes of cash from apparent sales of that product were delivered personally to Ye Gon, ¶¶ 52-53. A search of the plant discovered, on the equipment and work surfaces, traces of chemicals that could be used in the production of methamphetamine, such as pseudoephedrine, ephedrine, and ephedrine acetate, and the equipment in the plant could be used to produce such psychotropic substances, ¶¶ 40-42. Ye Gon did not have permission to manufacture psychotropic substances of any kind. ¶¶ 9, 43. Those activities are fully consistent with the importation and manufacturing contract that Ye Gon entered into with Chifeng Arker in September 2003, before he lost the ability to import the necessary chemicals lawfully.

ECF No. 50 at 29-31 (citing to numbered paragraphs in "Findings of Fact," Ye Gon, 768 F. Supp. 2d at 73-79).

The Mexican weapons charges were based on the seizure of firearms from Ye Gon's home and office. "First, firearms were seized from a locked, hidden room off the master bedroom in Ye Gon's home, where [agents also discovered] millions of U.S. dollars and other currency. There, Mexican authorities seized an AK-47 assault rifle, two 9mm semi-automatic pistols, and a .45-caliber pistol. Second, firearms were seized from Ye Gon's private office in Mexico City, where Mexican authorities also found 12 bags of unauthorized pseudoephedrine hydrochloride as well as a 9 mm pistol." Ye Gon, 768 F. Supp. 2d at 86.

With regard to the criminal conspiracy charge, the extradition court found that Ye Gon "worked closely with four other" named individuals and that there was probable cause "to believe that not only did Ye Gon act in concert with these individuals to violate Mexican drug and money laundering laws, but that he directed the activities of this criminal conspiracy. Id. at 84; see also id., Findings of Fact at ¶ 65.

Finally, as to the money laundering charges, the extradition court concluded that there was probable cause to believe Ye Gon had "engaged in money laundering of proceeds from his

illegal drug activity, in part by hiding millions of dollars in a closet, and in part by funneling cash proceeds through Mexican money exchanges in order to pay suppliers of equipment and raw materials for his unlawful chemical manufacturing plant in Toluca, Mexico. This accumulation of unexplained wealth [occurred] at the same time that Ye Gon was engaged in illegal drug importation and manufacturing; his surreptitious handling of receipts and payments involving the illegal Toluca plant; plus his use of Mexican money exchanges to disguise payments to Chifeng Arker." Id. at 86; see also id., Findings of Fact at ¶¶ 49-63.

### a. Drug charges

Ye Gon argues that dual criminality related to the drug charges is lacking for a number of reasons. First, he contends that N-acetyl-pseudoephedrine, the substance found in the first three unlawful shipments, is not a controlled or listed substance under United States law. He further notes that the U.S. Government itself has admitted that N-acetyl pseudoephedrine is not a controlled or listed substance in the United States. Second, he argues that his expert chemist stated that the Mexican test result, which found ephedrine acetate in the fourth shipment, does not conclusively prove that the substance was the kind of ephedrine acetate that is listed as an illegal chemical under U.S. law.

Ye Gon argues that the extradition court erred in concluding that Mexico's charges were sufficiently analogous to similar provisions in American law that dual criminality was satisfied. He contends that "[t]his 'close enough' approach failed to honor the legal requirements of dual criminality." ECF No. 63 at 43-44.

As to the bags of pseudoephedrine hydrochloride found in Ye Gon's office in Mexico City, Ye Gon relies on the fact that the quantity of these items was never alleged. He thus argues that the possession of those bags could, under United States laws, be a charge of simple

possession, which would only be a misdemeanor offense in the United States, and thus would not satisfy dual criminality.

The Government counters that the extradition court offered "two equally valid reasons" why dual criminality was satisfied for the drug offenses. ECF No. 65 at 32. First, the evidence showed that Ye Gon engaged in the unlawful importation, transportation, and possession of N-acetyl pseudoephedrine and ephedrine acetate to manufacture other prohibited substances. Those charged acts are punishable as felonies under 21 U.S.C. §§ 843(a)(6) and (a)(7), which make it unlawful to import "any . . . chemical" which may be used to manufacture a "listed chemical." Affirming the extradition decision on this basis requires an implicit rejection of the testimony of Ye Gon's chemistry expert that the ephedrine acetate found in the fourth shipment was not a salt or isomer of ephedrine that would be listed as a chemical under United States law.

Second, the Government contends that the extradition court properly concluded that even if none of the illegal shipments contained a controlled substance or listed chemical under U.S. law, both countries have drug laws directed at the same "basic evil" and both seek to regulate the importation of chemicals that can readily be converted to methamphetamine precursors and ultimately methamphetamine.

Having reviewed the record and the arguments of the parties, the Court concludes that the first ground given by the extradition court is sufficient to establish dual criminality for the drug charges. See ECF No. 41, Ex. B, at 24-29 n.10. That is, there was enough evidence to find that the Ye Gon's acts forming the basis of the Mexican drug charges would violate 21 U.S.C. §§ 843(a)(6) and (a)(7).[10] Thus, dual criminality exists for all the drug charges, including the

---

[10] Ye Gon contends that the extradition court misquoted the U.S. law's requirements, by omitting the crucial element that the defendant import "knowing, intending or having reasonable cause to believe, that [the precursor drug] will be used to manufacture a controlled substance or listed product." ECF No. 63 at 47 n.12. The facts as found by the extradition court, to which this Court defers, could clearly give rise to

charge of diverting sulfuric acid for the unlawful production of psychotropic substances.[11]

### b. Possession of Firearms[12]

Ye Gon claims that the Mexican weapons charges are not crimes under United States law, because they are brought under laws that criminalize the mere possession of certain weapons. He also contends that the only evidence linking the guns to illegal drugs is that four firearms were found near money that was allegedly drug proceeds, and a fifth gun was found near bags of a drug in a quantity that would give rise only to a simple possession charge in the United States. Ye Gon further asserts that even if the guns were found near drugs or drug money, the requirement that the firearm be used "in furtherance of a 'drug trafficking crime'" under 18 U.S.C. § 924(c) is not met here. Thus, the acts charged do not constitute a felony under United States laws. Moreover, the "in furtherance of" requirement is not a part of the Mexican charges.

The Government argues that the evidence credited by the extradition court sufficiently establishes that the weapons were near drug money and were in the same office in which illegal substances were found. The court also found that there was a silencer among the arsenal of weapons and an obscured serial number on the handgun in the office, all of which support the

---

an inference that Ye Gon knew or intended that the importation of the substance that is not otherwise illegal in the United States would be used to manufacture a controlled substance or listed product. Thus, the drug charges have a U.S. felony counterpart.

[11] In addition to asserting individual challenges to the dual criminality of most of the remaining charges, Ye Gon also challenges the dual criminality of all of the remaining charges as a group on the grounds that all the remaining charges are dependent on the drug charges being a valid predicate offense. That is, the money laundering depends on the money being the proceeds of illegal drugs, organized crime depends on illegal drug dealing and money laundering, and the only theory of dual criminality for the firearms charges requires a nexus and connection between illegal drugs and the firearms. Because the Court concludes there is dual criminality as to the drug charges, the Court rejects Ye Gon arguments that are based on the "dependence" of the other crimes.

[12] At the extradition hearing, the Government represented to the magistrate that weapons charges also constituted a crime under the laws of the District of Columbia because one of the weapons Ye Gon possessed was an AK-47, which is a prohibited "machine gun." The Government does not rely upon District of Columbia law as a basis for a finding of dual criminality, relying instead only on federal law. See ECF No. 65, Resp. at 45.

inference that the weapons were used or intended to be used to protect the contraband. See, e.g., United States v. Perry, 560 F.3d 246, 254 (4th Cir. 2009) (affirming § 924(c) conviction and noting the factors that should be considered as to whether a firearm was used in furtherance of a drug trafficking crime, include accessibility of the firearm, the proximity to drugs or gun profits, the type of weapon, whether it is stolen, and the circumstances under which the gun is found).

Ye Gon is alleged to have possessed a number of weapons that were illegal in his country, and those weapons were found in close proximity to illegal drugs and substantial amounts of cash, which amounts are alleged to be the proceeds of drug trafficking. Under Fourth Circuit precedent and cases in other circuits, these facts would be sufficient to constitute a Section 924(c) violation. See, e.g., Perry, 560 F.3d at 255 (weapons found in close proximity to drug paraphernalia sufficed to support § 924(c) conviction); United States v. Snow, 462 F.3d 55, 63 (2d Cir. 2006) (evidence supported 924(c) charge where illegally possessed guns were found in apartment bedroom in the same dresser as $6,000 cash and where drug paraphernalia and trace amounts of drugs were in the kitchen of the same apartment); id. at 63 n.8 (collecting similar authority). For all of these reasons, the Court concludes that dual criminality exists with regard to the weapons charges.

### c. Money Laundering Charge

Ye Gon argues that dual criminality is not met for several reasons as to the money laundering charge. First, he challenges the reliance on facts that showed money transfers, because those acts were not those "charged" in Mexico's offense, which simply alleges that Ye Gon and others "maintained funds in Mexican territory." Second, he contends there was no evidence that Ye Gon or others knew that any of the funds maintained had an illegal source.

Third, and most importantly, he claims that dual criminality is lacking because the Mexican money laundering statute does not require a financial transaction, while the U.S. statute does.

Again, Ye Gon's arguments place an undue emphasis on the elements of the offense, where dual criminality does not require identical elements of the offense. Instead, a dual criminality analysis simply requires that the acts or underlying conduct are criminal in both places. See Sensi, 879 F.2d at 895 ("[t]he central focus [of the dual-criminality rule] is on the defendant's acts.") The act of hiding the proceeds of illegal drug activity is illegal in both countries. Thus, dual criminality is met for this offense as well.

For the foregoing reasons, Claim 3 of the Petition is denied.

### 4. Claim 4: Extradition Is Not Barred By Articles 3 or 10 of the Treaty Due to the Alleged Procedural Insufficiency of the Evidence.[13]

Ye Gon's fourth claim is essentially that the evidence presented to the extradition court does not meet the procedural requirements set forth in the Treaty. He relies on Articles 3 and 10 of the Treaty. Article 3 provides:

> Extradition shall be granted only if the evidence be found sufficient according to the laws of the requested Party . . . to justify the committal for trial of the person sought if the offense of which he has been accused had been committed in that place.

ECF No. 63, Ex. C, Treaty. For a person who has not yet been convicted (such as a conviction in absentia), Article 10, Subdivision 3, also requires that the request for extradition be accompanied by:

> a)      a certified copy of the warrant of arrest issued by a judge or other judicial officer of the requesting Party;
>
> b)      Evidence, which, in accordance with the laws of the requested Party, would justify the apprehension and commitment

---

[13] Although the heading in the petition references Articles 2 and 10, Ye Gon quotes to and is clearly relying on Article 3. See, e.g., ECF No. 63, at 63.

for trial of the person sought if the offense had been committed
there.

ECF No. 63, Ex. C at 8-9.

Citing to these two provisions, Ye Gon argues that much of the evidence presented by the

Government at the extradition hearing is not sufficiently reliable because it consists of excerpts

of exhibits, rather than complete copies, and because the exhibits themselves do not indicate who

determined what portions would be "relevant," what grammatical changes would be, or what

constituted a reliable "summary." ECF No. 63 at 63-65. Ye Gon repeatedly points to the

testimony of his expert witness, Professor Saltzburg, for the proposition that, in the absence of

the background information regarding who made the changes and what changes were made from

the originals, such excerpts are inherently unreliable.

Ye Gon also relies on Professor Saltzburg's testimony that the quoted portion of Article

10, Subdivision 3 requires something more than a simple summary of what is in the arrest

warrant and that the arrest warrant alone is insufficient. ECF No. 63 at 65-66. Ye Gon claims that

subsections (a) and (b) set out "separate and independent requirements" and that they were not

met here.

Ye Gon further appears to challenge the accuracy of some of the translations of

documents in Spanish and, in particular, the fact that some supplemental documents were sent

without any English translations at all. Finally, he contends that the extradition court erred in

finding that "all of the evidence submitted by Mexico has been authenticated in accordance with

18 U.S.C. § 3190" and that "complete statements of witnesses" were "certified to be

authenticated by a Department of State official." To the contrary, Ye Gon contends, Section

3190's automatic authentication does not apply, because the certificate, not a copy, had to be

offered as proof and never was.

34

Summarizing all of his procedural insufficiency arguments, Ye Gon contends:

> At bottom, the Government's extradition [sic] submissions failed
> to satisfy the procedural requirements of the U.S.-Mexico
> extradition treaty – both with respect to Article 10 Section 3's
> requirement that there be evidence separate from the arrest
> warrant, and Article 3's requirement that the evidence be found
> "sufficient according to the laws of the requested Party." Mexico's
> almost universally-excerpted submissions did not satisfy Article 3,
> and its later submissions were never certified by an original
> certificate of the U.S. Department of State, with complete versions
> of Mexico's accounting and forensic reports also never submitted
> at all "accompanied by a translation in the language of the
> requested Party," as required by Article 10 Section 5. The
> Magistrate Judge erred in considering and relying on this evidence,
> in violation of the U.S.-Mexico treaty, and in denying Petitioner
> such process. The procedural expectations for extradition set forth
> in Article 3 (entitled "Evidence Required") and Article 10 (entitled
> "Extradition Procedures and Required Documents") were not
> satisfied, and the procedural flaws in Petitioner's extradition
> hearing warrant habeas relief under § 2241 & 2243.

D.E. 63, Pet. at 74-75, ¶ 186.

Ye Gon has failed to make a showing that there was error as to procedural sufficiency.
The Government correctly notes that the evidentiary requirements in extradition hearings are
minimal. See Haxhiaj, 528 F.2d at 285-86 ("[T]he magistrate judge has a great amount of
latitude in considering evidentiary support for an extradition request."). Indeed, the Supreme
Court has recognized that "unsworn statements of absent witnesses may be acted upon by the
committing magistrate, although they could not have been received by him under the law of the
state on a preliminary examination." Collins, 259 U.S. at 317. Cases applying that principle have
allowed extradition on evidence consisting of unsworn statements that do not comply with the
inapplicable Federal Rules of Evidence. See, e.g., Afanasjev v. Hurlburt, 418 F.3d 1159, 1163-66
(11th Cir. 2005) (unsworn bill of indictment that was over 100 pages long and contained
"detailed" summaries of witness statements and other hearsay evidence was "sufficiently reliable

evidence" on which to base probable cause finding); <u>Zanazanian v. United States</u>, 729 F.2d 624, 627 (9th Cir. 1984) (extradition court could rely on unsworn hearsay because "[n]either the applicable treaty nor United States law requires evidence offered for extradition purposes be made under oath"); <u>Bovio v. United States</u>, 989 F.2d 255, 259-61 (7th Cir. 1993) (sworn statement from foreign investigator recounting evidence was sufficient to establish probable cause, even though his statement did "not indicate how he obtained the information on which the [witness] statements are based, whether witnesses were under oath, and whether there are any original notes or recordings of witness interviews"); <u>In re Extradition of Saenz</u>, 2008 WL 366135, at *15 (S.D. Cal. Feb. 8, 2008) (addressing extradition request from Mexico and concluding that it was proper to "consider all of the . . . evidence in its probable cause determination, whether sworn or unsworn, or whether the evidence consists of an actual statement given by a witness or a summary thereof").

The Government is not required to provide certified translations of the charging documents. <u>See, e.g.</u>, <u>In re Extradition of David</u>, 395 F. Supp. 803, 806 (D. Ill. 1975) ("[T]ranslations must be presumed to be correct unless [the fugitive] presents some convincing evidence otherwise."); <u>Ntakirutimana v. Reno</u>, 184 F.3d 419, 430-31 (5th Cir. 1999) (if translated documents are authenticated in accordance with 18 U.S.C. § 3190, an "extradition court need not independently inquire into the accuracy of the translations submitted with a formal extradition request, because such a requirement would place an unbearable burden upon extradition courts and seriously impair the extradition process") (internal quotation and citations omitted). Instead, the accuracy of translations are presumed to be correct, unless shown to contain material errors. <u>See</u> <u>David</u>, 395 F. Supp. at 806. In sum, the Court concludes that the

evidence is sufficiently reliable to support a finding of probable cause and therefore **DENIES**

Claim 4.

### 5. Claim 5: The Extradition Court's Finding of Probable Cause Was Not Clearly Erroneous.

Ye Gon's fifth challenge is essentially a challenge to the evidence against him, which he

claims shows a lack of probable cause. Having reviewed the record and reviewed both Ye Gon's

specific challenges and his more general challenges to probable cause, the Court disagrees. Ye

Gon acknowledges the deferential standard this Court must give to the factual findings of the

extradition court. See Haxhiaj, 528 F.3d at 287. Ye Gon's arguments in this claim, however,

largely ignore the deference required. Ye Gon may be innocent of the Mexican charges against

him, and he will have the opportunity to vigorously contest those charges in the country where

they have been brought. But neither the extradition court's role, nor this Court's role, is to

evaluate or weigh the evidence proffered in support of the charges. Instead, the extradition

court's role is simply to ask whether there is probable cause to support the charges and this

Court's role is to determine whether there is "any evidence" to support a finding of probable

cause. See id. Having fully reviewed the record, the Court concludes that the evidence submitted

supports the finding of probable cause. Accordingly, the Court **DENIES** Claim 5.

### 6. Claim 6A: This Court Does Not Have Jurisdiction to Consider Whether The Risk of Torture to Ye Gon Should Bar His Extradition.

Ye Gon's Claim 6A, which is that he would be subject to torture if extradited, is

foreclosed by the Fourth Circuit's decision in Mironescu v. Costner, 480 F.3d 664, 670-71 (4th

Cir. 2007).[14] In Mironescu, the Fourth Circuit first noted that the Convention Against Torture

---

[14] There is (or at least was) a split in the circuits on this issue. See, e.g., Prasoprat v. Benov, 622 F. Supp. 2d 980, 984 -85 & n.3 (C.D. Cal. 2009) (noting split); Omar v. Geren, 689 F. Supp. 2d 1, 5-6 (D.D.C. 2009) (noting split and that Fourth Circuit and D.C. Circuit follow the same rule); but see ECF No. 84, US Resp. to Claim 6A, at 14-15 (discussing issue and noting that the sole circuit on the other side of the

("CAT"), which is not self-executing, is implemented only through the FARR Act. [15] See also

Turkson v. Holder, 667 F.3d 523, 526 n.3 (4th Cir. 2012) (noting same). The Mironescu Court

concluded that Section 2242(d) of the FARR Act deprived the district court of jurisdiction to

consider the petitioner's claims that he would be tortured if extradited. 480 F.3d at 675; see also

Munaf v. Geren, 553 U.S. 674 (2008) (in addressing claims of military detainees in Iraq who

challenged their transfer to Iraqi officials for prosecution, it would be improper for courts to

review the executive branch's determination regarding the likelihood of torture after transfer,

because it was a decision for the "political branches," not the courts). [16] Based on these

authorities, the Court **DENIES** Claim 6A.

Ye Gon has requested that, if this Court denies his torture claim at this time, that it do so

without prejudice to his ability to raise such arguments at a later time in any subsequent

proceedings. (D.E. 82 at 10.) The Government, although for different reasons, seems to agree

that a dismissal without prejudice would be appropriate. That is, the Government contends that

Ye Gon's claim is premature in any event because it could be mooted by the Secretary of State's

extradition decision, which has not yet been made. It does not seem that a denial of this claim

here would preclude the Secretary of State from considering the claim, and thus the Court is

uncertain what benefit, if any, a denial without prejudice would serve, but nonetheless **DENIES**

---

split was the Ninth, who recently issued Trinidad y Garcia v. Thomas, 683 F.3d 952 (9th Cir. 2012), which overruled its prior case to the extent that it held courts had the ability to review the substance of the Secretary's decision to extradite in the face of a torture claim.) Any circuit split aside, this Court is bound by the Fourth Circuit's pronouncements on the subject, which are clear.

[15] Foreign Affairs Reform and Restructuring Act, Pub. L. No. 105-277, Div. G, 112 Stat. 2681-82 (Oct. 21, 1998).

[16] Ye Gon cursorily asserts that, to the extent Mironescu bars his claim regarding torture, that bar violates the U.S. Constitution's Suspension Clause and that issue was never addressed by the Mironescu court. Respondents counter that the Suspension Clause is not violated because the writ of habeas corpus never existed to begin with; thus, no right to habeas was ever "suspended." See D.E. 84, Resp. to Claim 6A at 22-24). Based on Ye Gon's failure to adequately brief this argument, the Court does not consider it.

the claim without prejudice to Ye Gon's ability to raise it before the Secretary of State in subsequent proceedings.

### 7. SEALED Claim 6B: Ye Gon Is Not Entitled To Relief On Claim 6B.

In his final claim, Claim 6B, Ye Gon seeks relief from extradition on the grounds that there has been outrageous government conduct in this case constituting a due process violation, which he contends has put his life and the lives of his family members at risk and also demonstrates that the Mexican government cannot be trusted to protect him if he is extradited. The Court has carefully considered Ye Gon's final claim and the arguments of the parties concerning it. There is no evidence in the record that the allegedly "outrageous conduct" committed here was by, or on behalf of, any U.S. official. Accordingly, it does not give rise to a due process claim under the United States Constitution, which does not govern the conduct of foreign officials. See Prushinowski v. Samples, 734 F.2d 1016, 1018 (4th Cir. 1984) ("It is established that constitutional questions of deprivation of rights are addressed only to the acts of the United States Government and not to those of a foreign nation, at least for purposes of determining questions of extraditability."); Plaster, 720 F.2d at 349 n.9 (habeas petition challenging extradition "must claim that the conduct of our government is violating his constitutional rights").

This claim is therefore **DENIED.**

## III. CONCLUSION

For the reasons set forth supra at 3-5, Respondents' Motion to Dismiss Certain Federal Respondents, ECF No. 102, is hereby **GRANTED** and Attorney General Eric Holder, Jr., U.S. Marshal Edwin D. Sloane, and the U.S. Secretary of State are hereby **DISMISSED** from the case.

Additionally, for the reasons set forth above and for the reasons set forth in the Memorandum Opinion granting in part and denying in part Petitioner's Motion to Amend/Correct, entered this same day, the Court **DENIES** Ye Gon's Amended Petition for a Writ of Habeas Corpus Pursuant to 18 U.S.C. § 2241 (ECF Nos. 63, 82 (Claim 6A) and 91 (Claim 6B)). The third part of Claim 1 and Claim 6A are **DENIED WITHOUT PREJUDICE** and the remaining claims are **DENIED WITH PREJUDICE**.

Additionally, for the reasons set forth in its Memorandum Opinion granting the motion for stay, entered this same day, the Court hereby **STAYS** the extradition of Ye Gon during the pendency of his appeal before the United States Court of Appeals for the Fourth Circuit.

**ENTER**: This *17th* day of January, 2014.

James C. Turk
Senior United States District Judge